# STEVENS & LEE
### LAWYERS & CONSULTANTS

620 Freedom Business Center, Suite 200
King of Prussia, PA  19406
(610) 205-6000 Fax (610) 337-4374
www.stevenslee.com

| | |
|---|---|
| Direct Dial: | (610) 205-6039 |
| Email: | ljr@stevenslee.com |
| Direct Fax: | (610) 371-7977 |

September 22, 2016

**VIA ECF**

Honorable Vincent L. Briccetti
United States Courthouse
300 Quarropas Street, Room 630
White Plains, NY 10601

**Re:  *Mohammed Zafar Iqbal v. Teva Pharmaceuticals USA, Inc.*;**
**Case No. 7:16-cv-03464-VB**

Dear Judge Briccetti:

I am counsel for Defendant, Teva Pharmaceuticals USA, Inc. ("Teva"), and I am writing in response to the letter filed earlier today on behalf of Mr. Iqbal (Docket No. 21). In his request, Mr. Iqbal seeks to set up and knock down a straw man, asserting an incorrect reason for his termination and attempting to connect that reason to the fact that he did not receive a severance payment.[1]  Incredibly, however, Mr. Iqbal's discussion omits any reference to the primary reason for the objection at issue: Mr. Iqbal's refusal to enter into an appropriate protective order to protect proprietary and confidential information.

At issue is Mr. Iqbal's claim for a severance payment under Labor Law § 198(1-a) as well as other related non-payments, but ostensibly his claim for severance benefits which Teva admittedly did not provide given the circumstances of his separation.  It appears from Mr. Iqbal's letter that he incorrectly believes that the only reason he was not paid a severance when his employment was terminated is Teva's conclusion that he was terminated for cause.  It also appears that Mr. Iqbal incorrectly believes that he was terminated for requesting "prepayments."  As explained below, both of these propositions are incorrect, and ultimately irrelevant.

---

[1] Mr. Iqbal's portion of the letter contains several pages of alleged "facts' that are not supported by the record and which Teva disputes.  However, because those facts are wholly irrelevant to the Court's determination of the issue before it, Teva shall not address those inaccuracies in this letter unless otherwise directed to do so by the Court.

Philadelphia  •  Reading  •  Valley Forge  •  Allentown  •  Harrisburg  •  Lancaster  •  Scranton
Wilkes-Barre  •  Princeton  •  Charleston  •  New York  •  Wilmington
A PROFESSIONAL CORPORATION

SL1 1432795v1 030421.00653

## STEVENS & LEE
### LAWYERS & CONSULTANTS

Honorable Vincent L. Briccetti
September 22, 2016
Page 2

### Teva's Pomona Facility and Mr. Iqbal's Duties in R&D

A brief description of Teva's operations and Mr. Iqbal's position might assist the Court in understanding the issue. Teva manufactures generic pharmaceutical drugs by scientifically engineering or "copying" the chemical composition of existing branded drugs. To accomplish that, Teva (and other generic drug manufacturers) often obtain branded drugs from pharmacies and other vendors ("Suppliers") once the patents on those branded drugs expire or are about to expire. Mr. Iqbal worked in Teva's Pomona, New York Research and Development facility as the Associate Director of Process Engineering, where his responsibilities included, among other things, obtaining branded drugs from Suppliers at the lowest price possible.

### Iqbal's Termination

As part of a highly regulated and competitive industry, Teva maintains a Code of Conduct to ensure compliance with the many laws and regulations to which it is subject. An important provision in the Code of Conduct requires employees to follow a reporting procedure when there is a possibility of a conflict of interest arising out of their position with Teva. The Code of Conduct is enforced in part by a Teva business unit called the Office of Business Integrity (OBI), whose primary mission is to objectively and confidentially investigate reports of Code of Conduct violations, as well as alleged violations of the laws and regulations in the states and countries in which Teva operates.

In late 2015, Teva's auditors noticed that certain Suppliers from which Teva had obtained branded drugs were "prepaid" for those drugs[2] in circumstances that were inconsistent with Teva's normal practice. As a matter of course, the investigators alerted OBI, which conducted an investigation headed by OBI Investigator James Mikalic, a former Federal Bureau of Investigation (FBI) Supervisor and Homeland Security Executive now working for Teva.

Although the issue involved the prepayments, during his investigation Mr. Mikalic discovered that Mr. Iqbal had: 1) failed to properly disclose his ownership interest in a Supplier to which he directed substantial Teva business; and (2) improperly used Teva resources, including email, to conduct business for at least nine outside companies he owned. Both of these actions violated specific provisions in the Code of Conduct.

---

[2] In other words, someone at Teva authorized payments to the vendors before the drugs were delivered.

# STEVENS & LEE
## LAWYERS & CONSULTANTS

Honorable Vincent L. Briccetti
September 22, 2016
Page 3

At the conclusion of the investigation, based on Mr. Iqbal's failure to properly report the conflict of interest and his improper operation of outside businesses using Teva resources (and <u>not</u> simply because he had requested prepayment to the Supplier), Mr. Iqbal's employment was terminated.   Mr. Iqbal was not offered a severance in connection with his termination, and he did not execute a waiver or release.

<u>The Severance Policy</u>

Teva's Severance Policy, which is attached as Exhibit A, states that "[i]ndividual severance and termination situations will be managed on a case-by-case basis" and that a severance will typically be offered only in situations involving an elimination of a position, a reduction in force, or in "[o]ther instances, in Teva's discretion, as determined by the individual situation." Exhibit A at 1 (Teva-240). The Policy goes on to state: "While Teva reserves the right to determine, on a case-by-case basis, whether an individual employee is eligible for severance pay, the following circumstances will make an individual ineligible to receive severance benefits from Teva: . . . Termination for misconduct, or violation of company policies, procedures, practices or Ethics and Code of Conduct." (*Id.*).

The discretionary nature of the Severance Policy is re-emphasized on the last page of the Policy, which states: "Teva reserves the right to change, alter, revise or revoke any or all provisions of this policy, including questions of eligibility and the amount of any severance benefits payable hereunder, in its sole discretion, and at any point now or in the future." (*Id.* at 4 [Teva-243]).

The Policy also provides: "Receipt of severance benefits, including severance pay . . . are contingent on the eligible employee . . . executing, abiding by and not rescinding a waiver and release in the form provided by Teva. **In no event will an employee who fails to execute the waiver and release be eligible for severance benefits under this policy.** (*Id.* at 2 [Teva-241]) (emphasis added).

<u>Mr. Iqbal Refuses to Enter Into a Protective Order</u>

# STEVENS & LEE
## LAWYERS & CONSULTANTS

Honorable Vincent L. Briccetti
September 22, 2016
Page 4

The generic drug industry is highly competitive, and Teva takes many steps to protect its confidential and proprietary information such as the identify of branded drugs it seeks to obtain and the payment terms it offers Suppliers for those drugs.[3]

On July 29, 2016, Teva's counsel forwarded to Mr. Iqbal's counsel a proposed Agreed Protective Order that, once executed, would enable Teva to produce documents and provide information in this lawsuit containing otherwise confidential and proprietary information. Inexplicably, Mr. Iqbal's counsel has repeatedly refused to sign the Agreed Protective Order or propose an alternative order, instead offering arbitrary reasons for his refusal including: (1) the proposed order is too long (although he declined to propose deletions); (2) Mr. Iqbal wishes to be free to discuss Teva's confidential information in order to vindicate himself; and (3) protective orders are not typically used in New York State Court and he is not sufficiently familiar with their use in federal court. None of these reasons is an appropriate basis to refuse to enter into an appropriate protective order to facilitate the free exchange of discovery. As a result, Teva has been forced to spend substantial time redacting documents before they were produced, and its witnesses must be careful not to disclose confidential or proprietary information during depositions. Further, as explained below, the lack of a protective order was one of the key reasons for the objection being made at deposition and at issue in this letter.

## Ms. Lakis' Deposition

During Ms. Lakis' deposition she was asked when she first met Mr. Mikalic, and she replied that it was in connection with another unrelated OBI investigation. In response, Mr. Iqbal's attorney, Mr. Peska, stated: "I'm not going to ask you the name of the person. What was the basis or the general basis for the investigation? Was it similar to these allegations, conflict of interest, or what was the underlying basis for the investigation?" *See* Excerpt from Lakis Transcript, attached as Exhibit B, at 145:12-17. Ms. Lakis responded: "[N]o. **It was different.** [I]t had to do with the . . . services of an outside vendor and the, um, pay schedule arrangements that were made between the vendor and Teva." (Ex. B at 145:21 – 146:3). Ms. Lakis then testified that the other investigation concluded that the employee's authorization or request for prepayments had been improper. (Ex. B at 146:10).

Mr. Peska pestered the employee that was the subject of the unrelated investigation, along with the details of that investigation. Counsel for Teva objected

---

[3] These steps include requiring employees in the Research and Development department, such as Mr. Iqbal, to sign Confidentiality Agreements during their employment.

# STEVENS & LEE
### LAWYERS & CONSULTANTS

Honorable Vincent L. Briccetti
September 22, 2016
Page 5

on the basis that, in addition to having no conceivable relevance in this case, the unrelated OBI investigation is confidential, and the lack of an appropriate protective order precludes Ms. Lakis from disclosing the details.  (Ex. B at 148:1024).

<u>The Court Should Decline to Require Ms. Lakis to Return for a Second Deposition.</u>

The Court should decline to require Ms. Lakis to return for a second deposition to answer questions about a confidential investigation of another employee that has no relevance in this case (other than the fact that it happens to involve the same OBI investigator) for the following reasons:

- Contrary to the assertions in Mr. Iqbal's portion of this letter, his request for prepayments was <u>not</u> the basis for his termination.  Rather, Mr. Iqbal was terminated for failing to properly disclose his ownership interest in a vendor and for conducting outside business using Teva resources.[4]  Therefore, an unrelated investigation involving prepayments has no relevance here;

- Mr. Iqbal has unreasonably refused to agree to a protective order that would enable Teva to disclose confidential and proprietary information such as that surrounding the unrelated OBI investigation.  Regardless of the relevance of the unrelated OBI investigation (which Teva strongly disputes), Teva should not be required to disclose confidential information in the absence of a protective order;

- The Severance Policy makes it crystal clear that any severance payment is at Teva's discretion, and in no case is an at-will employee such as Mr. Iqbal entitled to severance as a matter of right.  Cases interpreting Labor Law § 198 have held consistently unambiguously that where, as here, a payment is offered on a discretionary basis, it may not be part of a claim for unpaid wages under Labor Law § 198.  *See, e.g., Kaplan v. Capital Company of America LLC*, 747 N.Y.S.2d 504, 505, 298 A.D.2d 110, 111 (N.Y. app. Div. 2002); *Modugu v. Continuum Health Partners, Inc.*, 771 N.Y.S.2d 118, 119, 3

---

[4] Even if prepayment had been a basis for termination, Mr. Iqbal's termination for these other violations of the Code of Conduct would preclude his eligibility for severance under the terms of the Severance Policy.

## STEVENS & LEE
### LAWYERS & CONSULTANTS

Honorable Vincent L. Briccetti
September 22, 2016
Page 6

A.D.3d 422, 423 (N.Y. App. Div. 2004).  This is yet another reason why Mr. Iqbal's attempt to prove that he was not terminated for cause is fruitless.

For these reasons, Teva respectfully requests that the Court rule that Ms. Lakis need not submit to a second deposition in order to answer questions about an unrelated and confidential matter that has no bearing on this case.[5]

Respectfully submitted,

STEVENS & LEE

LARRY J. RAPPOPORT

LJR:
Enclosures
cc:   Adam M. Peska, Esq. (via ECF)

---

[5] *Wultz v. Bank of China*, 979 F.Supp.2d 479 (2013), which Mr. Iqbal cites in his letter, is inapposite.  That case involved claims of attorney-client privilege with regard to document production and the sufficiency of a privilege log, issues that are not present here.  *Wultz*, 979 F.Supp.2d at 496-98.  Further, the Court in *Wultz* applied Chinese law relating to the privilege issue and granted in part and denied in part the plaintiff's motion to compel the production of documents.  *Id.*  A copy of *Wultz* is attached as Exhibit C.



 **Pharmaceuticals**

HUMAN RESOURCES MANAGEMENT GUIDELINE

| | |
|---|---|
| Guideline Title: | Severance Policy |
| Coverage: | All Non-Union US Employees |
| Location: | All US Locations |
| Date: | January 1, 2016 |
| Supersedes: | May 20, 2014 |

## INTRODUCTION

Teva believes that employees should be treated fairly, with dignity and respect; and, in certain specified situations, should be afforded some measure of financial security as they transition from their positions with the Company. Individual severance and termination situations will be managed on a case-by-case basis, in accordance with the guidelines outlined below.

## ELIGIBILITY

All regular, full- or part-time Teva employees may be eligible to receive severance in the following circumstances:

- Elimination of position;
- Considerable change in job responsibilities that requires a significant change in skill requirements, or bona fide occupational qualifications;
- Facility closing or relocation;
- Reduction in force; or
- Other instances, in Teva's discretion, as determined by the individual situation.

Selection of employees for termination as a result of a reduction in force will be accomplished consistent with the Teva reduction in force staffing process in use at the time of such reduction in force or job elimination process.

## INELIGIBILITY

While Teva reserves the right to determine, on a case-by-case basis, whether an individual employee is eligible for severance pay, the following circumstances will make an individual ineligible to receive severance benefits from Teva:

- Employees who have a written employment contract which provides for severance or termination payments;
- Voluntary resignation;
- Retirement;
- Displacement for reasons of permanent disability;
- Termination due to excessive absences or lateness;
- Termination for misconduct, or violation of company policies, procedures, practices or Ethics and Code of Conduct;
- Termination for unsatisfactory performance;
- Refusal to accept another reasonable position, as determined by Human Resources, taking into account the employee's skills and experience, compensation level and commuting distance; or
- The individual is a temporary worker (agency or otherwise), independent contractor or vendor.

## GENERAL

Open and Available Positions. Employees selected for termination will be afforded an opportunity to apply for open and available positions which they are qualified for and capable of performing.
- In order to apply for an open and available position, an employee's two (2) most recent performance evaluations must have been satisfactory ["Meets"] or better.

*Teva Pharmaceuticals – Severance Policy – December 1, 2015*

- Employees who have been issued corrective action documentation within six months prior to the termination date or who are currently participating in a performance improvement plan will not be eligible to apply for open and available positions, regardless of qualifications.
- Employees who do not qualify for open and available positions and are otherwise eligible for severance pay under these guidelines will receive severance pay.
- The opportunity to apply will run concurrent with any notice period or consideration period, not to exceed thirty (30) days.  Thereafter any application will be considered as a "re-hire".

<u>Employment Through Termination Date Required</u>.   Severance will be paid provided the employee remains in his/her position and satisfactorily performs all assigned duties and tasks through the last scheduled and agreed-upon working day and subsequently terminates employment with Teva.   If the employee accepts another position within Teva or terminates employment prior to the last scheduled working day, no severance will be paid.

<u>Retention Bonus</u>.  In some circumstances retention bonuses may be paid for positions that are identified as critical to the business.  Any requests for special retention bonuses must be accompanied by a written business justification document and require approval by the department Vice President, and the VP Human Resources; or the Sr. Director, HR Business Partner in the absence of the VP, Human Resources, and the Total Rewards CoE Regional Leader. Payment terms for retention bonuses will be determined on a case-by-case basis, and require approval by the department VP and Human Resources prior to being communicated to the employee.

<u>Temporary Assignments</u>.   The acceptance of a temporary assignment, within Teva, by a displaced employee prior to termination will not affect the employee's eligibility for severance at the end of the temporary assignment.

<u>Employment by Acquiring Entity</u>.  If the employee's position is being eliminated because a business unit is sold by Teva and if the sales agreement includes provisions specifically providing for the employment of affected employees by the purchaser, no severance will be paid.

Employees who join Teva because Teva acquires their employer shall not be entitled to severance benefits under this policy during the transition period of such acquisition, as determined by Teva, unless the acquisition agreement between Teva and their employer provides otherwise.

<u>Waiver and Release Agreement</u>.   Receipt of severance benefits, including severance pay, COBRA benefits premium payment, and career transition services are contingent on the eligible employee returning all Company property at termination and executing, abiding by and not rescinding a waiver and release in the form provided by Teva.  In no event will an employee who fails to execute the waiver and release be eligible for severance benefits under this policy.  Eligible employees who do not sign the required waiver and release agreement will still be eligible to receive all earned sales commissions and sales bonuses, and unused earned vacation pay.

<u>WARN Notification</u>. Under some circumstances the Company must provide notification to employees that will satisfy the requirements of the federal Worker Adjustment and Retraining Notification (WARN) Act, or similar state laws.  To meet this notification requirement the Company may provide the required notice period or provide pay in lieu of notice if allowed by law in that circumstance.

**PROCESS**
<u>Approval</u>.   Managers terminating employees must obtain approval of their immediate supervisor(s), department Vice President and Human Resources before notifying employees that they are eligible for severance.  Terminations of Directors, Sr. Directors, or Vice Presidents (grades 15+) must be approved by the President of the business unit.

<u>Severance Pay</u>.  The amount of severance pay will be based on length of service, calculated from the employee's Service Date to their last working day. Two (2) weeks severance pay will be paid for each year or partial year of service up to a maximum of 52 weeks of severance. Employees with less than one

*Teva Pharmaceuticals — Severance Policy — December 1, 2015*

(1) year of total service at termination will be credited with at least one (1) year of service for the purpose of this policy. The amount of severance pay will be based on the employee's annual base salary (exclusive of incentive, bonus and commission payments or shift differential). In the case of employees paid at an hourly wage rate, annual base salary will be determined by multiplying the current hourly rate by 2080 hours.

Payment Schedule. All amounts paid under this policy will be paid in a lump-sum, less all applicable deductions, including federal, state and local taxes. Severance payments are processed and paid through a manual check process (not direct deposit) and will be provided to the employee in accordance with all applicable federal, state and local laws; and in coordination with Company's payroll processes.

Unused Vacation. Employees will be paid total eligible, earned unused vacation time for the year in which the last working day occurs, calculated to their termination date. Unused vacation time accruals will be paid as a lump sum and will not extend the employee's date of termination.

Earned Sales Commissions and/or Sales Bonuses. Employees will be paid for their sales bonuses and/or commissions calculated per the respective plan document pro-rated through the employee's termination date. All sales bonuses and commissions will be paid as a lump sum, as soon as practical following the employee's termination date or according to the payout schedule as determined for this year.

Short Term Incentive Program and Bonuses. An employee is not eligible for the Annual Incentive Bonus if employment terminates with severance on or before June 30th of the Plan Year.

If separation occurs on or after July 1st of the Plan Year and the employee worked a minimum of 1,000 hours in the Plan Year, he/she will be eligible for a prorated bonus provided they sign and do not revoke the waiver and release offered by the Company in connection with severance benefits.

The bonus will be calculated using the bonus target at the time of termination and will be prorated for the time worked up through the termination date. The bonus will not be adjusted for Individual Performance and Business results and will be paid to the employee at the same time that the severance pay is paid.

Benefits. The Company will provide a lump sum taxable payment equivalent to the total monthly premiums for a period equivalent to the number of weeks for which the employee is receiving severance (e.g. 12 weeks of severance equals three (3) months of company-paid COBRA continuation premiums). Upon termination of employment the employee can decide whether to continue benefits with Teva in accordance with the benefits extension provisions of the Consolidated Omnibus Budget Reconciliation Act (COBRA), or arrange for benefits coverage elsewhere. Benefits under COBRA can be paid for on a month to month basis. Once COBRA benefits have been declined they will no longer be available.

This coverage becomes effective the first calendar day of the month following the employee's date of termination.

The employee is eligible to continue their enrollment in the COBRA program for a total of 18 months from the date of termination. An active COBRA participant has the option during the Open Enrollment process to change benefits within the plan (i.e. Medical, Dental) but does not have the option of electing a health care reimbursement account for the new plan year.

Paid time off, Short-term Disability (STD), and Long-term Disability (LTD) eligibility terminate as of the employee's last day worked.

All other benefits terminate as of the employee's date of termination or the last day of the month in which the employee terminates, according to the provisions of the particular benefit plan.

*Teva Pharmaceuticals -- Severance Policy -- December 1, 2015*

Career Transition Services.  In most circumstances Teva will select an organization to provide career transition services for a duration and at a service level to be determined by Teva. Costs associated with such services will be paid by Teva.  In no circumstance will Teva provide the employee with the cash value of the services in lieu of using those services.

Return of Company Property, Termination of Security Access.  The Human Resources department will coordinate the collection of all company property at the time of the employee's departure.  All necessary communication for termination of telephone service, information technology and related accounts and services, and access to and from Company facilities will be handled directly by Human Resources.

**ADMINISTRATION**
These guidelines shall be administered by Teva Human Resources and such other person or persons as Teva shall designate from time to time.  Teva reserves the right to change, alter, revise or revoke any or all provisions of this policy, including questions of eligibility and the amount of any severance benefits payable hereunder, in its sole discretion, and at any point now or in the future.  In addition, Human Resources shall have full authority to interpret and apply the provisions of these guidelines, in such a manner and to such an extent as it shall deem necessary or desirable to effectuate the terms.  This includes authority to correct any defects or omissions or to reconcile any inconsistencies in this policy. Human Resources may make such rules and regulations for the administration of these guidelines, as it deems necessary and desirable.  Any determination by Human Resources within the scope of its authority shall be conclusive and binding on all persons.

# B

COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

MOHAMMED ZAFAR IQBAL,

                    Plaintiff,

                                        Case No.:
             -against-                  7:16-cv-03464

TEVA PHARMACEUTICALS USA, INC.,

                    Defendant.

---------------------------------------X

                    Friday
                    August 26, 2016
                    10:10 a.m.

             EXAMINATION BEFORE TRIAL of the

       Defendant, TEVA PHARMACEUTICALS USA,

       INC., by and through its witness,

       ELAINE LAKIS, taken pursuant to Court

       Order, held at the offices of Peska &

       Associates, P.C., 235 Main Street,

       White Plains, New York, on the 26th

       day of August 2016, before a Notary

       Public of the State of New York.

             ROCKLAND & ORANGE REPORTING
                    2 Congers Road
             New City, New York 10956
                    (845) 634-4200

144

```
 1                    Elaine Lakis
 2   James Mikalic?
 3        A.    There was a conversation, earlier in
 4   the year, on another matter and that's when
 5   he --
 6        Q.    What was the other matter?
 7        A.    It's another, um, O.B.I. matter in
 8   Pomona.
 9        Q.    And what was that?  Who was that?
10        A.    I --
11             MR. RAPPOPORT:  I'm going
12        to object.
13             THE WITNESS:  Yeah.
14             MR. RAPPOPORT:  It has nothing to
15        do with the case.  It's a confidential
16        matter.  O.B.I. is involved and I
17        don't think that you need to know who
18        else may have been investigated.
19             MR. PESKA:  Objection noted.
20        Q.    But who was it?
21             MR. RAPPOPORT:  I'm going to
22        direct the witness not to answer.  If
23        you want to call the Judge, we can
24        call the Judge.
25        Q.    What -- okay.  So, there was --
```

145

1                       . Elaine Lakis

2    there's another investigation at Pomona? ·

3              A.    Uh-huh.

4              Q.    Is this another employee?

5              A.    Yes.

6              Q.    Okay.  Is it, um --- All right.  I'm

7    aware that there was an employee, his partner ·

8    that was investigated.  So, I'm aware of that.

9    Were you --- Is other than a Suffern Pharmacy

10   employee?

11             A.    Yes.

12             Q.    And I'm not going to ask you the

13   name of the person.  What was the basis or the

14   general basis for the investigation?  Was it

15   similar to these allegations, conflict of

16   interest, or what was the underlying basis for

17   the investigation?

18                  THE WITNESS:  Do I need to answer

19        that?

20                  MR. RAPPOPORT:  Yeah.

21                  THE WITNESS:  Um, no.  It was

22        different.

23             Q.    What was it?

24             A.    Um, it was, um, it had to do with

25   the, um, services of an outside vendor and the,

146

1                    Elaine Lakis

2   um, pay schedule arrangements that were made

3   between the vendor and Teva.

4          Q.    Okay.  Would that involve

5   prepayment?

6          A.    I believe it did.

7          Q.    Okay.  And what was the conclusion

8   of that investigation?  Was a prepayment

9   appropriate or not appropriate?

10         A.    It was not appropriate and it was

11  done based on the direction of someone in

12  Procurement in North Wales.

13  *      Q.    Okay.  And do you recall who, in

14  North Wales, that was?

15         A.    I prefer not to --

16              MR. RAPPOPORT:  Yeah.  You're

17         getting into confidential areas

18         involving, potentially, open

19         investigations that I'm not even

20         familiar with, and I don't see how it

21         connects --

22              MR. PESKA:  Well, hang on.

23              MR. RAPPOPORT:  -- to the wage

24         claim here and I'm gonna direct the

25         witness not to answer your --

147

1              Elaine Lakis

2          MR. PESKA:  I'm gonna tell you --

3          MR. RAPPOPORT:  -- question until

4     the Judge tells me.

5          MR. PESKA:  I'm gonna tell you

6     how it is relevant.  I'm gonna tell

7     you how it is fine.

8          MR. RAPPOPORT:  Okay.

9          MR. PESKA:  The basis of the

10    conclusion of his investigation was

11    that there was not a policy of

12    prepayment; correct?  You - you --

13    That's part of this - this - this --

14          MR. RAPPOPORT:  I'm not

15    testifying.

16          MR. PESKA:  This conclusion, the

17    conclusion reached, Larry, the

18    conclusion reached in here was that

19    there was a -- there was no policy of

20    prepayment.  Now, we've uncovered the

21    fact that prior to this investigation

22    there was an investigation regarding

23    an improper issue of prepayment.

24    She's testified that as a result of

25    that investigation that it was

148

1              Elaine Lakis

2        improper to engage in that

3        prepayment.  However, it did exist.

4        My question to her is -- well, that

5        you're objecting on, is all I'm

6        asking is:  Who?  There was someone.

7        All right.  Let's not put in names.

8   *    Q.   There was someone in North Wales

9   that authorized a prepayment; correct?

10             MR. RAPPOPORT:  I'm going to

11        direct the court reporter to mark

12        these pages as being pages in dispute

13        and subject to a direction by The

14        Court that this witness or some other

15        Teva representative must produce

16        evidence with regard to an unrelated

17        investigation by O.B.I. involving

18        other employees.  I don't think it's

19        appropriate.  We don't have a

20        confidentiality agreement here and,

21        as a result, I'm directing the

22        witness not to answer because of

23        confidential nature of the

24        information.

25             MR. PESKA:  Okay.  We'll get a

C

KeyCite Yellow Flag - Negative Treatment
On Reconsideration in Part Wultz v. Bank of China Ltd., S.D.N.Y., November 20, 2013

979 F.Supp.2d 479
United States District Court,
S.D. New York.

Sheryl WULTZ, individually, as personal representative of the Estate of Daniel Wultz, and as the natural guardian of plaintiff Abraham Leonard Wultz; Yekutiel Wultz, individually, as personal representative of the Estate of Daniel Wultz, and as the natural guardian of plaintiff Abraham Leonard Wultz; Amanda Wultz; and Abraham Leonard Wultz, minor, by his next friends and guardians Sheryl Wultz and Yekutiel Wultz, Plaintiffs,
v.
BANK OF CHINA LIMITED, Defendant.

No. 11 Civ. 1266(SAS).
|
Oct. 25, 2013.

**Synopsis**
**Background:** Injured victim of suicide bombing, which occurred in Israel, and personal representative of victim who was killed in such bombing, brought action against Chinese bank, alleging acts of international terrorism under Antiterrorism Act (ATA), based on bank allegedly having provided material support and resources to terrorist organization. Plaintiffs moved to compel bank to produce documents located in China in bank's control.

**Holdings:** The District Court, Shira A. Scheindlin, J., held that:

[1] Chinese law governed confidentiality of documents in bank's possession which were dated prior to plaintiffs' demand letter;

[2] United States law governed confidentiality of documents created after demand letter;

[3] bank was not judicially estopped from asserting "touch base" argument;

[4] bank was required to produce those documents listed on its privilege log which were governed by Chinese law;

[5] bank's in-house documents governed by United States privilege law were not protected by attorney-client privilege; and

[6] bank's privilege logs did not satisfy requirements of local rule governing privilege logs.

Motion granted in part and denied in part.

West Headnotes (32)

[1]      **Federal Courts**
         ⚖ Privilege and confidentiality

         Under federal evidentiary rule pertaining to privileges, questions of privilege are governed by principles of common law. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

         Cases that cite this headnote

[2]      **Federal Courts**
         ⚖ Conflict of Laws;  Choice of Law

         "Common law" applied under federal evidentiary rule governing privileges includes "choice of law" questions. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

         1 Cases that cite this headnote

[3]      **Privileged Communications and Confidentiality**
         ⚖ What law governs

         Under "touch base" analysis for determining which country's law applies to claims of privilege involving foreign documents, district court applies law of country that has predominant or most direct and compelling

interest in whether communications should remain confidential, unless that foreign law is contrary to public policy of forum in which action was brought.

2 Cases that cite this headnote

[4]     **Privileged Communications and Confidentiality**
◇=What law governs

Under "touch base" analysis for determining which country's law applies to claims of privilege involving foreign documents, in which district court applies law of country that has predominant or most direct and compelling interest in whether communications should remain confidential, unless that foreign law is contrary to public policy of forum in which action was brought, country with "predominant interest" is either place where allegedly privileged relationship was entered into or place in which that relationship was centered at time communication was sent. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

1 Cases that cite this headnote

[5]     **Privileged Communications and Confidentiality**
◇=What law governs

Under "touch base" analysis for determining which country's law applies to claims of privilege involving foreign documents, American law typically applies to communications concerning legal proceedings in the United States or advice regarding American law, while communications relating to foreign legal proceedings or foreign law are generally governed by foreign privilege law. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

2 Cases that cite this headnote

[6]     **Federal Civil Procedure**
◇=Discovery and Production of Documents and Other Tangible Things

Party objecting to discovery motion based on foreign law bears burden of demonstrating that such law actually bars production or testimony at issue.

Cases that cite this headnote

[7]     **Federal Civil Procedure**
◇=Discovery and Production of Documents and Other Tangible Things

In order to meet burden of demonstrating that foreign law actually bars production or testimony at issue, party resisting discovery motion based on foreign law must provide district court with information of sufficient particularity and specificity to allow court to determine whether discovery sought is indeed prohibited by foreign law.

Cases that cite this headnote

[8]     **Federal Civil Procedure**
◇=Discovery and Production of Documents and Other Tangible Things

Party objecting to discovery motion based on foreign law must describe, among other things, provisions of foreign law, basis for its relevance, and application of foreign law to facts of case.

Cases that cite this headnote

[9]     **Federal Civil Procedure**
◇=Discovery and Production of Documents and Other Tangible Things

In context of objection to discovery motion based on foreign law, foreign law, though

**Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)**

formerly treated as issue of fact, is now recognized as issue of law, to be established by any relevant source, including testimony. Fed.Rules Civ.Proc.Rule 44.1, 28 U.S.C.A.

Cases that cite this headnote

[10]   **Courts**
       ⟜Decisions of courts of other countries

Chinese courts do not routinely issue opinions: there is no system of guidance by precedent, judges deciding cases do not issue explanatory published opinions, and their judgments do not bind co-ordinate or lower courts in other cases.

Cases that cite this headnote

[11]   **Courts**
       ⟜Decisions of courts of other countries

Interpretation of Chinese law should be informed by attention to general practices and features of China's legal institutions, rather than by relying solely on inferences drawn from indeterminate legal language.

Cases that cite this headnote

[12]   **Privileged Communications and Confidentiality**
       ⟜Nature of privilege

Attorney-client privilege is one of the oldest recognized privileges for confidential communications.

Cases that cite this headnote

[13]   **Privileged Communications and**

**Confidentiality**
⟜Purpose of privilege

Attorney-client privilege is designed to encourage full and frank communication between attorneys and their clients.

1 Cases that cite this headnote

[14]   **Privileged Communications and Confidentiality**
       ⟜Communications from client to attorney and from attorney to client

Attorney-client privilege serves dual purpose of shielding from discovery advice given by attorney as well as communications from client to attorney, made in pursuit of or in facilitation of provision of legal services.

3 Cases that cite this headnote

[15]   **Privileged Communications and Confidentiality**
       ⟜Construction

Because attorney-client privilege stands in derogation of public's "right to every man's evidence" it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle.

Cases that cite this headnote

[16]   **Privileged Communications and Confidentiality**
       ⟜Presumptions and burden of proof

Burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with party asserting it.

Cases that cite this headnote

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

Cases that cite this headnote

[17] **Privileged Communications and Confidentiality**
⟳Elements in general; definition

In order to prevail on assertion of attorney-client privilege party invoking privilege must show that: (1) asserted holder of privilege is or sought to become client, (2) person to whom communication was made is member of bar of a court, or his subordinate and in connection with this communication is acting as a lawyer, (3) communication relates to fact of which attorney was informed by his client without presence of strangers for purpose of securing primarily either an opinion on law or legal services or assistance in some legal proceeding, and not for purpose of committing crime or tort, and (4) privilege has been claimed and not waived by client.

3 Cases that cite this headnote

[18] **Federal Civil Procedure**
⟳Work Product Privilege;  Trial Preparation Materials
**Privileged Communications and Confidentiality**
⟳Distinguished from work product

Work-product protection is broader than attorney-client privilege.

1 Cases that cite this headnote

[19] **Federal Civil Procedure**
⟳Work Product Privilege;  Trial Preparation Materials

"Work-product doctrine" protects attorney's mental impressions, opinions, or legal theories concerning specific litigation from discovery. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[20] **Federal Civil Procedure**
⟳Work Product Privilege;  Trial Preparation Materials

Unlike protection granted to attorney-client communications, privilege derived from work-product doctrine is not absolute. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

Cases that cite this headnote

[21] **Federal Civil Procedure**
⟳Work Product Privilege;  Trial Preparation Materials

Like other qualified privileges, work-product privilege may be overcome by showing of substantial need. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

Cases that cite this headnote

[22] **Federal Civil Procedure**
⟳Work Product Privilege;  Trial Preparation Materials

Document should be deemed prepared in "anticipation of litigation," and thus protected by privileged derived from work-product doctrine, if in light of nature of document and factual situation in particular case, document can fairly be said to have been prepared or obtained because of prospect of litigation. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

Cases that cite this headnote

[23] **Federal Civil Procedure**

⟵Work Product Privilege; Trial Preparation
Materials
**Privileged Communications and
Confidentiality**
⟵What law governs

Chinese law, rather than United States law,
governed confidentiality of in-house documents
in defendant Chinese bank's possession
pertaining to anti-money laundering (AML) and
compliance procedures and investigations,
among other documents, which were dated prior
to plaintiff suicide bombing victims' demand
letter, in action under Antiterrorism Act (ATA);
since attorney-client and work-product
communications and documents could be
subject to discovery under Chinese law,
applying Chinese privilege law did not violate
principles of comity or offend public policy of
forum in which action was brought. 18 U.S.C.A.
§ 2333(a).

Cases that cite this headnote

[24]     **Federal Civil Procedure**
⟵Work Product Privilege; Trial Preparation
Materials
**Privileged Communications and
Confidentiality**
⟵What law governs

Under "touch-base" analysis, United States law,
rather than Chinese law, governed
confidentiality of in-house documents in
Chinese bank's possession pertaining to
anti-money laundering (AML) and compliance
procedures and investigations, among other
documents, which were created after suicide
bombing victims' demand letter and related to
that letter and subject matter that gave rise to
victims' lawsuit against bank under
Antiterrorism Act (ATA); requested documents
pertained to United States law or conduct of
litigation in United States.

1 Cases that cite this headnote

[25]     **Estoppel**
⟵Claim inconsistent with previous claim or
position in general

Chinese bank's prior inconsistent position that
Chinese law should govern discovery in suicide
bombing victims' action against bank under
Antiterrorism Act (ATA) did not judicially estop
bank from subsequently asserting that, pursuant
to "touch base" analysis, United States law
should apply to discovery, absent bank's success
in prior proceeding.

Cases that cite this headnote

[26]     **Federal Civil Procedure**
⟵Work Product Privilege; Trial Preparation
Materials
**Privileged Communications and
Confidentiality**
⟵What law governs

While violations of duty of confidentiality may
trigger certain sanctions under Chinese law,
including suspension of legal license and
potential criminal punishment, duty of
confidentiality is ethical obligation and not
evidentiary protection analogous to
attorney-client privilege or work-product
doctrine.

Cases that cite this headnote

[27]     **Federal Civil Procedure**
⟵Work Product Privilege; Trial Preparation
Materials
**Privileged Communications and
Confidentiality**
⟵What law governs

Because Chinese law did not recognize
attorney-client privilege or work-product
doctrine, Chinese bank was required to produce
those in-house documents listed on its privilege
log which were governed by Chinese privilege
law, specifically, documents dated prior to
demand letter and documents dated after

demand letter that did not relate to demand letter, in suicide bombing victims' action against bank under Antiterrorism Act (ATA). 18 U.S.C.A. § 2333(a).

Cases that cite this headnote

[28] **Privileged Communications and Confidentiality**
⟜Relation of Attorney and Client

Chinese bank's in-house documents governed by United States privilege law, except documents which were actually communications from and to licensed attorneys, were not protected by attorney-client privilege, in suicide bombing victims' action against bank under Antiterrorism Act (ATA); Chinese law did not require in-house counsel to be licensed.

1 Cases that cite this headnote

[29] **Privileged Communications and Confidentiality**
⟜Relation of Attorney and Client

District court would not create "functional equivalency" test for invocation of attorney-client privilege with respect to Chinese bank's in-house documents, in suicide bombing victims' action against bank under Antiterrorism Act (ATA), since there were cognizable distinctions between attorney and in-house counsel in Chinese law, most critically that it was not essential for in-house counsel, some of whom may have provided legal advice, to be members of bar or have some form of legal credentials.

Cases that cite this headnote

[30] **Privileged Communications and Confidentiality**
⟜Business communications

Business advice, even when provided by licensed attorneys, is not protected by attorney-client privilege.

1 Cases that cite this headnote

[31] **Federal Civil Procedure**
⟜Work Product Privilege; Trial Preparation Materials

Work-product privilege does not apply to internal corporate investigation made by management itself. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

Cases that cite this headnote

[32] **Privileged Communications and Confidentiality**
⟜Privilege logs

Chinese bank's privilege logs, in suicide bombing victims' action against bank under Antiterrorism Act (ATA), in which bank stated in conclusory fashion that requested documents were "prepared or received by the Legal and Compliance Department, and that they involved requests for or provision of legal advice," did not satisfy requirements of local rule requiring privilege logs to include specific information about recipients and senders. 18 U.S.C.A. § 2333(a); U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 26.2(a)(2)(A).

Cases that cite this headnote

**Attorneys and Law Firms**

*483 Lee S. Wolosky, Esq., Steven I. Froot, Esq., Marilyn C. Kunstler, Esq., Jaime Sneider, Esq., Boies, Schiller & Flexner LLP, New York, NY, for Plaintiffs.

Mitchell R. Berger, Esq., Patton Boggs LLP, Washington, D.C., Zachary Carter, Esq., Lanier Saperstein, Esq., Neil McDonell, Esq., Eric Epstein, Esq., Daniel Goldberger, Esq., Dorsey & Whitney LLP, New York, NY, for Defendant.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

This suit arises out of the death of Daniel Wultz and the injuries of Yekutiel Wultz, suffered in a 2006 suicide bombing in Tel Aviv, Israel. Four members of the Wultz family brought suit against Bank of China ("BOC"), alleging acts of international terrorism under the Antiterrorism Act ("ATA"),[1] among other claims.

All of plaintiffs' non-federal claims against BOC have been dismissed.[2] In *484 addition, plaintiffs' attempt to hold BOC liable for aiding and abetting international terrorism under the ATA has been categorically foreclosed by the Second Circuit.[3] The plaintiffs' only remaining claim against BOC is for acts of international terrorism under the ATA, based on BOC allegedly having provided material support and resources to a terrorist organization.[4]

The general facts and procedural history of this case and plaintiffs' numerous attempts to obtain discovery from BOC were laid out in previous opinions and familiarity with them is assumed.[5] Before this Court is plaintiffs' third motion to compel BOC to produce documents located in China in BOC's control.[6] BOC argues that the documents are protected by the attorney-client privilege and/or the work-product doctrine. For the reasons stated below, plaintiffs' motion is granted in part.

## II. BACKGROUND

I first addressed plaintiffs' motion to compel BOC to produce various documents in its possession, specifically documents located in China pertaining to anti-money laundering ("AML") and compliance procedures and investigations in an order issued on October 29, 2012 ("the October 29 Order").[7] BOC argued that the requested production of documents would violate China's bank secrecy laws. Applying the Second Circuit's seven-factor comity test,[8] I granted plaintiffs' motion in part and ordered BOC to produce relevant documents except "confidential regulatory documents created by the Chinese government whose production is clearly prohibited under Chinese law."[9]

Rather than comply with the October 29 Order, BOC continued to object to its discovery obligations and raised alternative provisions of Chinese law—those relating to combating money laundering and other illegal financial transactions—which allegedly prevented the disclosure of any document whose production was ordered.[10]

In an opinion issued on May 1, 2013 ("the May 1 Order"), I granted plaintiffs' second motion to compel in part, again applying the Second Circuit's multi-factor comity test. The May 1 Order required BOC to produce documents pertaining to (1) "communications from the Chinese government to BOC from prior to January 23, 2008" concerning Said al-Shurafa ("Shurafa") and related accounts, (2) "materials concerning AML or [counter-terrorist financing] ("CTF") problems or deficiencies *485 at BOC's Guangdong Branch from January 1, 2003 to September 2008," (3) documents "concerning AML or CTF problems or deficiencies at BOC's Head Office from January 1, 2003 to September 2008, to the extent that those problems or deficiencies related to the [Palestinian Islamic Jihad ("PIJ") ], Hamas or any terrorists allegedly involved with those organizations," and (4) documents concerning Shurafa and related accounts, "including visits of foreign officials related to those same topics."[11]

The May 1 Order to produce was subject to two exceptions. *First,* BOC could withhold Suspicious Transaction Reports or Large-Value Transaction Reports, provided they were produced to the Court for *in camera* review.[12] Second, BOC could withhold "items subject to the attorney-client or work-product privileges," provided that the items were "listed in a document-level privilege log produced to plaintiffs, providing enough information to determine whether the documents are in fact privileged."[13]

Following the May 1 Order, BOC "produced a variety of documents" including "reports to its Chinese regulators concerning Said al-Shurafa," "minutes in its possession for meetings between BOC officials and representatives of the People's Bank of China," "policies and procedures related to" AML and CMF, and "internal audits of its United States branches for AML and CTF compliance during the relevant time period ... as well as all reports prepared by outside auditors Grant Thornton and KPMG."[14] In sum, "BOC has produced more than

200,000 pages."[15]

Plaintiffs claim that BOC's main production, made on May 21, 2013, "consisted largely of publicly available materials, previously-produced account records, and other filler."[16] According to plaintiffs, the May 21 production was the only "substantial production from the files of [BOC's] Chinese employees" and consisted of "5,751 documents."[17]

BOC subsequently provided two privilege logs, dated June 7, 2013 ("the June 7 Log")[18] and June 20, 2013, amended on August 6, 2013 ("the August 6 Log").[19] The two logs combined consist of 6,253 entries over which BOC asserts attorney-client privilege, work-product protection, or both.[20] Plaintiffs estimate that, in total, BOC has withheld 13,953 documents—"a figure more than double the number of documents that BOC has actually produced from China in response to the May 1 Order."[21]

## *486 III. APPLICABLE LAW

### A. Choice of Law

[1] [2] [3] [4] [5] Under Federal Rule of Evidence 501, questions of privilege are "governed by the principles of common law."[22] "The 'common law' applied under Rule 501 includes 'choice of law' questions."[23] "In determining which country's law applies to claims of privilege involving foreign documents, courts in the Second Circuit have adopted the 'touch base' approach applied in *Golden Trade [S.r.L. v. Lee Apparel Co.*]"[24] "Under this analysis, the Court applies 'the law of the country that has the predominant or the most direct and compelling interest in whether [the] communications should remain confidential, unless that foreign law is contrary to the public policy of this forum.' "[25] "The country with the 'predominant interest' is either 'the place where the allegedly privileged relationship was entered into' or 'the place in which that relationship was centered at the time the communication was sent.' "[26] "Thus, American law typically applies to communications concerning 'legal proceedings in the United States' or 'advice regarding American law,' while communications relating to 'foreign legal proceeding[s] or foreign law' are generally governed by foreign privilege law."[27]

### B. Chinese Law

[6] [7] [8] The party objecting to a discovery motion based on foreign law bears the burden " 'of demonstrating that such law actually bars the production or testimony at issue.' "[28] " 'In order to meet that burden, the party

resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law.' "[29] The party must describe, among other things, " 'the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case.' "[30]

[9] " 'Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law, to be established by any relevant source, including testimony.' "[31] Federal Rule of Civil Procedure *487 ("Rule") 44.1 establishes that "[t]he court's determination [of foreign law] must be treated as a ruling on a question of law."

[10] [11] Chinese courts do not routinely issue opinions: " '[t]here is no system of guidance by precedent, judges deciding cases do not issue explanatory published opinions, and their judgments do not bind co-ordinate or lower courts in other cases.' "[32] As I noted in two prior opinions in this case, "[t]he interpretation of Chinese law should be informed by attention to the general practices and features of China's legal institutions, rather than by relying solely on inferences drawn from indeterminate legal language."[33]

### C. Attorney–Client Privilege

[12] [13] [14] [15] "The attorney-client privilege is one of the oldest recognized privileges for confidential communications."[34] The privilege is designed to "encourage full and frank communication between attorneys and their clients."[35] The privilege serves the dual purpose of shielding "from discovery advice given by the attorney as well as communications from the client to the attorney, made in pursuit of or in facilitation of the provision of legal services."[36] However, because the attorney-client privilege "stands in derogation of the public's 'right to every man's evidence' ... '[i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle.' "[37]

[16] [17] "It is well settled that '[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it.' "[38] "In order to prevail on an assertion of the attorney-client privilege the party invoking the privilege" must show that:

"(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."[39]

**\*488 D. Work–Product Doctrine**

[18] [19] [20] [21] Work-product protection is " 'broader than the attorney-client privilege.' "[40] It protects "an attorney's mental impressions, opinions or legal theories concerning specific litigation" from discovery.[41] Rule 26(b)(3), which codifies the work-product protection, states in part that if a court orders discovery of materials prepared in anticipation of litigation by or for another party or its representative, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Unlike the protection granted to attorney-client communications, "[t]he privilege derived from the work-product doctrine is not absolute."[42] Like other qualified privileges, it may be overcome by a showing of substantial need.[43]

[22] The Second Circuit has interpreted the 'in anticipation of litigation' requirement broadly. Documents should therefore be "deemed prepared in 'anticipation of litigation' if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.' "[44]

**IV. DISCUSSION**

Plaintiffs request that BOC "be compelled to produce every document in China that is listed on its logs."[45] Plaintiffs make several arguments in support of this request. *First,* because "the documents ... are located in China and were sent to and from Chinese personnel at a Chinese state bank, Chinese law," which does not recognize the attorney-client privilege or the work-product doctrine, "governs BOC's privilege claims" and compels production.[46] *Second,* BOC would be unable to satisfy its burden even under United States privilege law, because a large number of the communications are not to or from licensed attorneys.[47] Finally, "BOC's privilege logs are grossly inadequate on their face and fail to comply with the most rudimentary requirements for a log [or with] the detailed requirements of Local Civil Rule 26.2."[48]

BOC, in turn, makes several arguments against

production. *First,* the Court should apply United States privilege law, because applying Chinese privilege law would be "contrary to public policy and principles of comity" as "there is no law in China that allows courts to require attorneys to testify against their clients, and in practice, no court has done so or would do so."[49] *Second,* BOC's privilege claims are \*489 supported under United States law even if the communications do not involve a licensed attorney if the individuals involved in the communication "serve as the functional equivalents of lawyers."[50] Finally, BOC's privilege logs "provide all of the information required by Local Rule 26.2."[51]

**1. Choice of Law Analysis**

"Courts in the Second Circuit have adopted the 'touch base' approach applied in *Golden Trade* " to determine which country's privilege should apply to foreign documents.[52] The "touch base" analysis typically considers which country "has the 'predominant' or 'the most direct and compelling interest' in whether those communications should remain confidential, unless that foreign law is contrary to the public policy of this forum."[53]

In *Golden Trade,* the court found that communications between an Italian corporation and its patent agents in Norway, Germany and Israel regarding patent law in those respective countries did not "touch base" with the United States because they "related to matters solely involving" foreign countries.[54] The court held that the applicable privilege law should be of those "countries [that] have the predominant interest in whether those communications should remain confidential," which are the nations "where the allegedly privileged relationship was entered into."[55] By contrast, courts have found that communications relating to legal proceedings in the United States or communications providing advice on American law do "touch base" with the United States and should be governed by American privilege law.[56]

Plaintiffs argue that the jurisdiction with the "predominant interest" in this matter is China because "[a]ll of the documents in question are located in China and BOC's privilege logs indicate that the individuals involved in the communications are Chinese BOC employees who work in China, and communicate almost exclusively with other BOC employees located in China."[57]

BOC argues that applying Chinese privilege law would be unfair and would force BOC to "produce a wide range of documents in accordance with broad U.S. discovery requirements while enjoying none of the protections of

U.S. privilege law."[58] Rather, BOC urges that the Court follow the reasoning of *Astra Aktiebolag v. Andrx Pharmaceuticals* and reject the application of Chinese law because of principles of comity and public policy.[59]

In *Astra*, the court held that Korean law would apply to documents pertaining to four legal proceedings held in Korean courts under the traditional "touch base" framework.[60] Korean law recognizes neither *490 the attorney-client privilege nor the work-product doctrine.[61] However, the *Astra* court found that "these documents would not be subject to production, whether through a discovery process or by court order, in a Korean civil lawsuit. Under Korean law, a court may only issue an order to compel document production under specific limited circumstances designated by statute."[62] Because production of the documents in question could not be compelled in Korea based on the statutes governing civil discovery in Korea, the court held that compelling their production in the United States "would violate principles of comity and would offend the public policy of this forum."[63]

[23] BOC urges the Court to follow *Astra's* reasoning and apply United States privilege law instead of Chinese law. BOC argues that, as in Korea, these documents would not be subject to production in civil discovery in China because "[i]n practice, no Chinese court would order an attorney to divulge such confidences" and compelling their production in an American court would violate the principles of comity and public policy mentioned in *Astra*.[64] Plaintiffs respond that *Astra* stands for the proposition that "applying Korean privilege law in a procedure governed by U.S. discovery rules would result in production that neither Korean civil procedure nor U.S. privilege law would have permitted on its own."[65] Plaintiffs argue that in this case, "Chinese law is vastly different from the law of Korea" and permits courts "to compel production of attorney-client communications and require attorneys to testify in court."[66]

BOC's primary argument against applying Chinese law to these documents is that "the kind of discovery that has taken place in this case would never occur in China, where a plaintiff must collect and submit its own evidence."[67] However *Astra* does not stand for the proposition that principles of comity forbid the application of foreign privilege law of any jurisdiction where discovery practices are more circumscribed than in the United States. BOC's preferred choice of law analysis would always require the application of U.S. law as there are few, if any, countries in the world where "the kind of discovery that has taken place in this case" would be permitted.

The critical inquiry in *Astra* is not whether the disclosure of attorney-client communications *would* happen, but rather whether it *could* happen. The court in *Astra* made clear that the documents at issue could not be produced under the "specific limited circumstances designated *491 by statute" and the opposing party had "no independent legal right to the documents under Korean law."[58]

Here, even BOC's expert, Randall Peerenboom, admits "[t]here are general provisions in [Chinese] law that allow judges to compel parties to provide certain information under certain circumstances."[69] For example, Article 67 of the Civil Procedure Law of the People's Republic of China ("PRC") states: "The people's court shall have the right to investigate and take evidence from the relevant work units or individuals, and such work units or individuals should not refuse to cooperate."[70] In addition, Article 72 states: "All work units and individuals that have knowledge of the circumstances of a case ought to give testimony in court."[71] While Mr. Peerenboom asserts that, "PRC courts would not compel lawyers to disclose confidential information ... in a civil case,"[72] nothing in Chinese law prevents the disclosure of these documents in the same way that Korean law prevented the disclosure of the documents in question in *Astra*. Indeed, according to an article on BOC's Chinese counsel's website "[t]he said provisions of the Civil Procedure Law create the basis for lawyers to be compelled to testify on a client's confidential information, and these laws prevail over any ethical duty of a lawyer to protect a client's information under attorney-client privilege.... [A]ttorneys and their clients are not exempt from disclosing information that would otherwise be protected by attorney-client privilege outside [China]."[73] Because attorney-client and work-product communications and documents could be subject to discovery under Chinese law, applying Chinese privilege law does not "violate principles of comity" or "offend the public policy of this forum."[74]

[24] BOC also argues that "the bulk of documents BOC withheld that were dated after January 28, 2008 [the date of plaintiffs' demand letter] concerned litigation in *492 an American court related to claims under American law" and should be governed by American privilege law under the "touch base" analysis.[75] Plaintiffs respond that BOC should be judicially estopped from making this argument, because it has previously argued that Chinese law should govern the production of documents located in China.[76] Plaintiffs also argue that BOC cannot show that "all of its documents generated after January 23, 2008" concerned American litigation.[77]

[25] Plaintiffs are incorrect in stating that judicial estoppel

bars BOC from asserting a "touch base" argument. Judicial estoppel " 'prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' "[78] "Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity."[79] In this instance, even if BOC's current position is contrary to its prior argument that Chinese law should govern discovery in this case, judicial estoppel is not appropriate or necessary because BOC did not prevail in its earlier arguments. Based on the *Golden Trade* "touch base" analysis, U.S. privilege law applies to all documents created after January 28, 2008 that do in fact relate to the demand letter and the subject matter that gave rise to this lawsuit, because those documents pertain to American law "or the conduct of litigation in the United States."[80]

### 2. Documents Governed by Chinese Law

BOC does not seriously contest the proposition that Chinese law does not include the attorney-client privilege or work-product doctrine as understood in American law.[81] Both parties agree that Chinese law creates a duty of confidentiality instead.[82]

[26] While violations of the duty of confidentiality may trigger certain sanctions under Chinese law, including suspension of a legal license and potential **493 criminal punishment,[83] the duty of confidentiality is an ethical obligation and not an evidentiary protection analogous to the attorney-client privilege or work-product doctrine.[84]

[27] Because Chinese law does not recognize the attorney-client privilege or the work-product doctrine, BOC must produce those items listed on its privilege log which are governed by Chinese privilege law. The responsive documents are those: (1) dated prior to January 28, 2008 and (2) documents dated after January 28, 2008 that do not relate to plaintiffs' demand letter.

### 3. Documents Governed by United States Law

Plaintiffs contend that BOC "cannot meet its burden of showing that its in-house documents would be privileged under U[nited] S[tates] law," even if American law applied.[85] Plaintiffs argue that attorney-client privilege requires communications involving licensed attorneys.[86] According to plaintiffs, in-house counsel in China are "not required to have legal degrees or bar certificates" and "simply passing the judicial exam ... does not suffice to constitute a license to practice law."[87] Plaintiffs claim that

because the record does not reflect that the members of BOC's Legal and Compliance Department and other departments are members of the Chinese bar, "their communications with other BOC employees (or among themselves) are not protected by any type of U.S. attorney-client privilege, and must be disclosed in their entirety."[88] Plaintiffs also contend that the documents should not be protected under the work-product doctrine because that protection can be overcome by a showing of substantial need. Plaintiffs argue that the Court's previous rulings, such as its order on April 9, 2013 ("the April 9 Order"), support plaintiffs' substantial need argument.[89]

BOC responds that "the application of a strict rule denying a Chinese company the protection of the attorney-client privilege makes little sense" because even though Chinese law does not require in-house counsel to be licensed, their role is the "functional equivalent" of a lawyer and they are permitted to give legal advice.[90] According to BOC, "a reasonable application of the American law of privilege" would recognize that BOC's in-house legal staff, even if unlicensed, "serves all of the **494 same functions as outside lawyers."[91] BOC also asserts that plaintiffs have not shown substantial need for overcoming the work-product protection. Even if the April 9 Order found that plaintiffs' need for communications with regulators overcame the bank examiner's privilege, BOC argues that the analysis under the work-product doctrine is different. Alternatively, BOC argues that the documents listed on the June 7 and August 6 privilege logs over which BOC asserts work-product protection are dated after January 28, 2008 and "significantly differ[ ] [from] the documents addressed" in the April 9 Order as those documents pertained to the issue of BOC's scienter in regard to events in 2006.[92]

[28] Defendant has failed to carry its burden of establishing that the documents contain "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance, or attorneys' mental impressions, opinions or legal theories concerning specific litigation."[93] As I discussed in *Gucci America v. Guess,* attorney-client privilege requires a showing "that the person to whom the communication was made 'is a member of the bar of a court.' "[94] BOC argues that this rule is too rigid and that attorney-client privilege should be extended to anyone who serves as the "functional equivalent of a lawyer."[95]

BOC cites two lower court cases from other Circuits in support of its proposed "functional equivalent" test. In *Renfield Corp. v. E. Remy Martin & Co.,* a Delaware trial court held that because the French legal system did not

have a "clear equivalent [to] an American bar," the requirement for the availability of the attorney-client privilege should be a "functional one of whether the individual is competent to render legal advice and is permitted by law to do so."⁹⁶ In *Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.*, an Illinois trial court held that the attorney-client privilege applies to communications with German patent agents who were "engaged in the substantive lawyering process."⁹⁷

Neither of these cases is persuasive and neither case has been followed elsewhere.⁹⁸ *495 In *Honeywell, Inc. v. Minolta Camera Co.*,⁹⁹ a New Jersey trial court explicitly rejected *Renfield* as inconsistent with *United Shoe*, a case often cited in this district and in the Second Circuit.¹⁰⁰

As BOC's own submissions and numerous declarations make clear, there are cognizable distinctions between a "lawyer" and an "in-house counsel" in Chinese law, most critically that it is "not essential" for in-house counsel to be members of a bar or have "some form of legal credentials."¹⁰¹ In an analogous recent opinion from this district, Magistrate Judge Frank Maas found that where "in-house counsel lawyers in the Netherlands are permitted to be, and frequently are, unlicensed," there can be no "reasonable mistake" as to whether an in-house counsel served as a licensed attorney.¹⁰²

[29] [30] The *United Shoe* principle justifies the protection of the attorney-client privilege for circumstances where a lawyer—whose authority derives from her position as a member of the bar—is engaged to provide legal advice. While the Chinese legal system may be developing, the distinctions between lawyer and in-house counsel are clear and presumably exist for a good reason. I see no compelling reason to depart from the long-standing principle of *United Shoe* and create a "functional equivalency" test for the invocation of the attorney-client privilege when applying United States law. To the extent BOC has claimed privilege over communications from, to and among members of legal or other departments who are not licensed attorneys, the attorney-client privilege does not apply.¹⁰³

[31] BOC has also claimed work-product protection over post-January 28, 2008 documents pertaining to BOC's investigations into the allegations of plaintiffs' demand letter. I already held in the April 9 Order that neither the attorney-client privilege nor work-product protection apply to these documents because the record indicates that after BOC's Chief Compliance Officer "received plaintiffs' demand letter, he called outside counsel, then set about performing the investigation within the Compliance Department—without the involvement of any

counsel, and not for the *496 purpose of obtaining legal assistance."¹⁰⁴ Privilege does not apply to "an internal corporate investigation ... made by management itself."¹⁰⁵

### 4. Sufficiency of Privilege Logs

Local Civil Rule 26.2(a)(2)(A) requires a privilege log to include the following information:

> (i) the type of document, *e.g.,* letter or memorandum; (ii) the general subject matter of the document, (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

[32] While plaintiffs highlight inconsequential minor errors, such as inconsistencies in spelling, the primary and most substantial basis for plaintiffs' argument is that BOC "has asserted privilege protection over communications between various business units ... without showing any involvement of any individual lawyer" and that BOC has asserted privilege over communications involving "entire departments at BOC" without identifying the members of the department, the individual involved in the communication and "whether that person was an attorney."¹⁰⁶

BOC responds that the "vast majority of entries in the logs" have complete descriptions for the required categories and offers to make several amendments to clarify certain minor issues.¹⁰⁷ However, BOC fails to address plaintiffs' chief concern, which is that the logs claim privilege over communications between departments without providing sufficient information to determine whether the recipients or creators of the documents were attorneys or were providing legal advice.

Plaintiffs have now raised this issue on numerous occasions.¹⁰⁸ BOC has consistently failed to address plaintiffs' request for further detail, stating in a conclusory fashion that the documents "were prepared or received by the Legal and Compliance Department, and that they involved requests for or provision of legal advice."¹⁰⁹ In further support of its claim that "a privilege log need not identify all of the individuals involved in a given communication to support a claim of privilege," BOC misleadingly cites *Export–Import Bank of the United States v. Asia Pulp & Paper Co.* for the

proposition that "limited logs—including those that 'provide only the name of a law firm'—may be adequate."[110] The case, however, supports **497** the opposite proposition: "Descriptions of the documents are bare-boned.... Some entries are undated, fail to identify the author of the document, provide only the name of a law firm, or fail to identify recipients of the document. The log is inadequate."[111]

BOC's own submissions demonstrate the need for detail regarding recipients and senders when asserting attorney-client privilege and work-product protection in logs. In its August 22, 2013 letter to the Court, BOC stated that the Legal and Compliance Department consisted of twelve employees in 2006, six of whom were licensed attorneys.[112] As discussed above, this fact has a significant impact on the privilege determinations and only bolsters plaintiffs' need for similar breakdowns for all departments where BOC has claimed a group privilege over communications.

The declaration from Xu Na Ke, the Chief of the Compliance Management Section in the Legal and Compliance Department of the Guangdong Branch states that the department "routinely provided legal advice" and that it was the "general practice" of the group "to sign responses to requests for legal advice" as a unit, but confirms that it was "not essential" to be a member of the Chinese bar to join the Department.[113] In fact, the declaration clarifies that not all communications from the Legal and Compliance Department, or other business departments, consisted of legal advice to and from licensed attorneys.[114]

I understand that collecting and reviewing a large volume of documents maintained in a foreign country for production in the United States is challenging, and providing adequate data for a privilege log is an unfamiliar task. However, BOC's privilege logs are not sufficient to allow either plaintiffs or this Court to evaluate what, if any, claims of privilege BOC may have. BOC shall have one final opportunity to amend its privilege logs only as to the documents dated after January 23, 2008 pertaining to plaintiffs' demand letter. The amended logs must provide adequate information about the individual authors and recipients, as well as a basis for claiming either attorney-client privilege or work-product protection consistent with this Order. BOC shall submit its amended privilege logs within ten days. If BOC again fails to submit adequate logs, it will have waived any claims of privilege over those documents.[115]

### *498 V. CONCLUSION

For the foregoing reasons, plaintiffs' motion is granted in part, BOC must complete all ordered production within twenty days from the date of this Order.

SO ORDERED.

**All Citations**

979 F.Supp.2d 479

### Footnotes

1       *See* 18 U.S.C. § 2333(a).

2       *See Wultz v. Bank of China Ltd.,* —— F.R.D. ——, No. 11 Civ. 1266, 2013 WL 1641179 (S.D.N.Y. Apr. 16, 2013) (dismissing plaintiffs' remaining non-federal claim as time-barred under New York "borrowing statute").

3       *See In re Terrorist Attacks on September 11, 2001,* 714 F.3d 118, 123 (2d Cir.2013) ("[A] defendant cannot be liable under the ATA on an aiding-and-abetting theory of liability." (citing *Rothstein v. UBS AG,* 708 F.3d 82, 97 (2d Cir.2013))).

4       *See* First Amended Complaint ¶¶ 106–115.

5       The background of the parties' disputes is summarized in *Wultz v. Bank of China Ltd.,* 910 F.Supp.2d 548, 551–52 (S.D.N.Y.2012) ( "*Wultz I* ") and *Wultz v. Bank of China Ltd.,* 942 F.Supp.2d 452, 454–61 (S.D.N.Y.2013) ("*Wultz II* ").

6       The first two motions were addressed in *Wultz I,* 910 F.Supp.2d at 551–52 and *Wultz II,* 942 F.Supp.2d at 454–61.

7       *Wultz I,* 910 F.Supp.2d at 551–52.

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

8     *See Strauss v. Credit Lyonnais, S.A.,* 249 F.R.D. 429, 438–39 (E.D.N.Y.2008) (citing *Minpeco S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 523 (S.D.N.Y.1987)).

9     *Wultz I,* 910 F.Supp.2d at 556.

10    *See* 2/28/13 Memorandum of Law on Behalf of Bank of China Ltd. in Opposition to Plaintiffs' Motion to Compel Discovery Prohibited Under the Law of the People's Republic of China, at 9–12.

11    *Wultz II,* 942 F.Supp.2d at 472–73.

12    *See id.*

13    *Id.*

14    9/17/13 Memorandum of Law on Behalf of Bank of China, Ltd. in Opposition to Plaintiffs' Motion to Compel Production of Documents Withheld as Privileged ("Def. Opp."), at 5.

15    *Id.* at 3.

16    9/3/13 Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion to Compel Production of Documents Located in China Improperly Withheld as Privileged ("Pl. Mem."), at 6.

17    *Id.*

18    *See* Exhibit ("Ex.") 9 to 09/03/13 Declaration of Olav A. Haazen, Counsel for Plaintiffs ("Haazen Decl.").

19    *See* Exs. 7–8 to Haazen Decl.

20    *See* Pl. Mem. at 6–7; Def. Opp. at 8.

21    Pl. Mem. at 7. Of the 6,253 entries on the combined privileged logs, 3,911 are categorized as "Email With Attachments." Plaintiffs estimate of the total number of documents is based on a rough calculation that estimates each email as containing two attachments. Because BOC does not clarify the total number of withheld documents in its submissions, I adopt plaintiffs' calculation for the purposes of this opinion. The large number of withheld documents in comparison to the number of documents in its main production, is not relevant to determinations of privilege but is illustrative of BOC's approach to its discovery obligations.

22    *Golden Trade S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 521 (S.D.N.Y.1992) (citing Fed.R.Evid. 501).

23    *Astra Aktiebolag v. Andrx Pharm., Inc.,* 208 F.R.D. 92, 97 (S.D.N.Y.2002).

24    *Gucci America, Inc. v. Guess?, Inc.,* 271 F.R.D. 58, 64 (2010).

25    *Anwar v. Fairfield Greenwich Ltd.,* —— F.R.D. ——, ——, No. 09 Civ. 118, 2013 WL 3369084, at *1 (S.D.N.Y. Jul. 8, 2013) (quoting *Astra,* 208 F.R.D. at 98).

26    *Astra,* 208 F.R.D. at 98 (quoting *Golden Trade,* 143 F.R.D. at 522).

27    *Anwar,* —— F.R.D. at ——, 2013 WL 3369084, at *1 (quoting *Gucci,* 271 F.R.D. at 65).

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

28    *Strauss v. Credit Lyonnais, S.A.,* 242 F.R.D. 199, 207 (E.D.N.Y.2007) (quoting *Alfadda v. Fenn,* 149 F.R.D. 28, 34 (S.D.N.Y.1993)).

29    *Id.* (quoting *Alfadda,* 149 F.R.D. at 34).

30    *Id.* (quoting *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.,* 426 F.3d 580, 586 (2d Cir.2005)).

31    *Wultz v. Bank of China Ltd.,* 860 F.Supp.2d 225, 230 (S.D.N.Y.2012) (quoting *United States v. Peterson,* 812 F.2d 486, 490 (9th Cir.1987)). *Accord In re Vitamin C Antitrust Litig.,* 810 F.Supp.2d 522, 562 (E.D.N.Y.2011) ("A determination of foreign law is, like choice of law analysis, a preliminary matter to be resolved by the court. Therefore, any disputed facts underlying that determination must also be resolved by the court.").

32    *Wultz v. Bank of China Ltd.,* No. 11 Civ. 1266, 2012 WL 5431013, at *4 n. 43 (S.D.N.Y. Nov. 5, 2012) (quoting Declaration of Professor George W. Conk, Ex. 1 to 9/21/12 Declaration of Marilyn C. Kunstler, Counsel for Plaintiffs, ¶ 26); *Wultz II,* 942 F.Supp.2d at 460–61.

33    *Wultz II,* 942 F.Supp.2d at 461 (footnotes omitted) (quoting and citing, among other sources, RANDALL PEERENBOOM, CHINA'S LONG MARCH TOWARD RULE OF LAW (2002)).

34    *Swidler Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998).

35    *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

36    *Id.*

37    *In re Grand Jury Proceedings,* 219 F.3d 175, 182 (2d Cir.2000) (quoting *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.1973)).

38    *Id.* (quoting *United States v. International Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997)) (some quotation marks omitted).

39    *Colton v. United States,* 306 F.2d 633, 637 (2d Cir.1962) (quoting *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)). *Accord Gucci America, Inc. v. Guess?, Inc.,* No. 09 Civ. 4373, 2011 WL 9375, at *1 (S.D.N.Y. Jan. 3, 2011); *SEC v. Beacon Hill Asset Mgmt. LLC,* 231 F.R.D. 134, 138 (S.D.N.Y.2004).

40    *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,* 318 F.3d 379, 383 (2d Cir.2003) (quoting *United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)).

41    *Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989).

42    *Nobles,* 422 U.S. at 239, 95 S.Ct. 2160.

43    *See In re Grand Jury Subpoena Dated July 6, 2005,* 510 F.3d 180, 184–87 (2d Cir.2007) (citing Rule 26(b)(3) and *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

44    *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practices & Procedures § 2024, at 343 (1994)).

45    Pl. Mem. at 2.

46    *Id.*

47    *See id.* at 3.

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

48      *Id.* at 2.

49      Def. Opp. at 2.

50      *Id.*

51      *Id.*

52      *Gucci,* 271 F.R.D. at 64.

53      *Astra,* 208 F.R.D. at 98 (citing *Golden Trade,* 143 F.R.D. at 522).

54      *Golden Trade,* 143 F.R.D. at 520–22.

55      *Id.* at 521.

56      *See, e.g., Gucci,* 271 F.R.D. at 66–70 (holding that American law applies to documents located in Italy pertaining to United States trademark law and lawsuit in United States federal court).

57      Pl. Mem. at 16–17.

58      Def. Opp. at 12.

59      *See id.* at 13.

60      *See Astra,* 208 F.R.D. at 99 ("When a Korean attorney is representing a foreign client in a Korean proceeding, the Korean attorney will generally anticipate that the Korean law of privilege will apply to the attorney's communications with the client and the work product created for that proceeding.") (quotation omitted).

61      *See id.* at 100–01.

62      *Id.* at 101.

63      *Id.* at 102.

64      Def. Opp. at 14.

65      Pl. Mem. at 21.

66      *Id. Accord* 9/23/13 Reply Memorandum of Law in Support of Plaintiffs' Motion to Compel Production of Documents Located in China Improperly Withheld as Privileged ("Rep. Mem."), at 6 ("... China has developed many discovery mechanisms similar to those available in U.S. courts, and Chinese courts do have the power to order production of attorney-client communications—a power that is actually exercised by authorities in China.").

67      Def. Opp. at 13. *See also* 10/15/13 Defendant's Surreply Memorandum in Opposition to Plaintiffs' Motion to Compel Production of Documents Withheld as Privileged, at 2 ("The extensive discovery, motion practice, and letter-application campaigns that have taken place in this matter would never happen in a Chinese court.").

68      *Astra,* 208 F.R.D. at 101.

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

69    09/17/13 Declaration of Randall Peerenboom ("Peerenboom Decl.") ¶ 6.

70    *Id.* ¶ 16.

71    *Id.*

72    10/9/13 Supplemental Declaration of Randall Peerenboom ("Peerenboom Sup. Decl.") ¶ 3.

73    Gui Hongxia and Li Xiang, *Attorney-client privilege: Is this Privilege Extended to Foreign Lawyers in China?,* Ex. 1 to
      Haazen Decl., at 1–2. Mr. Hongxia submitted a declaration in support of BOC's motion in opposition to clarify that the
      "key point of the [a]rticle was that an attorney may not refuse to testify before a Chinese court on the basis that the
      information sought concerns confidential communication with his or her client," and was not intended as a "comment
      on the pre-trial discoverability of attorney-client communications." 09/17/13 Declaration of Gui Hongxia ¶ 3. The
      distinction is irrelevant for purposes of the *Astra* analysis because Chinese courts can and do compel pre-trial
      discovery. As Mr. Peerenboom stated in a declaration submitted in an earlier case involving BOC, courts are critical to
      the discovery process in China: "If litigants encounter difficulties in obtaining evidence, they may petition the court to
      assist in discovery in accordance with Article 64," which requires the court to "investigate and collect evidence which
      litigants and their representatives cannot collect because of objective reasons, or evidence which the people's court
      deems necessary for the hearing." 03/15/09 Declaration of Randall Peerenboom, Ex. G to 09/23/13 Declaration of
      Marilyn C. Kunstler, Counsel for Plaintiffs ("Kunstler Decl.") ¶ 34. "The court may also conduct discovery on its own
      initiative to obtain evidence that the court deems necessary for the hearing." *Id.* ¶ 39. The Chinese Civil Procedure Law
      also provides for "pretrial exchange of evidence" in accordance with the law. *Id.* ¶ 40 (citing Article 37 of the Civil
      Procedure Law).

74    *Astra,* 208 F.R.D. at 102.

75    Def. Opp. at 16.

76    *See* Rep. Mem. at 5.

77    *Id.*

78    *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quoting *Pegram v. Herdrich,*
      530 U.S. 211, 227, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)).

79    *Id.* at 750–51, 121 S.Ct. 1808 (quoting *United States v. C.I.T. Constr. Inc.,* 944 F.2d 253, 259 (5th Cir.1991)).

80    *Astra,* 208 F.R.D. at 99.

81    At most, BOC states that Chinese courts, as a matter of practice, might not compel the disclosure of confidences. *See*
      Def. Opp. at 14 ("[T]here is no clear statute giving Chinese courts the authority to order attorneys to divulge confidential
      information about their clients.... In practice, no Chinese court would order an attorney to divulge such confidences.").
      The statements of Mr. Peerenboom on this issue are vague, inconclusive, and inconsistent. *See, e.g.,* Peerenboom
      Decl. ¶ 6 ("[It] would be extremely unlikely that a [Chinese] court would order a lawyer to divulge confidential client
      information"); *id.* ¶ 16 ("[T]here is a debate among academics about ... whether such provisions would allow a
      [Chinese] court to order lawyers to divulge confidential client information.").

82    *See* Pl. Mem. at 17–18; Def. Opp. at 14. *See also* Peerenboom Decl. ¶ 11 ("Article 38 of the Lawyers Law provides: 'A
      lawyer shall maintain the confidentiality ... of the circumstances and information of the client and others learned while
      practicing law which they do not wish to be disclosed' except in instances of a crime the client is preparing to commit
      that endangers national security, public security or safety.").

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

83   *See* Peerenboom Decl. ¶ 8.

84   *See Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer, Inc.,* No. 95 Civ. 8833, 1998 WL 158958, at *3 (S.D.N.Y. Apr. 2, 1998) ("[T]he fact that a statute requires a party to keep clients' affairs secret does not mean that a privilege exists. In this country, those with access to trade secrets, bankers, telephone companies and others are required not to divulge secrets of their clients' affairs absent court proceedings. Those laws do not create a privilege equivalent to the attorney/client privilege.").

85   Pl. Mem. at 23.

86   *See id.*

87   *Id.* at 24 (citing 09/03/13 Declaration of Li Wang, Senior Partner, Liaoning Shenyang Law Firm, Ex. 18 to Haazen Decl. ¶ 3).

88   *Id.*

89   *See* Pl. Mem. at 25 ("[The Court] expressly *rejected* BOC's argument that Plaintiffs' need for BOC's communications with regulators regarding its AML/CTF practices was insufficient to override the bank examiner's privilege.") (citing *Wultz v. Bank of China,* ——F.R.D. ——, —— – ——, No. 11 Civ. 1266, 2013 WL 1453258, at *7–11 (S.D.N.Y. Apr. 9, 2013)).

90   Def. Opp. at 17–19 (citing Peerenboom Decl. ¶ 26).

91   *Id.* at 20.

92   *Id.* at 21.

93   *Wultz,* —— F.R.D. at ——, 2013 WL 1453258, at *12 (quotations omitted).

94   *Gucci,* 2011 WL 9375, at *2 (quoting *United Shoe,* 89 F.Supp. at 358–59).

95   Def. Opp. at 20.

96   98 F.R.D. 442, 444 (D.Del.1982).

97   No. 95 Civ. 0673, 1996 WL 732522, at *10 (N.D.Ill. Dec. 18, 1996).

98   Magistrate Judge Michael Dolinger rejected *Renfield* in *Malletier v. Dooney & Bourke, Inc.,* No. 04 Civ. 5316, 2006 WL 3476735, at *17 (S.D.N.Y. Nov. 30, 2006), holding that there is "no compelling reason for deviating from the consistent line of authority that holds to the contrary." The *Heidelberg Harris* decision is similarly unpersuasive, given existing American case law which grants attorney-client privilege to registered patent agents as a specified exception, not based on a general rule of "functional equivalency." *See Buyer's Direct, Inc. v. Belk, Inc.,* No. 12 Civ. 00370, 2012 WL 1416639, at *3 (C.D.Cal. Apr. 24, 2012) ("[T]he congressional goal of allowing clients to choose between an attorney and a patent agent representative in proceedings before the [United States Patent and Trade Office] would be frustrated if the attorney-client privilege were not available to communications with registered patent agents.... However, the privilege is limited to communications related to presenting and prosecuting applications before the USPTO, as this is the extent to which Congress has granted patent agents the same status as an attorney representative.").

99   *See* No. 87 Civ. 4847, 1990 WL 66182, at *2–3 (D.N.J. May 15, 1990).

Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)

100   *See, e.g., Colton,* 306 F.2d at 637; *Davis v. City of New York,* 10 Civ. 699, 2012 WL 612794, at *10 (S.D.N.Y. Feb. 27, 2012); *In re Rivastigmine Patent Litig.,* 237 F.R.D. 69, 73 (S.D.N.Y.2006); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 441 (S.D.N.Y.1995).

101   09/18/13 Declaration of Xu Na Ke, Chief of the Compliance Management Section in the Legal and Compliance Department of the Guangdong Branch ("Xu Decl.") ¶ 7. *See also* Def. Opp. at 17–20; Peerenboom Decl. ¶¶ 25–33.

102   *Anwar,* —— F.R.D. at ——, 2013 WL 3369084, at *2.

103   Even if some Chinese in-house counsel do provide legal advice, BOC does not address whether the same in-house counsel also provides business advice, as is common for American in-house counsel. Business advice, even when provided by licensed attorneys, is not protected by the attorney-client privilege. *See, e.g., Georgia–Pacific Corp. v. GAF Roofing Mfg. Corp.,* No. 93 Civ. 5125, 1996 WL 29392, at *4 (S.D.N.Y. Jan. 25, 1996) (privilege does not attach to in-house counsel's advice addressing environmental risks because it is business advice as opposed to a legal opinion). Even if certain members of BOC's in-house legal team were licensed attorneys, it is unclear from the record whether those members also had duties and rendered business advice that would fall outside the realm of attorney-client privilege.

104   *Wultz,* —— F.R.D. at ——, 2013 WL 1453258, at *12.

105   *In re Grand Jury Subpoena,* 599 F.2d 504, 511 (2d Cir.1979) (citing *United Shoe,* 89 F.Supp. at 358).

106   Pl. Mem. at 14–15.

107   Def. Opp. at 9–10.

108   *See, e.g.,* 05/28/13 Letter from Lee Wolosky, Counsel for Plaintiffs, to Lanier Saperstein, Counsel for BOC, Ex. C to Kunstler Decl., at 1 ("BOC's privilege log lists as ... privileged many communications and other documents that appear not to involve BOC's attorneys, but rather entire BOC departments, entire BOC branches, and individuals who are not lawyers.... Please explain BOC's basis for asserting the attorney-client and work product privileges over such materials."); 06/25/13 Letter from Haazen, to Saperstein, Ex. 10 to 09/18/13 Declaration of H. Alex Iliff, Counsel for BOC ("Iliff Decl."), at 2 ("BOC's log refers only ... to the "New York branch," "the Compliance Department," ... or other departments.").

109   07/04/13 Letter from Iliff to Haazen, Ex. 11 to Iliff Decl. at 3.

110   Def. Opp. at 23 (quoting *Export–Import Bank of the United States v. Asia Pulp & Paper Co.,* 232 F.R.D. 103, 111 (S.D.N.Y.2005)).

111   *Export–Import Bank,* 232 F.R.D. at 111.

112   *See* 08/22/13 Letter from Saperstein to the Court, Ex. 8 to Iliff Decl., at 1.

113   Xu Decl. ¶¶ 4, 6–7.

114   Not only does the Xu Declaration concede that members of the Department were not necessarily licensed attorneys, it also does not categorically state that the Department only provided legal advice, as opposed to business advice. Even if every communication from the Department was from a licensed attorney, further detail is required as to the context of the communications to ensure that the communication satisfies the other elements of attorney-client privilege or work-product protection. *See, e.g., NextG Networks of NY, Inc. v. City of New York,* No. 03 Civ. 9672, 2005 WL 857433, at *2 (S.D.N.Y. Apr. 13, 2005) ("Even where a communication is identified as having involved a lawyer, there is no evidence that it was created for the purpose of providing or obtaining legal rather than business advice, that it was intended to remain confidential, and that the privilege has not been waived.").

**Wultz v. Bank of China Ltd., 979 F.Supp.2d 479 (2013)**

115    *See Aurora Loan Serv., Inc. v. Posner, Posner & Assoc., P.C.,* 499 F.Supp.2d 475, 479 (S.D.N.Y.2007) ("Failure to furnish an adequate privilege log is grounds for rejecting a claim of attorney client privilege.") (citing *United States v. Constr. Prod. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996)).

**End of Document**                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                              20