**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MOHAMMED ZAFAR IQBAL,      )
                                )
          Plaintiff,         )      Case No.: 7:16-cv-03464
                                )
v.                             )
                                )
TEVA PHARMACEUTICALS USA, INC.,  )
                                )
         Defendant.      )
                                )

**DEFENDANT'S MEMORANDUM OF LAW
<u>IN SUPPORT OF SUMMARY JUDGMENT</u>**

Table of Contents

Page

I. PROCEDURAL HISTORY AND INTRODUCTION ..................................................1

II. FACTS .................................................................................................................1

   A. Iqbal Was An At-Will Employee With Teva. ................................................1

   B. Other Compensation and Benefits Iqbal Seeks In This Lawsuit ...................2

      1.   Stock Options ..........................................................................................2

      2.   Severance ................................................................................................3

   C. Rules and Policies Governing the Conduct of Teva Employees ...................4

      1.   Conflicts of Interest Policy .....................................................................5

      2.   Outside Employment Policy ...................................................................6

      3.   Electronic Communications Policy .........................................................6

   D. Iqbal Was Terminated For Violating the Conflicts of Interest, Electronic
      Communications, and Outside Employment Policies, and Teva's Code
      of Conduct. ..............................................................................................7

      1.   Iqbal Failed to Disclose a Conflict of Interest. .......................................7

      2.   OBI Investigates the Transactions with Suffern Pharmacy. ...................8

      3.   Iqbal's Employment Is Terminated Based On The Findings of
         the Investigation. ...............................................................................10

III. ARGUMENT ....................................................................................................11

   A. The Standards for Granting Summary Judgment Are Well Established. .......11

   B. The Offer Letter Is Not An Enforceable Contract. .......................................12

   C. Even If The Offer Letter Were An Enforceable Contract, Teva Did Not
      Breach It. .................................................................................................15

      1.   Teva Paid Iqbal the Salary Set Forth in the Offer Letter. ......................15

      2.   Bonus Payments Were Discretionary, and Iqbal Did Not Meet
         the Eligibility Requirements For A Bonus in 2016. .............................17

      3.   Iqbal Did Not Meet the Requirements For A Severance. ......................18

      4.   Iqbal's Stock Options Expired When His Employment Was
         Terminated. .......................................................................................20

      5.   There Is No Basis For Iqbal's Claim For Contractual Vacation
         Pay. ...................................................................................................21

   D. The Court Should Dismiss as Moot Iqbal's Claim for Vacation Pay and
      His Claim for Equitable Relief. ................................................................21

   E. The Court Should Dismiss Iqbal's Claim Under Labor Law
      Section 198(1-a). .....................................................................................22

Table of Contents
(continued)

Page

IV. CONCLUSION...................................................................................................24

(ii)

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abiele Contr. v. New York City School Constr. Auth.*,
91 N.Y.2d 1, 666 N.Y.S.2d 970, 689 N.E.2d 864 (N.Y. Ct. App. 1997) ..............................15

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)..........................................................................................................11

*Ansorge v. Kane*,
244 N.Y. 395, 155 N.E. 683 (N.Y. Ct. App. 1925) ................................................12

*Barker v. Time Warner Cable, Inc.*,
897 N.Y.S.2d 668 (N.Y. Sup. Ct. 2009) .........................................................14, 15

*Bergin v. Century 21 Real Estate Corp.*,
No. 98 Civ. 8075(JGK), 2000 WL 223833 (S.D.N.Y., Feb. 25, 2000) ..................13

*Bessemer Trust Co., N.A. v. Branin*,
618 F.3d 76 (2d Cir. 2010)..............................................................................................14

*Brennan v. J.P. Morgan Securities, Inc.*,
801 N.Y.S.2d 230 (N.Y. Sup. Ct. 2004) ..........................................................17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................................12

*De Madriaga v. Union Bancaire Privee*,
103 A.D.3d 591, 961 N.Y.S.2d 50 (N.Y. Sup. Ct. App. Div., 1st Dep't 2013)....................17

*Deebs v. Alstom Transp., Inc.*,
346 Fed. Appx. 654 (2d Cir. 2009)..........................................................................16

*Eagle v. Emigrant Savings Bank*,
148 A.D.3d 47649 N.Y.S.3d 124 (N.Y. Sup. Ct., App. Div., 1st Dep't 2017)......................14

*Elite Technology N.Y. Inc. v. Thomas*,
70 A.D.3d 506894 N.Y.S.2d 420 (N.Y. Sup. Ct., App. Div., 1st Dep't 2010)......................12

*Gottlieb v. Kenneth D. Laub & Co., Inc.*,
82 N.Y.2d 457, 626 N.E.2d 29 (N.Y. Ct. App. 1993) ....................................................22, 23

*Griffin v. Bookman*,
48 A.D.2d 777, 369 N.Y.S.2d 139 (N.Y. Sup. Ct., App. Div., 1st Dep't 1975)....................13

*Hall v. United Parcel Serv. Of Am.*,
76 N.Y.2d 27 (N.Y. Ct. App. 1990)..........................................................................17

SL1 1442332v1 030421.00653

*Herbert H. Landy Ins. Agency, Inc. v. Navigators Management Co., Inc.*,
    No. 14 Civ. 6298(LGS), 2015 WL 170460 (S.D.N.Y., Jan. 13, 2015)....................................22

*Khudan v. Lee*,
    No. 12-cv-8147 (RJS), 2016 WL 4735364 (S.D.N.Y., Sept. 8, 2016) ...................................16

*Lozada v. Delta Airlines, Inc.*,
    No. 13-cv-7388 (JPO), 2014 WL 2738529 (S.D.N.Y. June 17, 2014)...................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................................11

*McNabb v. MacAndrews & Forbes Group, Inc.*,
    No. 90 Civ. 5482 (CLB), 1991 WL 284104 (S.D.N.Y., Dec. 24, 1991), *aff'd*
    972 F.2d 1328 (2d Cir. 1992)................................................................................................17

*Namad v. Salomon Inc.*,
    74 N.Y.2d 751, 545 N.Y.S.2d 79, 543 N.E.2d 722 (N.Y. Ct. App. 1989) ......................14, 17

*New York Civil Liberties Union v. Grandeau*,
    453 F.Supp.2d 800 (S.D.N.Y. 2006)......................................................................................21

*Niagara Foods, Inc. v. Ferguson Elec. Serv. Co., Inc.*,
    111 A.D.3d 1374, 975 N.Y.S.2d 280 (N.Y. Sup. Ct., App. Div., 4th Dep't
    2013) ......................................................................................................................................12

*O'Grady v. BlueCrest Capital Management LLP*,
    646 Fed. Appx. 2 (2d Cir. 2016)............................................................................................14

*Parker v. Revlon, Inc.*,
    211 A.D.2d 415, 621 N.Y.S.2d 306 (N.Y. Sup. Ct. App. Div., 1st Dep't 1995)...................22

*Preiser v. Newkirk*,
    422 U.S. 395, 95 S.Ct. 2330 (1975)......................................................................................21

*Resetarits Const. Corp. v. Olmsted*,
    118 A.D.3d 1454, 988 N.Y.S.2d 797 (N.Y. Sup. Ct., App. Div., 4th Dep't
    2014) ......................................................................................................................................12

*Slotnick v. RBL Agency Ltd.*,
    271 A.D.2d 365, 706 N.Y.S.2d 431 (N.Y. Sup. Ct., App. Div., 1st Dep't 2000)...................23

*Spectrum Research Corp. v. Interscience Inc.*,
    1997242 A.D.2d 810, 661 N.Y.S.2d 871 (N.Y. Sup. Ct., 3d Dep't 1997) .............................13

*Toro v. City of New York*,
    No. 12-cv-4093 (RRM) (RLM), 2015 WL 1014044 (E.D.N.Y. Mar. 6, 2015)......................16

*Weiner v. The Diebold Group, Inc.*,
    173 A.D.2d 166 (N.Y. Sup. Ct., App. Div. 1st Dep't 2002)....................................................17

*Zhao v. State Univ. of N.Y.*,
    472 F.Supp.2d 289 (E.D.N.Y. 2007) ....................................................................................12

**STATUTES, RULES & REGULATIONS**

Federal Rule of Civil Procedure 56(c) ........................................................................................11

New York Labor Law § 198(1-a) .........................................................................................11, 22, 23

## I.  PROCEDURAL HISTORY AND INTRODUCTION

Defendant, Teva Pharmaceuticals USA, Inc. ("Teva"), submits this Brief in Support of its Motion for Summary Judgment on all counts of the Complaint of Plaintiff, Mohammed Zafar Iqbal ("Iqbal").

## II.  FACTS

### A.  Iqbal Was An At-Will Employee With Teva.

Iqbal first became employed by Teva's predecessor company, Barr Laboratories, Inc. ("Barr") in 1997.  *See* Defendant's Statement of Material Facts In Support of Its Summary Judgment Motion (hereinafter "SMF"), at ¶ 1).  He became a Teva employee in 2010 when, after a series of transactions, Barr's parent company became a wholly-owned subsidiary of Teva. (SMF at ¶ 2).  The Department in which Iqbal worked – Research and Development – among other things, obtains branded drugs after the applicable patents on those drugs expire or are about to expire and, through clinical testing, creates generic drugs.  (SMF at ¶ 3).

In December of 2012, Teva promoted Iqbal to the position of Associate Director, Process Engineering.  (SMF at ¶ 4).  The promotion was documented in an offer letter (the "Offer Letter"), which is the entire basis for Iqbal's breach of contract claim in this lawsuit. (SMF at ¶ 4).  The Offer Letter sets forth Iqbal's initial salary and states that he is eligible for a bonus "subject to the terms and conditions in the 2013 Bonus Program."  (SMF at ¶ 5).  The Offer Letter does not describe any obligations by Iqbal or the duties and expectations of his new position.  (SMF at ¶ 7).  Iqbal does not contend that he was ever given any other offer letter or explicit contract regarding his compensation at Teva.  (SMF at ¶ 15).

With regard to the Bonus Program, the Offer Letter states that Teva retains total discretion with regard to whether to pay a bonus, and "Teva reserves the right to change, end, or alter plans and eligibility dates at any time."  (SMF at ¶ 6).  The terms of the Bonus Program are

explicitly incorporated into the Offer Letter.  The Bonus Program also states that all decisions

under the Bonus Program are at Teva's discretion.  (SMF at ¶ 8).  It continues:

> To be eligible to receive an annual bonus award an employee must
> be an active employee in good standing on the date that bonuses
> are paid, with limited exceptions.  An employee is in good
> standing when there are no known performance shortfalls or
> compliance violations over a period of time (i.e. 12 months).
> Eligibility to participate in the plan does not guarantee a[] bonus
> award."

(SMF at ¶ 8).  Bonuses pursuant to the Bonus Program are paid to qualifying employees in

March or April of each year. (SMF at ¶ 9).

### B. Other Compensation and Benefits Iqbal Seeks In This Lawsuit

#### *1.  Stock Options*

In 2014 Iqbal's supervisor, Tony Tong, told Iqbal that Teva was awarding him

company stock options.  (SMF at ¶ 13).  The Teva Pharmaceuticals Industries Limited 2010

Long Term Equity Based Incentive Plan ("Incentive Plan") governed the award of stock options

to Iqbal.  (SMF at ¶ 16).   The Incentive Plan provides that "the vesting of an Option shall occur

only while the Participant is employed or rendering services to the Employer, and all vesting

shall cease upon a Participant's Termination with the Employer for any reason."  (SMF at ¶ 17).

Subsection 5(f)(i) of the Incentive Plan provides:

> (iii) In the event of a Participant's Termination with the Employer
> prior to the Expiration Date by the Employer for Cause, all of such
> Participant's Options (whether or not vested) shall immediately
> expire as of the date of such Termination.

(SMF at ¶ 18).  "Cause" is defined in the Incentive Plan, in relevant part, as:

> [C]onduct of the Participant, in connection with his or her
> employment, that has, or could reasonably be expected to result in,
> material injury to the business or reputation of the Company or its
> Affiliates [or] any material violation of the policies of the
> Company or its Affiliates, including, but not limited to . . . those
> set forth in the manuals or statements of policy of the Company or
> its Affiliates . . . "

(SMF at ¶ 18).  Section 5(b) states that "The term of each Option shall be set by the Committee at the time of grant . . ." (SMF at ¶ 19).

Teva awarded Iqbal 1304 stock options on March 12, 2015. (SMF at ¶ 21).  The Award Agreement Iqbal received in connection with the award expressly incorporates the terms of the Incentive Plan.  (SMF at ¶ 22).  Pursuant to the Award Agreement, 25% of the options would vest on the first anniversary of the Grant Date, *i.e.*, March 12, 2016; another 25% would vest on the second anniversary, *i.e.*, March 12, 2017; another 25% would vest on the third anniversary, *i.e.*, March 12, 2018; and the remaining 25 % of the options would vest on the fourth anniversary of the Grant Date, *i.e.*, March 12, 2019.  (SMF at ¶ 23).

Like the Incentive Plan, the Award Agreement states that all vesting is "[s]ubject to the Participant's continuous employment with the Company and its subsidiaries and affiliates through the applicable vesting dates."  (SMF at ¶ 24).  Also like the Incentive Plan, the Award Agreement provides that if Iqbal was terminated by Teva "for Cause" (as defined in the Incentive Plan) "all of such Participant[']s Options (whether or not vested) shall immediately expire . . ." (SMF at ¶ 25).

### 2. *Severance*

Teva's Severance Policy states:  "Individual severance and termination situations will be managed on a case by case basis, in accordance with the guidelines outlined below." (SMF at ¶ 26).  The Severance Policy provides that employees may be eligible to receive severance in the following circumstances:

- Elimination of position;
- Considerable change in job responsibilities that requires a significant change in skill requirements, or bona fide occupational qualifications;
- Facility closing or relocation;

> •      Reduction in force; or
>
> •      Other instances, in Teva's discretion, as determined by the individual situation.

(SMF at ¶ 27).  On the other hand, the Severance Policy states:

> While Teva reserves the right to determine, on a case by case basis, whether an individual employee is eligible for severance pay, the following circumstances will make an individual eligible to receive severance benefits from Teva:  . . . Termination for misconduct, or violation of company policies, procedures, practices or Ethics and Code of Conduct;

(SMF at ¶ 28).

Under the Severance Policy, Teva retains complete discretion to determine whether to pay a departing employee a severance.  The Severance Policy states: "Teva reserves the right to change, alter, revise or revoke any or all provisions of this policy, including questions of eligibility and the amount of any severance benefits payable hereunder, in its sole discretion, and at any point now or in the future."  (SMF at ¶ 29).

The Severance Policy also provides:

> Receipt of severance benefits, including severance pay . . . are contingent on the eligible employee . . . executing, abiding by and not rescinding a waiver and release in the form provided by Teva. In no event will an employee who fails to execute the waiver and release be eligible for severance benefits under this policy . . .

(SMF at ¶ 30).

If a departing employee is paid a severance, the Severance Policy states that such employee "is not eligible for the Annual Incentive Bonus if employment terminates with severance on or before June 30th of the Plan Year."  (SMF at ¶ 31).

## C. Rules and Policies Governing the Conduct of Teva Employees

Iqbal's employment, like that of all Teva employees, was governed by ethical standards and rules codified in formal policy documents and in Teva's Code of Conduct.  The Rules and Policies pertinent to this lawsuit are described below:

1.     ***Conflicts of Interest Policy***

Teva's Conflicts of Interest Policy states, in relevant part:

> Each employee must be free from any actual or potential conflict of interest and must avoid even the appearance of such a conflict in dealing with other businesses or individuals on behalf of Teva.

> A conflict of interest may arise in any situation in which an employee's judgments and loyalties are divided between any business or outside interest that, to any degree, is incompatible with the best interests of Teva.  Employees must avoid any situation where personal interests . . . might conflict, or even appear to conflict, with the best interests of Teva.  This includes any situation that might force an employee to choose between his or her own personal or financial interests and the interests of Teva. Whenever an employee faces the prospect of direct or indirect personal gain having an influence upon his or her judgment or actions in the conduct of Teva's business, a conflict of interest exists and must be remedied.

(SMF at ¶ 32).  The Policy explains:  "Types of activities and or relationships that could potentially affect an employee's independent judgment may include outside employment relationships [or] personal investments . . . " (SMF at ¶ 33).  The Conflicts of Interest Policy requires employees to "disclose, in writing and in advance, any potential or actual conflict of interest for resolution."  (SMF at ¶ 34).

Section 3.2.2 of the Conflicts of Interest Policy, titled "Businesses Similar in Nature, Vendors, Suppliers or Customers" states:

> Employees should avoid outside business or consulting activities that would divert their time, interest or talents from Teva business. The employee's manager must approve, in writing, any outside or consulting activity for a vendor, a supplier of goods or services, a customer or partner of Teva, or a business that provides services to or related to the healthcare industry. . .

(SMF at ¶ 35).

The Code of Conduct also addresses potential conflicts of interest and requires employees to "resolve any potential conflicts of interest in a transparent and open manner."

5

(SMF at ¶ 36).  It requires employees to "inform and seek approval from our Compliance and Legal Departments upon commencement of negotiations or contacts relating to a potential transaction between our Company and an entity . . ." (SMF at ¶ 36).  Further, under the Code of Conduct, employees must "avoid using Company opportunities, Company property and information or our position for personal gain" and "receive our HR manager's approval before engaging in outside employment, consulting, or serving on the board of directors (or comparable position) of an external organization."  (SMF at ¶ 37).

### 2.   *Outside Employment Policy*

Teva's Outside Employment Policy states:

> It is the policy of Teva that no outside employment or interests interfere with the ability of its employees to satisfactorily perform their job duties and meet the scheduling demands and other work requirements of Teva.  Outside employment or interests will present a conflict of interest if they have or present the opportunity to have an adverse impact on Teva.

(SMF at ¶ 38).  It further states:

> If Teva determines that outside work or activity is interfering with Teva performance, the employee may be asked to terminate or modify the outside work/activity if he/she wishes to remain with Teva . . . Teva may opt to terminate the employee's employment if Teva, at its sole discretion, determines that the circumstances of the employee's violation of this policy renders continued employment inappropriate.

(SMF at ¶ 39).

### 3.   *Electronic Communications Policy*

The Electronic Communications Policy states:  "All communication systems and hardware must be used primarily for [Teva] business purposes.  (SMF at ¶ 40).  The Policy provides: "Use of any company resources in violation of this policy is grounds for disciplinary action up to and including termination of employment."  (SMF at ¶ 41).

The Code of Conduct also addresses use of Teva's electronic communications resources and provides: "Computer technology – hardware, software, networks and the information that runs on them – is critical to our business success and must be protected. Everyone who uses a computer has the responsibility to use these resources appropriately, securely, and for intended business uses. . . ." (SMF at ¶ 42).  The Code of Conduct states that the use of "Teva's Internet access, email, facsimile, telephone and copying systems . . . should not further the business activity of any other entity other than Teva . . . "  (SMF at ¶ 43).

### D. Iqbal Was Terminated For Violating the Conflicts of Interest, Electronic Communications, and Outside Employment Policies, and Teva's Code of Conduct.

#### 1.   *Iqbal Failed to Disclose a Conflict of Interest*.

Iqbal had an ownership interest in an entity formed in February 2014 called Suffern Pharmacy ("Suffern").  (SMF at ¶ 44).  In January and February of 2015, Iqbal learned that Teva's R&D Department was seeking certain branded drugs, and he arranged to have Suffern supply those drugs to Teva.  (SMF at ¶ 45).  Between March and May of 2015, Teva conducted nearly $470,000.00 in transactions with Suffern, resulting in approximately $50,000.00 in profit to Iqbal's pharmacy, Suffern.  (SMF at ¶ 46).

In late 2015 Teva retained an external, independent auditor to conduct a routine audit of compliance paperwork for Teva's suppliers and vendors.  (SMF at ¶ 47).  While reviewing documents relating to Teva's transactions with Suffern, the auditor became concerned upon discovering that documentation was missing for Suffern, but Teva had conducted substantial business with Suffern in a relatively short period of time.  (SMF at ¶ 48).  After further investigation, the auditor learned that Suffern was owned by Iqbal and another Teva

employee.[1]  (SMF at ¶ 49).  Accordingly, the auditor referred the matter to Teva's Office of

Business Integrity ("OBI"), an internal department that investigates suspected violations of

Teva's rules, policies, and Code of Conduct.  (SMF at ¶ 50).

### 2.   *OBI Investigates the Transactions with Suffern Pharmacy.*

OBI assigned the matter to Teva Investigator James Mikalic, a former FBI Agent

and Assistant Director of Intelligence for the New York State Office of Homeland Security.

(SMF at ¶ 51).  Mikalic's investigation of the transactions with Suffern began in December of

2015 and lasted approximately 14 months.  (SMF at ¶ 52).  The details of Mikalic's investigation

and his conclusions are documented in his March 8, 2016 Final Investigation Report.  (SMF

at ¶ 53).  The investigation included a review of purchase orders, invoices and records relating to

Suffern from Teva's Procurement Office, and documents from Iqbal's Teva-owned email and

computer files on which, it was learned, Iqbal kept documents relating to Suffern and other

companies in which he had an ownership interest.  (SMF at ¶ 54).  Mikalic also interviewed

Iqbal, another Teva employee who co-owned Suffern with Iqbal, and other Teva employees with

knowledge of the Suffern transactions.  (SMF at ¶ 55).  Additionally, Mikalic reviewed many

hundreds of pages of emails and email attachments from Iqbal's Teva email account in which

Iqbal and his Suffern business partners discussed Suffern business interests.  (SMF at ¶ 56).

Mikalic also reviewed emails Iqbal sent to certain drug manufacturers from his Teva account on

behalf of Suffern.  (SMF at ¶ 56).

Through his investigation, Mikalic discovered that, while registering Suffern with

Teva's Procurement Department, Iqbal took what appeared to be steps to conceal and disguise

the level of his involvement with Suffern.  (SMF at ¶ 58).  For example, despite the fact that

Iqbal signed most documents on behalf of Suffern as "President and CEO," this was not the case

---

[1] The other Teva employee was terminated by Teva for the same reason as Iqbal.

with almost all of the paperwork Suffern submitted to Teva, which instead was signed by Eugene Frankel, and Iqbal's name was conspicuously absent from those documents. (SMF at ¶ 59). Similarly, Iqbal never communicated with members of Teva's Procurement Department when Suffern was becoming registered as a Teva supplier. Instead, Iqbal used another employee, Anwar Hosain, to conduct those discussions. (SMF at ¶ 60). During negotiations with Teva, Suffern representatives other than Iqbal frequently emailed Teva representatives, and they did not openly include Iqbal on those emails. It was later discovered that the Suffern representatives had "blind copied" Iqbal on those emails, an arrangement Iqbal admits was devised to help him appear to "stay away as much as possible . . ." (SMF at ¶ 61).

Additionally, Mikalic's forensic email review revealed that Iqbal had pressured Teva to pre-pay Suffern for certain orders, rather than following Teva's standard 60-day payment terms. (SMF at ¶ 62). For example, Iqbal told people in Teva's Procurement office that the supplier could only send the product if Teva pre-paid for the product in the next few days, giving the impression that he was relaying what a supplier told him in connection with an arm's length transaction, rather than speaking as Suffern's CEO and President. (SMF at ¶ 62). In reality, Iqbal was trying to obtain the money early because Suffern was having cash flow problems. (SMF at ¶ 63). In fact, in one email, Iqbal's Suffern business partner referred to Suffern's cash flow problems and stated: "Let's keep our fingers x'ed. I see Iqbal is pushing the T[eva] guys about the p[re] payment." (SMF at ¶ 64).

Iqbal admits that Suffern charged Teva a markup for the pharmaceuticals and that his company made a profit on that amount. (SMF at ¶ 65). Additionally, as a result of the scheme, Suffern had an unfair advantage over competitors because Iqbal's role at Teva enabled

Suffern to have an insider's knowledge of imminent projects and pipeline information, so that it could order drugs Teva would soon be seeking in order to corner the market.  (SMF at ¶ 66).

Separately, while reviewing Iqbal's email account, Mikalic discovered that during regular working hours Iqbal used Teva resources, including his Teva-provided email account, to run ten (10) outside businesses other than Suffern, including another pharmacy, eight dry cleaning businesses and a real estate partnership. (SMF at ¶ 67).  Iqbal also submitted paperwork on behalf of those businesses from his Teva email account to various entities and agencies, including the Internal Revenue Service, accounting firms, insurance companies, banks, the New York State Board of Pharmacy, the New York Secretary of State, Legal Zoom, advertising agencies, suppliers, the Better Business Bureau of Fort Worth, Texas, and the Texas Commission on Environmental Quality.  (SMF at ¶ 68).  By conducting and running his businesses using his Teva email, Iqbal gave the false impression that Teva was affiliated with the companies and approved the transactions and negotiations.  (SMF at ¶ 69).

### 3. *Iqbal's Employment Is Terminated Based On The Findings of the Investigation*.

Based on his investigation, Mikalic concluded that Iqbal's failure to disclose to Teva in writing, as required by Teva policy, his personal interest in Teva's transactions with Suffern Pharmacy violated the Code of Conduct and the Conflict of Interest Policy.  (SMF at ¶ 71).  Mikalic also concluded that Iqbal's operation of outside businesses during work time using Teva resources violated both the Electronic Communication Policy and the Outside Employment Policy.  (SMF at ¶ 72).  As a result of Iqbal's violations, Teva's Associate Director of Human Resources, Elaine Lakis, terminated his employment.  (SMF at ¶ 73).

As a result of that termination, and in accordance with the Incentive Plan and the Award Agreement, Iqbal's unvested stock options expired when his employment ended.  (SMF at ¶ 74).  Iqbal was not employed with Teva when bonuses were paid in 2016.  (SMF at ¶ 76).

During Iqbal's deposition in this case, Teva discovered that Iqbal had not been paid for some unused vacation time when his employment was terminated.  (SMF at ¶ 75).  On August 24, 2016, Teva's counsel forwarded a check from Teva to Iqbal's counsel in the amount of $5,067.72, thereby resolving Iqbal's claim for unpaid vacation pay. (SMF at ¶ 75).

Iqbal filed this lawsuit on or about April 14, 2016, asserting a common law breach of contract claim and seeking a retroactive pay increase, a 2016 bonus, stock options, payment for unused vacation time, a severance payment, and equitable relief in the form of the return of belongings he left at Teva's facility.  He also seeks liquidated damages and attorney's fees pursuant to New York Labor Law § 198(1-a).

## III.  ARGUMENT

### A.  The Standards for Granting Summary Judgment Are Well Established.

Federal Rule of Civil Procedure 56(c) requires the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).  A fact is "material" if it might affect the outcome of the suit under relevant substantive law.  *Id.*

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

SL1 1442332v1 030421.00653

475 U.S. 574, 586 (1986).  The non-moving party must identify specific facts showing that there is a triable issue, as "[t]he mere existence of a scintilla of evidence" will not defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 252.  The plaintiff cannot simply restate the allegations of his complaint or rely on self-serving conclusions unsupported by specific facts in the record, but instead must affirmatively come forward with admissible evidence establishing a genuine issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B. The Offer Letter Is Not An Enforceable Contract.

"[T]he elements of a breach of contract cause of action are 'the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages.' "  *Niagara Foods, Inc. v. Ferguson Elec. Serv. Co., Inc.*, 111 A.D.3d 1374, 1376, 975 N.Y.S.2d 280 (N.Y. Sup. Ct., App. Div., 4th Dep't 2013).  "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."  *Resetarits Const. Corp. v. Olmsted*, 118 A.D.3d 1454, 1455, 988 N.Y.S.2d 797, 798 (N.Y. Sup. Ct., App. Div., 4th Dep't 2014) (quotation and citations omitted).  "That meeting of the minds must include agreement on all essential terms."  *Id*.  Thus, "[i]f a material element of a contemplated contract is left for future negotiations, there is no contract enforceable under the statute of frauds or otherwise."  *Ansorge v. Kane*, 244 N.Y. 395, 398, 155 N.E. 683, 694 (N.Y. Ct. App. 1925).  *See also Zhao v. State Univ. of N.Y.*, 472 F.Supp.2d 289, 317-18 (E.D.N.Y. 2007) ("There is no enforceable agreement if the parties have failed to agree on all of its essential terms or if some of the terms are too indefinite to be enforceable.") (citing to New York decisions).

To be enforceable under New York law, an employment agreement must contain all essential terms of employment, including compensation, commencement date and duration, and the employee's obligations to the employer.  *See Elite Technology N.Y. Inc. v. Thomas*, 70

A.D.3d 506894 N.Y.S.2d 420 (N.Y. Sup. Ct., App. Div., 1st Dep't 2010) ("The essential

elements of an effective employment contract "consist of the identity of the parties, the terms of

employment, which include the commencement date, the duration of the contract and the

salary.") (citations omitted); *Spectrum Research Corp. v. Interscience Inc.*, 1997242 A.D.2d 810,

811, 661 N.Y.S.2d 871, 872 (N.Y. Sup. Ct., 3d Dep't 1997) (essential terms lacking where

agreement failed to delineate the precise nature of the work to be done, price and manner of

payment, and time of performance); *Bergin v. Century 21 Real Estate Corp.*, No. 98 Civ.

8075(JGK), 2000 WL 223833, at \*6 (S.D.N.Y., Feb. 25, 2000) ("[T]he alleged agreement that

the defendant would hire the plaintiff as a consultant is also unenforceable because, in addition to

the absence of any agreement as to compensation, there is no allegation that the parties agreed to

any of the other essential terms of such an arrangement, such as Bergin's role, or the services he

would provide.").

   Here, the Offer Letter upon which Iqbal relies is not enforceable as a contract

because it contains almost none of the essential terms for an enforceable agreement.  At most, it

is written confirmation of two initial compensation terms offered to Iqbal in 2012.  The Offer

Letter contains no start date or duration of employment.  Nor does it set forth Iqbal's obligations

to Teva or any job duties he would be required to perform.  The Offer Letter also does not

address benefits Iqbal would receive, such as his health insurance, tuition reimbursement, and

some of the benefits and compensation he seeks in this lawsuit – vacation, stock options,

severance, a bonus[2], or a yearly pay raise.  Thus, the Offer Letter does not address the essential

terms of Iqbal's employment, and it is not an enforceable contract.  *See Griffin v. Bookman*, 48

A.D.2d 777, 778, 369 N.Y.S.2d 139, 141 (N.Y. Sup. Ct., App. Div., 1st Dep't 1975) ("[T]he

---

[2] Although the Offer Letter refers to the terms of Teva's Bonus Program, as explained below, it merely states that
 Iqbal will be eligible to participate in the program, and it does not guarantee a bonus.

above writing is insufficient to establish an enforcible [sic] contract since a material element of the contemplated agreement—the extent, if any, of plaintiff's participation in the commissions referred to—is left for future negotiations.").

New York courts have held that offer letters such as the one here are not binding contracts. *See Barker v. Time Warner Cable, Inc.*, 897 N.Y.S2d 668, at *4 (N.Y. Sup. Ct. 2009) ("To the extent that the Plaintiff claims that the 'Offer of Employment' letter constitutes the "Employment Agreement" that forms the basis for his breach of contract cause of action, such argument is entirely meritless."); *Eagle v. Emigrant Savings Bank*, 148 A.D.3d 47649 N.Y.S.3d 124, 125 (N.Y. Sup. Ct., App. Div., 1st Dep't 2017) (holding offer letter stating that the plaintiff was eligible for participation in defendant's carried interest compensation plan was not an enforceable contract) (citations omitted).

Even if the portion of the Offer Letter addressing Iqbal's salary could be deemed an enforceable contract, the remaining statements concerning Iqbal's eligibility for a bonus cannot. The Offer Letter and the Bonus Program incorporated therein give Teva complete discretion to change, modify, or terminate the Bonus Program at any time and to decide whether and when to award a bonus. (SMF at ¶¶ 6, 8). The Bonus Program also states: "Eligibility to participate in the plan does not guarantee a[] bonus award." (SMF at ¶ 8). As a matter of law, this language defeats Iqbal's claim that the Offer Letter is an enforceable contract entitling him to a bonus. *See O'Grady v. BlueCrest Capital Management LLP*, 646 Fed. Appx. 2, 4 (2d Cir. 2016) ("Paragraph 3 of the Agreement unambiguously states that '[a]ny bonus program established and awards made pursuant thereto by the Company will be subject to the Company's sole and absolute discretion.' **This language precludes O'Grady from claiming that nonpayment of bonus was a breach of contract**.") (emphasis added); *Bessemer Trust Co., N.A.*

14

*v. Branin*, 618 F.3d 76, 91 (2d Cir. 2010) ("**[U]nder New York law the insertion of the word discretion into a bonus arrangement signals the end to any possible challenge to a bonus determination** . . .") (quotation omitted) (emphasis added); *Namad v. Salomon Inc.*, 74 N.Y.2d 751, 753, 545 N.Y.S.2d 79, 80, 543 N.E.2d 722 (N.Y. Ct. App. 1989) (affirming dismissal of breach of contract claim because "the bonus clause unambiguously vests discretion regarding the amount of bonus compensation to be awarded in defendants' management."); *Barker v. Time Warner Cable, Inc.*, 897 N.Y.S.2d 668, at*4 (N.Y. Sup. Ct. 2009) ("**To the extent that the Plaintiff claims that the 'Offer of Employment' letter constitutes the 'Employment Agreement' that forms the basis for his breach of contract cause of action, such argument is entirely meritless**.") (emphasis added).

   Because the Offer Letter is not an enforceable contract, Teva is entitled to summary judgment on all counts.

  **C. Even If The Offer Letter Were An Enforceable Contract, Teva Did Not Breach It.**

   "[T]he fundamental objective when interpreting a written contract is to determine the intention of the parties as derived from the language employed in the contract." *Abiele Contr. v. New York City School Constr. Auth.*, 91 N.Y.2d 1, 9, 666 N.Y.S.2d 970, 689 N.E.2d 864 (N.Y. Ct. App. 1997). Assuming *arguendo* that the Offer Letter is an enforceable contract, Teva has complied with the plain language of the Offer Letter, which addresses only two items: Iqbal's 2013 salary and his eligibility to participate in Teva's Bonus Program.

   ***1. Teva Paid Iqbal the Salary Set Forth in the Offer Letter.***

   The Offer Letter states that Iqbal will be paid $5,769.23 per week in bi-weekly checks, annualized to $150,000.00. (SMF at ¶ 5). Iqbal does not contend that he was not paid at

least that amount.  In fact, he concedes that he was paid <u>more</u> than that by the time his employment ended.  (SMF at ¶¶ 11-12).

During his deposition, Iqbal clarified that he is actually seeking a retroactive pay increase for the two-month period of January and February 2016.  This claim is based on Iqbal's unsupported testimony about his recollection that, when past pay increases were implemented in March of each year, employees also received a separate, lump sum check representing a retroactive pay increase from January 1 through the date of implementation.  Based on that recollection, Iqbal seeks payment for the eight-week period from January 1, 2016 to his termination on February 26, 2016.

Even if Iqbal's recollection was accurate (it was not), it would not establish a basis for his breach of contract claim.  The Offer Letter says nothing about a guaranteed pay increase, let alone a lump sum check to be paid to Iqbal each year representing a retroactive pay increase.  The record evidence establishes that Teva makes and has made no such retroactive payments.[3]  SMF at ¶ 77.  Iqbal's unsupported, self-serving contention, contrary to Teva's evidence and in defiance of logic, does not create a genuine issue of fact and cannot overcome summary judgment.  *Deebs v. Alstom Transp., Inc.*, 346 Fed. Appx. 654, 656-57 (2d Cir. 2009) (affirming grant of summary judgment because "plaintiffs rel[ied] almost exclusively upon" their own testimony in the face of defendants' documentary evidence).  *See also Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 WL 4735364, at *5 (S.D.N.Y., Sept. 8, 2016) (holding that "Plaintiff's self-serving and incomplete testimony . . .  is insufficient to create a genuine dispute of fact . . .");  *Lozada v. Delta Airlines, Inc.*, No. 13-cv-7388 (JPO), 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014) (concluding that plaintiff's "self-serving, incomplete, and inconsistent" deposition testimony was "not sufficient to create a genuine dispute of fact in light of

---

[3] Nor would there be any logical reason to do so.

16

[defendant's] documented evidence"); *Toro v. City of New York*, No. 12-cv-4093 (RRM) (RLM), 2015 WL 1014044, at *5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence – beyond the allegations in his complaint and his own unsupported deposition testimony" to support plaintiff's claim).

### 2. *Bonus Payments Were Discretionary, and Iqbal Did Not Meet the Eligibility Requirements For A Bonus in 2016.*

"The rule with respect to bonuses is that an employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." *Brennan v. J.P. Morgan Securities, Inc.*, 801 N.Y.S.2d 230, at *2 (N.Y. Sup. Ct. 2004) (citing *Hall v. United Parcel Serv. Of Am.*, 76 N.Y.2d 27, 36 (N.Y. Ct. App. 1990); *Weiner v. The Diebold Group, Inc.*, 173 A.D.2d 166, 167 (N.Y. Sup. Ct., App. Div. 1st Dep't 2002)). "An employee has no enforceable right to compensation under a discretionary compensation or bonus plan." *Id.* (citing *Namad*, 74 N.Y.2d at 753).

Iqbal cannot reasonably dispute that the Bonus Program gives Teva complete discretion to determine whether to pay an employee a bonus. Given that discretion, Teva had no obligation to pay Iqbal a bonus in 2016 after his employment was terminated for violating company policies and the Code of Conduct. *See De Madriaga v. Union Bancaire Privee*, 103 A.D.3d 591, 961 N.Y.S.2d 50, 51 (N.Y. Sup. Ct. App. Div., 1st Dep't 2013) ("Defendant's policy that the payment of bonuses was entirely discretionary was clearly expressed in the offer letter to plaintiff, in the company handbook, and in a memorandum . . .  Thus, none of her bonus-based claims . . . are viable.") (citation omitted); *McNabb v. MacAndrews & Forbes Group, Inc.*, No. 90 Civ. 5482 (CLB), 1991 WL 284104 at *6 (S.D.N.Y., Dec. 24, 1991) ("A discretionary bonus is precisely that and the Agreement creates no obligation on the part of MacAndrews to pay McNabb an annual bonus.") (citation omitted), *aff'd* 972 F.2d 1328 (2d Cir. 1992).

SL1 1442332v1 030421.00653

Equally problematic for Iqbal, the Offer Letter that he contends is an enforceable contract states only that Iqbal would be "***eligible***" to participate in the Bonus Program in 2013. Eligibility to participate in a bonus program is not a guarantee that a bonus will be paid.  Indeed, the Bonus Program explicitly states:  "***Eligibility to participate in the plan does not guarantee a[] bonus award***."  (SMF at ¶ 8) (emphasis added).

Further, the terms of the Bonus Program unambiguously establish that Iqbal did not meet the requirements for a bonus in 2016.  First, the Bonus Program states that employees will be eligible for a bonus only if the employee is "an active employee in good standing on the date that bonuses are paid."  (SMF at ¶ 8).  It provides: "An employee is in good standing when there are no known performance shortfalls or compliance violations over a period of time (i.e. 12 months)."  (SMF at ¶ 8).  Iqbal was not employed with Teva when bonuses were paid in 2016. Even if he were, given Iqbal's violations of the Code of Conduct, the Conflicts of Interest Policy, the Outside Employment Policy, and the Electronic Communications Policy, he was not an "employee in good standing."  Therefore, Iqbal did not meet the requirements for a bonus.

Finally, to the extent Iqbal contends that he is entitled to both a bonus and a severance, the plain language of the Severance Policy forecloses that claim.  The Severance Policy states:  "**An employee is not eligible for the Annual Incentive Bonus if employment terminates with severance on or before June 30th of the Plan Year**."  (SMF at ¶ 31) (emphasis added).  Iqbal was terminated in February (*i.e.*, before June 30th).  Therefore, under no circumstances would he be entitled to both a severance and a bonus.

### 3. *Iqbal Did Not Meet the Requirements For A Severance.*

The Offer Letter does not address payment of a severance, and under the terms of Teva's Severance Policy, Iqbal did not meet the requirements to be paid a severance when his employment was terminated.

The Severance Policy unambiguously vests Teva with the sole discretion to decide whether to pay a departing employee a severance.  (SMF at ¶¶ 26-29).  Of the five explicit circumstances in the Severance Policy in which an employee "***may be eligible***" for a bonus, the only one that could conceivably apply here is: "Other instances, in Teva's discretion, as determined by the individual situation."  (SMF at ¶ 27) (emphasis added).  Because this provision explicitly states that Teva has discretion to determine whether to pay a severance, there is no merit to Iqbal's claim that Teva is obligated to pay him a severance.

In fact, the remaining terms of the Severance Policy preclude his claim for a severance.  The policy states: "While Teva reserves the right to determine, on a case-by-case basis, whether an individual employee is eligible for severance pay, the following circumstances will make an individual ineligible to receive severance benefits from Teva: . . . **Termination for misconduct, or violation of company policies, procedures, practices or Ethics and Code of Conduct** . . ." (SMF at ¶ 28) (emphasis added).  Iqbal was terminated for misconduct that violated company policies and the Code of Conduct.  Therefore, he was ineligible for a severance under the plain terms of the Severance Policy.

Further, the Severance Policy states that the receipt of severance benefits is "contingent on the eligible employee . . . executing, abiding by and not rescinding a waiver and release in the form provided by Teva," and it states that "***In no event will an employee who fails to execute the waiver and release be eligible for severance benefits under this policy*** . . ." (SMF at ¶ 30).  It is undisputed that Iqbal did not execute a waiver and release.  Therefore, he was not eligible for a severance.

SL1 1442332v1 030421.00653

### 4.    *Iqbal's Stock Options Expired When His Employment Was Terminated.*[4]

The Offer Letter does not address stock options.  There are also at least two reasons under the Incentive Plan and the Award Agreement why Iqbal is not entitled to stock options.

First, under the Award Agreement, the first 25% of Iqbal's stock options were scheduled to vest on March 12, 2016, and all remaining options were scheduled to vest in subsequent years.  (SMF at ¶ 23).  However, both the Award Agreement and the Incentive Plan state that all vesting shall cease upon a participant's termination *for any reason*.  (SMF at ¶¶ 17, 24).  Iqbal's employment terminated on February 26, 2016, before the first scheduled vesting date.  Because no options had vested before Iqbal's employment ended, and because no vesting could occur after his employment ended, Iqbal neither had nor ever will have vested Teva stock options.

Second, both the Award Agreement and the Incentive Plan state that, in the event of Iqbal's termination for cause, all stock options, whether vested or unvested, shall immediately expire.  (SMF at ¶¶ 18, 25).  "Cause" means

> [C]onduct of the Participant, in connection with his or her employment, that has, or could reasonably be expected to result in, material injury to the business or reputation of the Company or its Affiliates [or] any material violation of the policies of the Company or its Affiliates, including, but not limited to . . . those set forth in the manuals or statements of policy of the Company or its Affiliates . . . "

(SMF at ¶ 20).  Iqbal cannot credibly dispute that his termination for serious conduct that violated Teva policies and the Code of Conduct falls squarely within this definition of "Cause."  Thus, under the explicit terms of the Incentive Plan and the Award Agreement, all of Iqbal's

---

[4] Although the Complaint refers to "stock," during this litigation Iqbal clarified that he is seeking previously granted stock options that expired when his employment ended.

20

stock options expired when his employment terminated on February 26, 2016, and he is not entitled to stock options.

**5.     _There Is No Basis For Iqbal's Claim For Contractual Vacation Pay._**

As with his other claims, Iqbal cannot identify any contractual basis for his claim for vacation pay, which is not addressed in the Offer Letter.  Therefore, this claim fails.  In any event, as explained below, this claim is now moot.  Therefore, Teva is entitled to summary judgment on Iqbal's breach of contract claim.

### D.   The Court Should Dismiss as Moot Iqbal's Claim for Vacation Pay and His Claim for Equitable Relief.

In *Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330 (1975), the Supreme Court held that a federal court must dismiss claims that are rendered moot while litigation is pending because "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them."  *Id.* at 401.  In that case, a prison inmate brought Constitutional claims against prison officials, but the circumstances that the inmate alleged violated his rights were remedied while the litigation was pending before the District Court.  The Supreme Court held that "[t]he rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed . . ." *Id*.  Because there was no "live controversy" when the District Court had issued its decision, the Supreme Court remanded the case with instructions to the District Court to dismiss the claim as moot.  *Id*. at 403.

Here, after Iqbal clarified during his deposition what vacation pay he was seeking, Teva reviewed its records and paid him for all unused vacation, thus resolving this claim.  (SMF at ¶ 75).  Teva also returned to Iqbal the personal property he had left at Teva's facility.  **Iqbal's attorney acknowledged that both of these claims are now moot** in his Reply Brief in support

of Iqbal's Motion to Amend the Complaint.  *See* Reply Brief, Docket No. 49, attached hereto as

Exhibit A, at 4 ("Plaintiff's owed vacation time . . . has been fully paid following the oral

examination of the Plaintiff, and thus has been removed from the [proposed] amended complaint.

Likewise, after the Plaintiff's oral examination, the Plaintiff's personal property was returned,

thus the Plaintiff removed [that claim in the proposed amended complaint].").

Therefore, the Court should dismiss as moot Iqbal's claim for vacation pay and

his claim for equitable relief.  *See New York Civil Liberties Union v. Grandeau*, 453 F.Supp.2d

800, 807 (S.D.N.Y. 2006) (granting defendant's summary judgment motion on the ground of

mootness); *Herbert H. Landy Ins. Agency, Inc. v. Navigators Management Co., Inc.*, No. 14 Civ.

6298(LGS), 2015 WL 170460, at *2 (S.D.N.Y., Jan. 13, 2015) ("Plaintiff states that it no longer

seeks a preliminary injunction because "the passage of time [has] undermine[d]" the need for it.

Any claim for preliminary injunction is therefore dismissed as moot.").

### E.  The Court Should Dismiss Iqbal's Claim Under Labor Law Section 198(1-a).

It is well-settled that New York Labor Law Section 198 does not apply to

common-law breach of contract claims.  Rather, it permits courts to award fees, expenses,

interest, and liquidated damages for proven violations of other, substantive sections of Article 6

of the Labor Law.  *Gottlieb v. Kenneth D. Laub & Co., Inc.*, 82 N.Y.2d 457, 464, 626 N.E.2d 29,

33 (N.Y. Ct. App. 1993) ("[T]he statutory remedy of an award of attorney's fees to a prevailing

employee, as well as the liquidated damages remedy . . . are limited to actions for wage claims

founded on the substantive provisions of Labor Law article 6.").  *See also Parker v. Revlon, Inc.*,

211 A.D.2d 415, 416, 621 N.Y.S.2d 306, 307 (N.Y. Sup. Ct. App. Div., 1ˢᵗ Dep't 1995) ("An

action [for Section 198(1-a) damages] under Article 6 of the Labor Law is limited to claims

founded upon the substantive provisions of that statute" and "nothing in the language of the

statute suggests that it was intended to provide any remedy whatsoever for the successful

prosecution of a common-law civil action for contractually due remuneration . . .") (citations, quotations, and internal alterations omitted).

Here, Iqbal does not assert substantive claims under Section 6 of the Labor Law. His only substantive claim is a common law breach of contract claim.  Therefore, under *Gottlieb* and its progeny, Iqbal cannot recover liquidated damages and attorney's fees under Section 198(1-a), and the Court should dismiss that claim.

This case is similar to *Slotnick v. RBL Agency Ltd.*, 271 A.D.2d 365, 706 N.Y.S.2d 431 (N.Y. Sup. Ct., App. Div., 1st Dep't 2000).  In *Slotnick* the plaintiff, like Iqbal, asserted a breach of contract claim for alleged unpaid compensation against her former employer, along with a claim for liquidated damages and attorney's fees under Section 198(1-a). *Id*. at 431.  After a nonjury trial the court awarded the plaintiff unpaid wages along with liquidated damages and attorney's fees under Section 198(1-a).  *Id*.  The Appellate Division reversed on appeal, noting that Section 198(1-a) "provides only a damage remedy for substantive violations of Article 6 of the Labor Law and depends upon pleading and proof of such substantive violation." *Id*. at 431-32 (citing *Gottlieb*, 82 N.Y.2d at 464-65).  Because the plaintiff did not assert a substantive claim under Article 6 of the Labor Law, the court held, "the judgment should not have included those damages." *Id*. at 432.

For the same reason, this Court should grant summary judgment for Teva on Iqbal's claim under Section 198(1-a).[5]

---

[5] Even if he could assert a viable claim under Section 198(1-a), such claim would be derivative of his breach of contract claim.  Because the breach of contract claim should be dismissed, the Section 198(1-a) claim should also be dismissed.

23

## IV.  CONCLUSION

For the foregoing reasons, Teva is entitled to summary judgment on each count of Iqbal's Complaint.


Respectfully submitted,

STEVENS & LEE, P.C.


Date:  May 5, 2017                    By:  /s/*Brad M. Kushner*_____
                                            Bradley L. Mitchell
                                            485 Madison Avenue, 20th Floor
                                            New York, New York 10022
                                            (212) 319-8500
                                            blm@stevenslee.com

                                            Larry J. Rappoport (*pro hac vice*)
                                            ljr@stevenslee.com
                                            Brad M. Kushner (*pro hac vice*)
                                            bmk@stevenslee.com
                                            1818 Market Street, 29th Floor
                                            Philadelphia, PA  19103
                                            (215) 496-3839

                                            *Attorneys for Defendant*

24