Page 22

144:17 159:9
things 8:17 29:24
  62:12 64:23 72:7
  156:14
think 8:11 10:4
  12:13,13 18:25
  19:22 22:20 27:14
  27:22 28:22 32:15
  35:7 37:21 41:4
  41:20 42:25 43:11
  43:13 44:10,16,19
  49:25 52:18 57:11
  57:14 61:12,22
  64:9 69:16 72:5
  72:19 73:6,7 76:8
  77:5,6 80:11
  82:22 89:9 91:19
  92:24 93:13 96:6
  97:12 100:13,25
  112:5 113:20
  114:8,11 115:4
  118:20 123:6,11
  123:20 124:20
  125:12 127:7
  128:13,15,23
  129:2 134:19
  141:13 149:3
  150:20 152:21
  153:19 155:14,19
  163:17 168:6
  172:6 175:8
  178:24 180:18
  183:18,19 184:19
  186:19 187:9
  190:16,18,21
  191:7
thinking 66:7
third 16:22 17:2
  48:2,9,10 60:20
  116:21 122:18
  138:7 152:23
  153:7 159:13,17
thirty 11:17 53:23
  54:3 89:16 156:16
  168:7,17
thirty-day 89:16

167:21 168:24
thought 15:8,10
  19:7 23:22 27:5,9
  27:13 36:5 92:19
  96:3 102:9 150:24
  155:21 156:5,6
  172:12 173:14,16
three 5:25 10:8
  31:16 152:24
  153:3 173:24
  186:2 189:7
thrust 90:21 191:20
Tim 85:12 86:22,24
  86:25 131:5,11,23
  132:2,6,7
time 1:18 3:17 7:21
  11:19 15:9,10
  16:4,11,18,25
  17:11,18 18:12,20
  19:3,13,22 20:5
  21:23 22:18 27:17
  33:12 34:12 36:7
  46:11 56:20 65:3
  70:16 77:8 79:24
  81:16 97:13
  105:13 110:24
  112:14 119:3,13
  124:6 145:6,9
  149:10,12 154:5
  154:24 158:3
  179:20 181:21,23
  182:3,4 183:12,12
  187:20,22
timeline 31:14
  50:21 113:25
  114:10 174:6
times 105:22
  119:15 125:13
  126:16 180:8,11
  191:8
timing 50:19 51:8
  113:17 152:1̇6
title 5:16 7:10
  42:12 46:5 82:16
  105:23 130:14
titled 158:25

titles 142:14 145:3
today 70:9 131:23
  136:20 137:19
  141:11 165:11
told 19:21 22:6
  27:7 40:6 43:6,10
  51:5 55:25 60:16
  71:2,3,21 73:8,11
  124:14 128:2
  137:24 140:20
  143:20 146:22
  181:2,17 186:18
Tom 189:5
Tong 27:24 28:2,4
  28:11,22 29:5,7
  29:12 31:9,15,20
  32:10 35:6 36:8
  38:9,18,22 40:3
  111:23 135:25
  159:21,25 160:4
  160:13,16 178:20
  181:15,19 182:14
  182:15 183:4,14
  190:8 191:8,12
Tony 27:24 28:2,4
  28:11,22 29:5,7
  29:12 31:9,15,20
  32:10,12 33:23
  35:6 36:8 38:9,18
  38:22 40:3 111:23
  135:25 159:21,25
  160:4,13,16
  178:20 181:15,19
  182:14,15 183:4
  183:14 190:8
  191:8,12
top 62:19 84:2
  115:25 121:20
topics 70:5
totality 41:22
totally 65:25
  175:21 178:24
touch 15:9 16:7,19
touched 149:2
training 46:16
transacting 94:24

transaction 52:11
  53:3 58:24 89:3
  127:8 163:22
  164:7 165:13
  172:11,14 176:7
transactions 46:25
  59:17 80:17 85:16
  85:21 94:15,17,19
  100:15 132:15,21
  164:3,9,17,23
  166:11,16 168:20
  175:25 176:3
transcript 4:2
  52:25 194:25,25
  196:9 197:3
transferred 7:2
transfers 91:25
transgression
  180:9
transgressions
  187:22
transition 125:6
transmitted 163:18
transparency 22:15
transparent 20:9
  21:13,19 22:11,22
  42:7 143:15 144:5
treated 139:4
TRIAL 1:15
trials 4:12
tried 41:25 55:8
  107:17 111:3
  114:22 119:25
tries 43:9
true 11:11 22:5
  39:23 52:18 70:11
  128:13 134:10,21
  135:9,12,15
  136:21 137:23
  157:11 169:17,19
  196:9
truthful 138:21
try 17:23 34:21
  77:3 147:15
trying 27:4 75:22
  89:7 106:6 118:18

118:20 119:5
  125:16,17 162:10
  165:7,9
tubes 153:18
  169:14,16,22
  171:20 172:17,18
  174:3,13 176:8
  177:10,11
Tuesday 73:7
turn 13:18
turned 96:20
TUSA 151:5
twelve 30:21 41:24
  191:8
twenty 192:8,14,17
  192:20,23
twenty-four 175:19
twenty-one 5:14
  6:2,20
two 4:10 5:23 6:2
  10:8 15:2 18:22
  19:4,24 31:22
  36:21 38:4 70:2,3
  70:11 79:21 82:4
  82:6 83:21 84:5
  121:17,23 124:22
  125:16 129:22
  142:14 143:3,7,25
  145:3 150:20
  153:18 156:24
  157:9 168:23
  193:9
type 5:20 6:3,23
  42:7,7 46:15
  166:12
typical 89:13
typically 72:20
  73:16 163:5
  165:24 178:9
  180:14 188:22,24
typing 26:21

_____ U _____
U.S 46:6 80:8
  158:13
ultimately 54:13



Page 23

94:20
unacceptable 41:15
unavailable 138:19
unaware 33:16
uncomfortable
156:14
uncommon 92:14
underline 134:14
138:12
underlined 138:15
underlining 131:9
135:6
underneath 76:17
understand 3:16,22
16:5 18:17 19:17
33:14 36:16 38:4
41:23 42:22 44:10
53:13 75:18 76:3
103:21 109:16
117:7 142:23
150:3 157:18
162:23 164:10
165:18 168:3
169:14 171:11,21
171:23,24 175:8
175:10 178:8
190:15,20
understanding
17:4,11 18:11
36:12,23 40:8
71:5 117:10 170:5
172:4 174:25
178:10
understands 126:8
understood 53:10
54:12 72:8 109:8
114:5 129:5 176:2
unethical 44:2
126:20 127:3,12
128:16
unfair 49:16 74:24
75:22 76:7 85:9
93:16,20,23
unfounded 180:5
180:13
United 1:1 46:4

130:20
units 50:22 52:13
52:14 55:10,12,16
55:22 57:2 59:2
93:6,7 176:12
177:9
University 4:20
unquote 68:4 89:21
unrelated 178:24
unsigned 158:14
unsuccessful 18:2
untrue 146:24
unusual 10:5 90:19
91:6,21
upper 77:19
USA 1:6 3:14
use 15:15,18 26:4
41:9,9 60:23
66:15 67:9 68:4
68:13 69:18,21
71:19 150:15
155:9 157:6,6
usually 12:4 149:11
154:6 175:24
184:19

**V**

V-E-I-T 9:6
value 78:18,21
185:15 186:7
Veit 9:6
vendor 18:15 30:10
30:15 35:12,13,25
38:2,7,10,15
39:21 40:7,15
43:25 45:15 64:8
65:6,9 66:6 77:16
89:11,12,15 92:3
95:22 106:16,25
111:10 113:12
135:22 136:14
139:5 160:5
161:23
vendors 16:10,13
16:15,18 17:5,8
43:7 66:7 89:14

95:20 100:4,6
125:4 176:16,20
verbal 3:21
versus 4:13
viability 37:17
viable 94:11
vice 145:25 158:15
view 41:16
violate 64:22
violated 49:15
violation 124:18
191:3
violations 64:24
76:11 87:24
violative 40:9
virtue 94:3 128:23
128:24
Vitiello 1:19 3:4
196:3,19
voluntarily 73:14
voluntary 7:16,17
volunteered 128:14

**W**

W-2 27:19
W-9 112:21 117:5
118:14,15,21,25
120:22 136:15
137:4,21
W-9s 117:7
W2 8:8
wages 8:8
wait 15:21
walk 22:8
want 3:17 16:2
18:10 37:13 40:12
41:6 57:7 61:10
88:6 113:21 115:5
134:15 135:10
136:6 154:11,14
165:6 174:21
191:15
wanted 38:4 105:10
131:22 175:17
wants 142:23
wasn't 10:23 14:6

18:21 23:11 27:3
29:8,9 58:22 71:7
79:3 106:13
127:13 128:18
135:24 140:19
143:17,21 154:25
157:13 186:20
way 12:3 19:15
25:8 28:24 31:21
34:24 41:21 49:25
50:3 54:10 62:11
64:2 66:7 80:3
82:15 105:19
112:14 116:19
129:8,9 133:19
135:3 139:6
141:14 143:2,20
168:7 174:12
175:21,23 186:24
196:14
Wayne 183:6
We'll 29:22
we're 126:4 177:5
website 98:24
Wednesday 57:13
73:7
week 73:9,11
183:19
weeks 145:18
179:23
weigh 36:25 77:14
155:17
weighing 100:16
welcome 141:24
went 46:15 49:13
162:14
weren't 27:21
136:15
whatsoever 127:19
161:21 189:16
white 1:10 2:6 6:8
6:13
wholesaler 92:11
willing 153:15
wire 6:10
wise 129:23

withdraw 171:15
withdrawn 170:19
witness 1:16 3:2,25
14:14 39:17 47:24
48:15 61:7,8
115:10 133:16
147:6 154:12
196:7,10
witness's 126:5
witnesses 24:7
woman 9:5
wont 141:4
word 15:19 25:9,10
37:22 41:10 44:17
66:15,25 67:8,9
67:15 68:13,23
69:23 71:19 72:22
121:21 134:10
words 15:15 18:10
41:6 67:4 68:4
69:6,18,22 135:10
171:7
work 5:2,20 6:22
8:14,22 9:7,14,15
9:16 35:23 62:15
102:5 103:8
108:12 159:11
162:10
worked 5:5,9,13
6:7,11,13 7:3,12
28:24 49:3 97:5
103:3,5 166:3
188:7,8 195:5
worker 9:24 95:17
96:23
workers 97:8,9
working 5:21 17:8
43:12 84:12 97:15
191:16
works 9:17,18 43:8
84:11 97:12
worth 41:24
wouldn't 34:19
54:13 69:14 77:7
77:24 105:9
126:13 171:21,25



MAGNA
LEGAL SERVICES

Page 24

175:16 178:3
179:7 189:23
191:14
Woznyi 9:9 14:6
  45:4 95:16 96:5
  96:23 99:13
  100:24 101:2,4
  103:2,5,8,16
  139:16 157:23
  195:5
Woznyi's 103:17
writing 29:8 32:21
  32:23 36:21,24
  37:16,17 142:13
  166:13 178:18
  181:13
wrong 151:15
wrote 22:4 123:25
  132:25 143:6
  144:18
www.MagnaLS.c...
  1:25

___X___
x 1:2,8 171:15
  194:1 195:1
XYZ 176:24

___Y___
Yatindra 77:13
yeah 11:16 30:3
  97:11 108:18
  115:4 123:7 150:9
  163:4 177:11
year 7:14,18 27:16
  106:24 177:25
  192:6,22
years 5:7,14,17,18
  5:23 6:2,20 27:11
  91:12,14 156:16
  177:24 178:2
  186:16,19,24
  188:8 193:8
York 1:1,10,20 2:6
  3:5 5:23 6:6,11
  7:2,11 83:9,13

196:4

___Z___
Z-E-B-L-E-C-K-...
  28:22
Zafar 1:2 63:10,24
  69:2 75:22 76:22
  77:24 84:10 85:13
  122:19 127:2
  135:14 136:2
  142:15 160:25
Zafar's 74:21,23
  75:10,16 185:8
Zafar?' 68:5
Zahavi 11:4,12
  13:25,25 14:4,10
  15:13 17:15,17,21
  19:2,12,21 20:10
  20:11,13,16 21:3
  21:9,12 22:6,14
  22:17 23:24 28:24
  35:4 44:7 45:4
  48:20 77:13 79:18
  79:23 81:22 82:5
  82:14 83:14 85:2
  93:14 96:7,16
  99:18 100:16
  103:15,22 105:18
  129:12 130:4
  132:10 138:5,9
  139:24 142:21,23
  143:8 144:13
  145:6 147:17,20
  156:24 157:11,14
  166:8 173:11,22
  186:2
Zahavi's 16:21
  82:15 143:4,18
Zeblecks 28:21,23
  28:25 29:4 31:15
  45:25 74:7,8
  77:12 78:2 93:15
  93:21 94:6,12
  95:5 126:22
  132:10,25 167:7
  168:12 181:19

Zebleckes' 29:12
zero 191:13
Zl 63:7 122:4

___0___

___1___
1 13:7 194:5
1(800) 98:11,17
1:39 144:12
10 10:1 68:25 88:14
  115:14 194:15
100 53:7 93:7 100:1
  155:3
101 55:17,22 57:2
  59:2 101:1 176:9
102 102:1
103 103:1
104 104:1 194:14
105 105:1
106 106:1
10601 1:10 2:6
107 107:1
108 108:1
109 109:1
1099 8:5,20
10th 131:19
11 11:1 61:23 116:9
  116:24 194:16
11:13 1:12
110 110:1
11003:9
111 111:1
1114 32:10
1119 83:22,23
112 112:1
113 113:1
114 114:1
115 115:1 194:15
116 116:1 194:16
117 117:1 194:17
118 118:1
119 81:21 82:2
  84:25 119:1
11th 147:13,17
12 12:1 117:22

194:17
120 78:21 120:1
121 121:1 194:18
122 122:1
123 123:1
124 124:1
125 125:1
126 126:1
1266 104:10
127 127:1
128 128:1
129 129:1
12th 136:10 142:7
  142:13 144:12
  145:14 157:3
13 13:1 120:22
  121:6 194:5,18
130 130:1 194:19
131 131:1
132 132:1
133 133:1
134 134:1
135 135:1
136 136:1
137 137:1
138 138:1
139 139:1 194:20
13th 122:11,15
14 14:1 48:5,11
  130:9 134:7
  194:19
140 140:1 195:5
141 141:1
142 142:1 194:21
143 143:1
144 144:1
145 145:1
146 146:1
147 147:1
148 148:1
149 149:1
15 15:1 139:11
  194:20
150 150:1 153:18
151 151:1
152 152:1

153 153:1
154 154:1
155 155:1
156 156:1
157 157:1
158 158:1 194:22
159 159:1
16 16:1 142:4
  147:11 194:21
160 160:1
161 161:1
162 162:1
163 163:1
164 164:1
165 165:1
166 166:1 194:23
167 167:1
168 168:1
169 169:1 194:24
17 17:1 158:10
  194:22
170 55:10,13,16,22
  93:6,7 170:1
  172:18 176:12
  177:9
171 171:1
172 172:1
173 173:1
174 174:1
175 175:1
176 176:1
177 177:1
178 178:1
179 179:1
17th 80:13
18 18:1 166:21
  194:23
180 180:1
181 181:1
1818 2:16
182 182:1
183 183:1
184 184:1
185 185:1
186 186:1
187 187:1



**188** 188:1
**189** 189:1
**18th** 1:11 84:5
  197:5
**19** 19:1 169:4
  194:24
**190** 190:1
**19002** 3:10
**191** 191:1
**19103** 2:17
**192** 192:1
**193** 193:1
**194** 194:1
**195** 195:1
**196** 196:1
**197** 197:1
**1982** 4:22
**1988** 5:14
**1990** 7:3,4
**1st** 132:12 158:14

**2**

**2** 2:1 24:18 194:6
**2/11/15** 107:14
**2/11/2015** 61:23
  114:21
**2/14/15** 107:19
**2/4/2015** 114:25
**2:04** 81:17
**20** 20:1
**2000s** 6:25
**2004** 7:5
**2009** 5:14 7:13
**2010** 193:4
**2011** 7:13 192:25
**2012** 158:14 192:6
  192:8,16
**2013** 192:19
**2014** 192:22
**2015** 8:3,11,12
  13:23 19:23 23:3
  23:6 27:16 28:23
  29:3 31:3,20 32:8
  42:9 46:23 47:4,5
  61:22,23 77:10
  84:5 85:14 95:10

**95:13** 97:14
**122:11** 126:23
**140:4,10** 142:10
**142:11** 145:14,16
**147:13,17** 157:3
**159:24** 181:18
**2016** 1:11 13:10,17
  13:25 47:20 68:2
  194:5,10 197:5,18
**20th** 120:9
**21** 21:1
**215)751–1949** 2:18
**22** 22:1
**23** 23:1
**230** 169:16,22
  174:3,13
**235** 1:10 2:5
**24** 24:1 194:6
**25** 25:1
**25,000** 167:14
**25th** 77:8 94:9,13
  126:23 132:25
  133:2
**26** 26:1
**26th** 13:25 68:2
**27** 27:1
**27th** 32:11
**28** 28:1
**28th** 32:8 159:24
  181:18
**29** 29:1
**29th** 2:16 53:8
**2nd** 174:4

**3**

**3** 3:1 32:4 194:7
**3.1** 159:5,18
**3.2** 159:3
**3.2.4** 45:15
**30** 30:1
**300,000** 51:14
  54:22 57:14,18
  58:15 168:22
**31** 31:1
**31st** 28:23 32:7
**32** 32:1 194:7

**33** 33:1
**34** 34:1
**35** 35:1
**36** 36:1
**37** 37:1
**38** 38:1
**39** 39:1
**3rd** 53:4 174:5

**4**

**4** 4:1 44:23 68:21
  194:8
**4:49** 193:16
**40** 40:1
**405** 158:14
**41** 41:1
**42** 42:1
**425** 102:3
**43** 43:1
**44** 44:1 194:8
**45** 45:1
**46** 46:1
**47** 47:1 194:9
**48** 48:1
**49** 49:1 116:25
**4th** 1:10 2:5 136:5

**5**

**5** 5:1 13:18 47:18
  194:9
**50** 50:1
**51** 51:1
**52** 52:1
**53** 53:1
**54** 54:1 116:25
**55** 55:1
**56** 56:1
**57** 57:1
**57,000** 53:5 54:21
  174:14
**570** 45:2
**578** 139:15
**58** 58:1
**59** 59:1
**5th** 143:22

**6**

**6** 6:1 14:25 62:4
  107:9 113:24
  114:17 168:21
  194:11
**60** 60:1
**61** 61:1
**62** 62:1 194:11
**63** 63:1
**64** 64:1
**65** 65:1
**66** 66:1 68:2
**67** 67:1 68:21,25
**68** 68:1
**69** 69:1
**6th** 167:7

**7**

**7** 7:1 46:23 73:19
  73:22 168:21
  194:12
**7:16-cv-03464** 1:5
**70** 70:1
**71** 71:1
**72** 72:1
**72,000** 53:9 168:23
**73** 73:1 194:12
**74** 74:1
**75** 75:1
**75,000** 54:21
  167:17
**76** 76:1
**77** 77:1
**78** 78:1
**79** 79:1 194:13
**795** 147:12

**8**

**8** 8:1 51:25 55:15
  79:14,17 194:13
**8/13** 131:7
**80** 80:1
**81** 81:1
**810** 134:17
**811** 134:13 138:7
**812** 132:9 133:9

**82** 82:1
**83** 83:1
**84** 84:1
**85** 85:1
**86** 86:1
**866-624-6221** 1:24
**87** 87:1
**88** 88:1
**89** 89:1
**8th** 47:20 61:22
  140:10 194:10

**9**

**9** 9:1 68:2 103:25
  104:4,8 194:14
**90** 90:1
**91** 91:1
**914)686-5042** 2:7
**92** 92:1
**93** 93:1
**94** 94:1
**95** 95:1
**950** 107:12 114:14
**96** 96:1
**97** 97:1
**98** 98:1
**99** 99:1
**9th** 13:9,17 194:5



MAGNA
LEGAL SERVICES



## OFFICE OF BUSINESS INTEGRITY (OBI)

## CONFIDENTIAL

### FINAL* INVESTIGATIVE REPORT:

**OBI Case # 2015 – 175**
**Conflict of Interest / Misuse of Teva Resources / Collusion**

**March 8, 2016**

*A Preliminary Investigative Report dated February 9, 2016 was issued to Management and Human Resources in furtherance of this investigation and to allow for a discussion of next steps, including the interviews of additional witnesses and the Implicated Parties. Those interviews took place on February 22, 2016 and are contained herein. This report should be considered the Final Investigative Report for this matter.

Date Assigned: December 8, 2015

Assigned To: Jim Mikalic

Business Unit / Division: OBI

Office of Business Integrity
CONFIDENTIAL



## I. INTRODUCTION

On December 8, 2015, John O'Grady, Senior Director, Internal Audit (IA), and Richard Wright, Vice President, Compliance Audit, shared the following with the OBI:

During the normal course of conducting a contract management audit of Teva vendors, IA discovered a potential conflict of interest with an entity known as Suffern Pharmacy. IA explained that the owners of Suffern Pharmacy are two Teva employees, Zafar Iqbal, Associate Director, Process Engineering, R&D, Pomona; and Daud Hosain, Associate Director, Product Robustness, Pomona. IA also advised that there were payments to Suffern Pharmacy in which the amounts, as well as the timing, appeared suspicious.

IA further shared that Debra Anzalone, Manager, Global R&D, Compliance became aware of this matter and conducted an Inquiry beginning in March 2015 and concluding in July 2015, at which time Teva Compliance and Procurement concluded that a business relationship between Teva and Suffern Pharmacy was not prudent and elected to terminate the relationship.

IA was also concerned about the volume of business that Suffern Pharmacy conducted with Teva in a short period of time. A review of Teva Accounts Payable (AP) indicated that Suffern Pharmacy, prior to its cessation of fulfilling orders for Teva, received approximately $470,000.00 from February 2015 until June 2015.

Furthermore, although this matter was opened to investigate a conflict of interest allegation and a suspicious payment history, this investigation determined during its course that Messrs. Iqbal and Hosain, in addition to each gentleman having a 25% interest in Suffern Pharmacy, have a 25% interest each in another entity known as Monroe Pharmacy. Moreover, the investigation revealed that Mr. Iqbal owns approximately eight dry cleaners and laundromats in Texas as well as a limited liability real estate partnership. The investigation determined that both gentlemen engage in the habitual practice of utilizing Teva's resources (time and Information Technology (IT)) to attend to numerous and constant outside business demands and requirements.

Finally, another potential violation of the Code of Conduct emerged during this investigation in which Messrs. Iqbal and Hosain are suspected of engaging in market collusion and possible bid rigging as it relates to some of the business transactions they conducted with Teva.

Note:

This Final Investigative Report differs from the Preliminary Investigative Report issued on February 9, 2016, in that, this report contains interview results of the Implicated Parties and Miriam Morris, Inventory Control Coordinator, Pomona, that can be found beginning on page fifteen.

| # | Allegation Description | Resp. Investigator |
|---|---|---|
| A | Zafar Iqbal and Daud Hosain have a created a conflict of interest and have violated Teva's Conflicts of Interest Policy by not properly disclosing an ownership interest in Suffern Pharmacy prior to Suffern Pharmacy becoming a vendor of Teva's. | J. Mikalic |
| B | Messrs. Iqbal and Hosain have created additional conflicts of interest by operating outside businesses in addition to Suffern Pharmacy. | J. Mikalic |
| C | Messrs. Iqbal and Hosain have violated Teva's Electronic Communications and Outside Employment Policies for personal gain. | J. Mikalic |
| D | Messrs. Iqbal and Hosain have violated the Code of Conduct by colluding | J. Mikalic |

2

Office of Business Integrity
CONFIDENTIAL

| with outside business associates and by engaging in bid rigging with a Teva employee, the result of which enriched Messrs. Iqbal and Hosain and caused economic harm to Teva. | |

## II. OVERVIEW OF FINDINGS

At the issuance of the Preliminary Investigative Report, the OBI made the following four assessments:

The investigation clearly established that Messrs. Iqbal and Hosain do, in fact, own Suffern Pharmacy. The investigation also determined that they didn't properly disclose in writing, as required by Teva's Conflict of Interest Policy, their interest in Suffern Pharmacy and the fact that they wanted to engage in commerce with Teva. Furthermore, the investigation determined that Messrs. Iqbal and Hosain, in addition to not disclosing, were not transparent in revealing their interests in Suffern Pharmacy and attempted to conceal, at least during the initial filing stage with Teva Procurement in January 2015, their ownership of that company. Allegation A is therefore **SUBSTANTIATED.**

The investigation also determined that no contract was executed between Teva and Suffern Pharmacy; instead, only a Reciprocal Confidentiality Agreement, which was signed by Suffern Pharmacy employee, Eugene Frenkel, Supervising Pharmacist on February 11, 2015, exists. The investigation determined that in a relatively short period of time (five months) Suffern Pharmacy positioned itself to do almost $500,000.00 in business with Teva and earned approximately $50,000.00 in profit.

Messrs. Iqbal and Hosain have also been running their own businesses during regular working hours while utilizing Teva's resources and have, therefore, created additional conflicts of interest. Moreover, the investigation determined that in the course of conducting and running their other businesses, Teva time and resources were significantly abused in violation of Teva's Electronic Communication Policy and Outside Employment Policy. The investigation further revealed that Messrs. Iqbal and Hosian utilize their Teva Outlook email accounts to manage their outside business interests, thereby indirectly and inappropriately representing Teva as part of their outside business dealings. The OBI concludes that allegations B and C are therefore **SUBSTANTIATED.**

Another concern that was uncovered during this investigation related to an incident of price fixing and collusion with other pharmacies within the local Pomona-area market who are friendly with Messrs. Iqbal and Hosain. As explained below in detail, in May 2015 Messrs. Iqbal and Hosain colluded with five other local pharmacies to monopolize the market for a particular product that Teva required, the result of which was a windfall of over $32,000.00 for Suffern Pharmacy. Furthermore, to exacerbate this situation, Mr. Iqbal sought and received pre-payments from Teva for this and other orders and falsely stated to his Teva colleagues that in order to consummate this transaction, he needed to pre-pay his suppliers (a statement the investigation concluded is not true). Allegation D is therefore **SUBSTANTIATED.**

In sum, the investigation has established that Messrs. Iqbal and Hosain, by engaging in this conduct, have violated the following Teva policies:

- By failing to properly disclose a conflict of interest vis-à-vis Suffern Pharmacy, they have violated the Code of Conduct and US Policy – 405 Conflicts of Interest.
- By having run their own businesses during normal business hours while utilizing Teva time and resources, they have created another conflict of interest in violation of the Code of Conduct and US Policy – 405 Conflicts of Interest.

3

**Office of Business Integrity**
**CONFIDENTIAL**



- Both gentlemen have violated Teva's US Electronic Communications Policy and Teva's Outside Employment Policy as a result of these outside business activities.
- Messrs. Iqbal and Hosain have colluded with other pharmacies and may have participated in bid rigging with a Teva employee to manipulate the market to their benefit and to the detriment of Teva in violation of the Code of Conduct's Antitrust and Unfair Competition Clauses.

**Note:**

As a result of this Final Investigative Report containing interview results of the Implicated Parties and Ms. Morris, the OBI confirms that Allegations A, B and C are **SUBSTANTIATED** and modifies Allegation D to be **PARTIALLY SUBSTANTIATED**. This finding is being modified due to insufficient evidence to support the contention that bid rigging and collusion existed between Mr. Iqbal and Ms. Morris. This is further explained in the interview of Ms. Morris.

## III.  INVESTIGATIVE ACTIONS & PERSONS INTERVIEWED

- Interview of Shulamit Zahavi, Global Category Manager, Procurement, Israel
- Analysis of Messrs. Iqbal and Hosain's Information Technology (IT) Resources
- Analysis of Teva's Accounts Payable and Suffern Pharmacy Invoices for services rendered for the period February 2015 – May 2015
- Examination of OBI proprietary databases
- Review of the Code of Conduct, US Policy – 405 Conflicts of Interest, Outside Employment Policy and Electronic Communications Policy

## IV.  INVESTIGATION DETAILS

As noted above, the OBI began its investigation by discussing with IA and Ms. Anzalone the allegation that a conflict of interest existed between Messrs. Iqbal and Hosian, acting as Suffern Pharmacy representatives, and Teva and requesting that they share any and all records that were available to them. In addition, the OBI obtained from IA all Purchase Orders (POs) and invoices relating to transactions between Teva and Suffern Pharmacy. These invoices revealed that Suffern Pharmacy was located at 24 Lafayette Avenue, Suffern, New York 10901, with telephone number (845) 661-1210.

The OBI also reviewed all email correspondence provided by Ms. Anzalone and IA. The OBI learned that by March 2015 several Teva employees were made aware of the fact that Suffern Pharmacy was owned by two Teva employees. On March 11, 2015, Ms. Morris disclosed this fact during the course of a routine email request to have the payment terms for Suffern Pharmacy changed from net 60 days to net 30 days.

Summary extracts of those emails that are germane to this investigation are as follows:

- On March 11, 2015, in response to the request for a change from net 60 to net 30, Shulamit Zahavi, Global Category Manager, Procurement, Israel requested extensive information about Suffern Pharmacy.
- On March 11, 2015, while supplying very positive answers about Suffern Pharmacy to Ms. Zahavi's questions, Ms. Morris advised, "Please note that Suffern Pharmacy is owned by two Teva employees."
- On March 12, 2015, Ms. Zahavi requested their names and titles and Ms. Morris supplied them to her.

4

Office of Business Integrity
CONFIDENTIAL



- This disclosure caused Ms. Zahavi and Janet Zebleckes, Senior Director, Procurement, R&D, North Wales, to begin an effort to fully identify the extent of the conflict of interest.
- On March 27, 2015, Ms. Zebleckes sent an email inquiry to Tony Tong, Vice President, R&D, and asked if he was aware that Suffern Pharmacy was owned by two employees and if he had disclosed this fact to Human Resources (HR).  Mr. Tong said that he was aware of the ownership but he didn't think HR was apprised.
- On March 29, 2015, Ms. Zebleckes brought this matter to the attention of Ms. Anzalone, who from April until July 2015 conducted a thorough review of this matter and assessed it to be a conflict of interest that needed to be addressed and eliminated.
- On April 2, 2015, Ms. Zahavi, when replying to Ms. Morris's request for an advance payment to Suffern Pharmacy for an order of REDACTED said, "Since, again, this purchase is putting us in a very stressful situation.  I approve the payment but I suggest to **stop** (bold added by Ms. Zahavi) ordering from this vendor until we get a response from Legal."

*The OBI investigator notes that although Ms. Zahavi raised concerns and red flags as early as March 2015 and that these concerns were echoed and reinforced by Ms. Zebleckes as well as Ms. Anzalone, R&D continued to use Suffern Pharmacy throughout April, May and June 2015. Additionally, the investigation's email review determined that the debate on whether or not to engage Suffern Pharmacy continued within Procurement, Legal and Compliance over these months and lasted until the end of July when Procurement and Compliance decided to terminate the business relationship.*

In order to learn more about the circumstances surrounding the period of March – July 2015 regarding Teva's business dealings with Suffern Pharmacy, the OBI spoke with Ms. Zahavi on January 26, 2016.  Ms. Zahavi provided the following information:

- Ms. Zahavi recalled the circumstances relating to Suffern Pharmacy and said as soon as she learned of the owners' identities and their positions within Teva, she assessed the arrangement to be problematic and potentially unethical.
- Ms. Zahavi explained that as pharmacy owners and a Teva supplier as well as Teva employees, their roles would certainly give them an unfair advantage over their competition as they would have access to co-workers' knowledge of imminent projects and specific pipeline information that Suffern Pharmacy's competitors would not.
- Ms. Zahavi stated that she and some other Teva employees researched the idea of building firewalls and cut-outs for Suffern Pharmacy transactions but this idea, in the end, proved to be unworkable.  Consequently, by June or July 2015, she said Teva stopped doing business with Suffern Pharmacy.
- The OBI informed Ms. Zahavi of the existence of a $75,000 blanket PO Teva issued to Suffern Pharmacy and that Suffern Pharmacy exceeded that by $400,000.00.
- Ms. Zahavi explained this is not unusual as a blanket PO is generally used for smaller purchases and that Suffern Pharmacy was issued separate POs for other orders. *(Investigator's Note: The OBI confirmed this statement to be true, that is, there are additional POs issued to Suffern Pharmacy.)*
- She said two issues in particular gave her pause when it came to Suffern Pharmacy.
- One issue was she found it very difficult, prior to Ms. Morris's disclosure, to ascertain the owners' identities.  She thought it was odd that, unlike other suppliers, she had a hard time getting in touch with Suffern Pharmacy's owners and, at the time, thought there was something secretive about the whole situation.
- When asked if any one Teva employee was the source of this less-than-transparent behavior, Ms. Zahavi said it was Ms. Morris.  Ms. Zahavi did not say she felt it was necessarily

5

Office of Business Integrity
CONFIDENTIAL



intentional; she said it was just odd.  Ms. Zahavi said Ms. Morris finally disclosed in an email that the owners were Teva employees.

- The second issue Ms. Zahavi cited was a particularly perplexing transaction involving Suffern Pharmacy and the product REDACTED.  Ms. Zahavi explained that in May 2015 the Pomona site needed a large quantity (170 units) of this product.  She said a red flag went up for her because for some reason, as this need was recognized, the product "disappeared from the market."  She said, although the Pomona staff was trying to locate this product with other suppliers, only Suffern Pharmacy had an adequate supply to fulfill the order, which they ultimately did.  *(Investigator's Note: Suffern Pharmacy earned over $25,000.00 on this $300,900.00 order. This aspect of the investigation will be further explained later in this report.)*
- Ms. Zahavi said she has never heard of Monroe Pharmacy and that, to her knowledge, Teva does not do business with them.  *(Investigator's Note: As mentioned in the Introduction of this report, the investigation uncovered the fact that Messrs. Iqbal and Hosain own this business as well, a development that will be expanded on later in the report.)*

Check of OBI Proprietary Databases

A check of proprietary databases determined that the corporation BDesh, Inc. owns Suffern Pharmacy, 24 Lafayette Avenue, Suffern, New York.  The initial filing in the state of New York for this corporation was February 26, 2013. The officers are listed as Mustaque Khan, Principal; and Mohammed H. Rahman, Executive Director.

The only connection to Messrs. Iqbal and Hosain uncovered during the proprietary database checks is a cellphone number that appears on Suffern Pharmacy's invoice letterhead.  That number, (845) 661-1210, was determined to be subscribed to by Mr. Iqbal and is his personal property, not Teva-issued property.

To gain a clear and concise comprehension of the business transactions conducted between Teva and Suffern Pharmacy, the OBI reviewed Teva AP records, POs and Suffern Pharmacy invoices.

Financial Analysis of Teva POs and Suffern Pharmacy (Vendor # 92972) Invoices

Through the analysis of Teva POs, AP and Suffern Pharmacy invoices, the OBI learned that Suffern Pharmacy's business with Teva consisted of ten transactions from February 2015 until May 2015 before Teva Procurement and Compliance instructed Teva R&D to cease using them.  The OBI examined the below invoices and all appear to be in conformity with the products being ordered and paid for.  What was unknown prior to this investigation was whether all these transactions were done transparently, at an arm's length and in Teva's best interests.  More details on these concerns will be presented below supported by evidence gleaned during the forensic email review.

| Invoice Date | PO Number | Payment Date | Product | Quantity | Amount |
|---|---|---|---|---|---|
| February 25 | 42193637 | June 10 | REDACTED | 4 | $  6,580.00 |
| February 26 | 42193637 | April 30 | REDACTED | 1 | 1,768.69 |
| March 6 | 42193637 | May 4 | REDACTED | 1 | 230.25 |
| March 7 | 42193637 | May 11 | REDACTED | 3 | 690.75 |
| March 9 | 42193637 | May 11 | REDACTED | 1 | 12,845.38 |
| March 10 | 42193637 | May 11 | REDACTED | 3 | 690.75 |
| April 2 | 42196515 | April 3 | REDACTED | 230 | 57,527.60 |
| April 6 | 42193637 | June 10 | REDACTED | 35 | 24,330.95 |
| May 13 | 42199767 | May 21 | REDACTED | 170 | 300,900.00 |

6

Teva-226

A.133

Office of Business Integrity
CONFIDENTIAL



| May 27 | 42200551 | May 29 | REDACTED | 41 | 72,570.00 |
|--------|----------|--------|----------|----|-----------|
| Total  |          |        |          |    | $478,134.37 |

As alluded to above, and explained in detail below, the investigation ultimately determined that Messrs. Iqbal and Hosain do, in fact, own Suffern Pharmacy. The next phase of the investigation was to ascertain the extent of their use of Teva IT resources to conduct Suffern Pharmacy business and how these outside activities may have clashed with Teva's interests. From this effort the OBI learned not only did Messrs. Iqbal and Hosain use Teva IT resources for their personal gain, but that they may have gained an unfair advantage during some of the above transactions.

<u>Review of Messrs Iqbal and Hosain's IT Resources and Examination of Emails Relating to Business Conducted Between Suffern Pharmacy and Teva et al</u>

After receipt of required approvals, the OBI conducted a targeted, key word search examination of Messrs. Iqbal and Hosain's IT resources for the period July 1, 2014 to July 31, 2015.

For some of the above transactions, the OBI found financial email evidence from Messrs. Iqbal and Hosain's account that provided keen insights into how much Suffern Pharmacy earned during these transactions. The records are in the following forms:

- Excel spreadsheets for Suffern Pharmacy prepared by Mr. Hosain and Messrs. Iqbal and Hosain's partners at Suffern Pharmacy indicating investments, expenses and profit
- Suffern Pharmacy POs sent to drug supplier REDACTED by Mr. Iqbal
- Emails among Mr. Iqbal, his partners and suppliers discussing quotes and profit margins

Through analysis of these records, the OBI was able to determine that Suffern Pharmacy earned approximately $50,000.00 in profit from the $476,983.82 in revenue it received from Teva. The majority of the $50,000.00 in net income was earned in April and May 2015 on the REDACTED and REDACTED transactions.

The next portion of this report explains how the OBI arrived at the figure of $50,000.00 in profit and also discusses three separate products - REDACTED REDACTED and REDACTED - and how Messrs. Iqbal and Hosian may have violated Teva's Code of Conduct as the transactions involving these products were discussed and consummated.

REDACTED Transactions - Evidence of Possible Collusion

As cited above by Ms. Shulamit, the May 2015 transaction involving the 170 units of REDACTED was, in her opinion, suspicious as the "product disappeared from the market." Ms. Shulamit's suspicion was confirmed through evidence and statements gleaned from the email examination.

Throughout April and May 2015, Mr. Iqbal attempted to acquire REDACTED and communicated with the drug manufacturer REDACTED dozens of times and, although he contacted REDACTED on his Teva email account, it was clear he was representing Suffern Pharmacy during these numerous exchanges. The desired orders over this time ranged from 156 to 450 units. Ultimately, it appears that Suffern Pharmacy was able to acquire some units from REDACTED, although Mr. Iqbal was extremely upset with REDACTED employees that they could not satisfy an order for 450 units.

Some additional emails shed light on what was happening with this order and Mr. Iqbal's request for Teva to pre-pay his suppliers, which are none other than his business (Suffern Pharmacy) and fellow pharmacy owners.

7

Office of Business Integrity
CONFIDENTIAL



- On May 11, 2015, Mr. Iqbal emailed Ravinder Raju, Senior Project Manager, R&D and said, "Just wondering, have u heard anything from Shull regarding REDACTED? We have now 170 tubes. But since the price is so high close to $340,000 - no one wants to hold it beyond 2 days. They can only wait until Wednesday for the prepay. Pls let me know. Sorry to bother you on this. The tubes are now out of market - just wanted to make sure we get all those are available. Pls let me know asap. I will do everything possible to help. Thanks!" (*The OBI Investigator would like to add that when Mr. Iqbal mentions "Shull", he is referring to Shulamit Zahavi, who would have to approve any pre-payment.*)
- On May 18, 2015, Mr. Hosain emailed his Suffern Pharmacy partners and said, "Fyi......,.it looks like REDACTED will deduct ~$72,000 on 05/22 (this Friday) or 05/25 (next Tuesday) and RDC will take out ~$16,000 this Thursday. We need to closely monitor this in case we do not have enough in our account (in case we do not get prepayment). In addition, we have to consider the situation of others who provided us REDACTED. Hopefully, we will get a big payment from REDACTED (>25K) this week for REDACTED for Richard Decker."
- Shortly after on May 18, 2015, Mr. Hosain replied to numerous emails from Mr. Iqbal and another Suffern Pharmacy partner, Mokerram Chowdhury, as they generally discussed Suffern Pharmacy's cash flow problems. Then Mr. Hosain clearly referred to the pre-payment request and how that will help their cash flow issue. Mr. Hosain said, "Let's keep our finger x'ed. I see Iqbal (original) is pushing the T-guys about the p-payment."
- On May 20, 2015, Shulamit (Shull) Zahavi sent an email to several colleagues and said, "I approve the prepayment this time."

*The OBI investigator questions the truthfulness and intent of Mr. Iqbal when he writes to Mr. Raju that, "they can only wait until Wednesday for the pre-pay." As explained below, Mr. Iqbal is referring to his suppliers, who are in this case Suffern Pharmacy and his business associates who own other pharmacies. Moreover, it is also obvious from Mr. Hosain's comments that a pre-payment was a very important business concern relating to cash flow and had little to do with pre-paying their* REDACTED *suppliers, which was what Mr. Iqbal had disingenuously told his Teva colleagues.*

On May 21, 2015, Suffern Pharmacy received a pre-payment of $300,900.00 for the 170 units from Teva and then on May 29, 2015, they received another pre-payment for $72,570.00 for the 41 units. At Mr. Iqbal's persistent urging, both transactions were paid well ahead of the customary net 60-day terms.

On May 29, 2015, when both REDACTED transactions were finalized, Suffern Pharmacy partner, Mr. Chowdhury, emailed them an Excel spreadsheet called "Summary of REDACTED Business Transaction" in which he referred to the two orders of REDACTED – 170 units and 41 units. The Excel spreadsheet contained explicit details on the source of the 170 units. Of note, on the spreadsheet the first entry is the pre-payment figure of $300,900.00 Suffern Pharmacy received from Teva.

The spreadsheet showed that of the 170-unit order, Suffern Pharmacy supplied 69. The remaining 101 units were acquired through their network of friends who own pharmacies ( REDACTED - 37 units, REDACTED – 32 units, REDACTED – 25 units, REDACTED - 5 units, REDACTED – 2 units).

Furthermore, on the spreadsheet, Messrs. Hosain and Chowdhury concluded that based on how much Suffern Pharmacy had to pay the above pharmacies for their units that, "12.8% of our profit goes to our friends who helped us make it happened (sic)."

8



Office of Business Integrity
CONFIDENTIAL

Through analysis, the OBI determined that on the $300,900.00 transaction Suffern Pharmacy earned $25,197.00 in net income. For the 41-unit order in which Suffern Pharmacy supplied 38 units and REDACTED supplied 3 units, Suffern Pharmacy made $7,376.00 in net income, for a total of $32,573.00 in net income from both orders.

*It is the OBI investigator's opinion that Messrs. Iqbal and Hosain deliberately colluded with their fellow pharmacists to monopolize the* REDACTED *market. Corroborating this assessment is Ms. Zahavi's recollection that she felt at the time there was something suspicious about this transaction. It appears her instincts were correct.*

Prior to these May 2015 transactions, Mr. Iqbal tried extremely hard and in vain to fulfill an even larger order of REDACTED. To illustrate the level of frustration Mr. Iqbal expressed when he learned in April 2015 that REDACTED would not be able to satisfy his request for 450 units, below are some examples of Mr. Iqbal's tone when dealing with a REDACTED representative while emailing from his Teva email account and simultaneously representing Suffern Pharmacy. (All emails are verbatim with typos left uncorrected.)

- On April 30, 2015, Mr. Iqbal sent an email to Daniel App of REDACTED, "I am very disappointed to let you know that some other company got their hands on this 450 tubes ($800K business) – couldn't – lost a big business!!!"
- On April 30, 2015, Mr. App responded and said, "Don't copy even one into these emails! You are going to lose this account. Please call me first. I understand that you are upset,"
- On April 30, 2015, Mr. Iqbal replied (*Investigator's Note: Mr. Iqbal is referring to Matt Poulos of* REDACTED *with whom Mr. Iqbal was upset*), "If he doesn't push his boundary and keep showing arrogance like this – we are not going anywhere – where other people are pushing their boundaries and doing everything getting $800K business. He should take is much more passionately. My aim not happy with him."

*The OBI investigator notes that Mr. Iqbal arrives at the figure of $800,000.00 in lost business by multiplying 450 units by $1770 per unit. If* REDACTED *would have been able to fulfill this order, Suffern Pharmacy would have earned approximately $80,000.00 ($720,000.00 - 450 x $1600 - their average cost per unit.) The OBI investigator would also like to highlight the fact that Mr. Iqbal was very agitated and was complaining to Mr. App that his* REDACTED *colleague, Mr. Poulos, does not stretch the rules in order to get the job done, even though the order's size would have caused Mr. Poulos to violate a* REDACTED *policy if this deal had gone through. Also, to get a sense of the magnitude of Mr. Iqbal's outside interests and work habits for personal gain, the OBI investigator would also like to note that this exchange with several* REDACTED *employees regarding the 450-unit order resulted in the transmission of 115 emails from April 1, 2015 to April 30, 2015.*

Additionally, the email review determined that for at least some of the transactions Mr. Iqbal established a clear advantage as he was provided price quotes of Suffern Pharmacy's competitors, as highlighted below.

REDACTED and REDACTED Transactions - Evidence of Potential Bid Rigging

The below email exchange between Mr. Iqbal and Ms. Morris is in reference to the product REDACTED:

- On March 12, 2015, Ms. Morris emailed Mr. Iqbal and said, "Please provide a price quote. Thanks."
- On March 12, 2015, Mr. Iqbal replied, "$1,831.95/Tube.  Thanks!"

Office of Business Integrity
CONFIDENTIAL



- On March 13, 2015, Ms. Morris came back, "Zafar, I can get it for $1,793.  Please advise if you can better this price.  Thanks!"
- On March 13, 2015, Mr. Iqbal replied, "I just discuss (sic) with folks from our distributor -- we can do $1790.02."
- On March 13, 2015, Ms. Morris said, "Thanks for that quote.  Also I can get the REDACTED for $216.00.  Can you beat that?"

Although there is no evidence from POs and AP to indicate that the order of REDACTED was consummated with Suffern Pharmacy, it does illustrate the manner in which Mr. Iqbal was able to gain inside information from Ms. Morris to better position himself in the negotiations.  The above email exchange then turns to the topic of the product REDACTED, which is explained further below.

By March 24, 2015, Teva R&D had determined there was a need for the product REDACTED and Ms. Morris began her search for this product.  As mentioned in the preceding email on March 13, 2015, Ms. Morris said she could obtain REDACTED for $216.00 per unit and asked Mr. Iqbal, "Can you beat that?"  Emails between Mr. Iqbal and REDACTED employees established that Suffern Pharmacy was able to acquire the required 230 units at a price of $202.23 each, as indicated on the REDACTED PO that was found in Mr. Iqbal's email to Mr. App of REDACTED.

Inexplicably, a week later Teva agreed to pre-pay Suffern Pharmacy $57,527.60 for 230 tubes (@ $250.12 each).  As noted above, Suffern Pharmacy financial records and REDACTED POs uncovered during this investigation determined that Suffern Pharmacy's profit on this one transaction was $11,014.70.  It is not clear from the email review why Ms. Morris did not pursue the supplier who quoted her the $216.00 per unit price.

Also, of note is the fact that on March 6 and March 7, 2015, Suffern Pharmacy sold 4 tubes of REDACTED to Teva for $230.25 each.  So, in less than three weeks' time, Mr. Iqbal raised his price to $250.12 per unit when his cost remained the same at $202.23 per unit.

Finally, regarding the REDACTED transaction, below is an email exchange between Ms. Morris and Mr. Iqbal that is indicative of possible collusion and coaching of Mr. Iqbal by Ms. Morris:

- On March 25, 2015, Mr. Iqbal sent the following note to Ms. Morris: "After a great deal of efforts, R&D has found this particular lot of REDACTED which is comparable to Teva's product, so it is highly critical for the success of the bio-study for this product.  Teva's product is in the clinic and R&D must have this REDACTED lot asap.  The source getting the lot for us could get such large quantity of the REDACTED (230 tubes) only on pre-payment.  But we need to act very fast.  As this is a very fast moving product the same lot is available only for few days, therefore, if we do not act now this particular lot will not be available for us to buy.  This is a very business critical product for Teva, so your quick approval will be highly appreciated."
- On March 26, 2015, Ms. Morris replied to Mr. Iqbal, "Thanks.  I spiffed it up some and have just sent it."
- On April 1, 2015, Mr. Iqbal wrote back, "Hi, Do you know when the pre-pay will be deposited in our account?  Thanks!"
- On April 6, 2015, Ms. Morris said, "The invoice paid 4-3-15 as ACH payment in the amount of $52,527.60."

*The OBI investigator notes that Mr. Iqbal's email creates a sense that only this source can get this product.  He also conceals "the source getting the lot..." is Suffern Pharmacy.  Ms. Morris's reply that she "spiffed it up some" suggests she provided material support to finalize Mr. Iqbal's initiative.  As*

10

Office of Business Integrity
CONFIDENTIAL



*noted in the last email, this transaction also resulted in a pre-payment for Suffern Pharmacy, circumventing the established 60-day terms.*

As mentioned above, Ms. Zahavi said that, prior to Ms. Morris's disclosure, it was very difficult to ascertain the ownership of Suffern Pharmacy. Her assessment is supported in the next section by the manner in which the Supplier Questionnaire for Suffern Pharmacy was completed and the details their representative provided. This pattern of a lack of transparency continued by the manner in which Mr. Iqbal referred to Suffern Pharmacy in his emails in January and February 2015.

Review of Emails Relating to Suffern Pharmacy's Vendor Registration with Teva

- On January 9, 2015, Eugene Frenkel, Supervising Pharmacist sent a letter of introduction to Teva employees.
- On January 19, 2015, Mr. Frenkel sent another email and enclosed the New Supplier Registration Packet. Mr. Iqbal is copied on this email.
- A review of this packet (Supplier Questionnaire) contained the name of Mr. Frenkel as Suffern Pharmacy's authorized representative.
- On January 20, 2015, Mr. Iqbal emailed Constance Deeney, Supplier Data Coordinator, North Wales and said, "Just wondering how long it takes to set up a new supplier in the system."
- Following the above emails are several others where Mr. Iqbal inquired about additional registration requirements and where he referred to Suffern Pharmacy as a "new supplier" or "this vendor."
- Although Mr. Iqbal repeatedly referred to himself in Teva emails to his outside business interests that he is the President and CEO of Suffern Pharmacy, nowhere in the Teva Procurement application does his name appear and neither does Mr. Hosain's name.

*The OBI investigator believes the above summary supports Ms. Zahavi's contention that Suffern Pharmacy's ownership by two Teva employees was deliberately disguised, not properly disclosed and withheld from common knowledge during the official registration process.*

Review of Messrs. Iqbal and Hosain's IT Resources and Analysis of Their Use of Teva Resources to Conduct and Further their Outside Business Interests

Obvious to the OBI throughout the email examination was that Mr. Iqbal, and to a lesser extent, Mr. Hosain, simply because he has fewer outside business interests, use their Teva email extensively for outside business interests. Mr. Iqbal operates no less than ten outside businesses and Mr. Hosain has an interest in two, Suffern and Monroe Pharmacies. Mr. Iqbal regularly identified himself on Teva emails as the President and CEO of Suffern Pharmacy and he regularly used this title as well as others for some of his other businesses.

Below are but a few example of these emails, followed by a summary of the businesses Mr. Iqbal owns and a partial list of businesses and government agencies he and Mr. Hosain regularly contacted to fulfill their outside business requirements.

- On January 28, 2015, Mr. Iqbal sent an email to Daniel App of <span style="background:black;color:white">REDACTED</span> with the subject being "New Credit Application Existing Pharmacy." In the email, Mr. Iqbal provided the identities, addresses and social security numbers of the four partners of Suffern Pharmacy (Messrs. Iqbal and Hosain, Mr. Chowdhury and Mohammed Rahman) and requested that Mr. App process their credit application so that Suffern Pharmacy could obtain credit from <span style="background:black;color:white">REDACTED</span>.

11

Office of Business Integrity
CONFIDENTIAL



- As mentioned earlier in this report, Messrs. Iqbal and Hosain started a second corporation, Monroe Pharmacy. Beginning in December 2014, many emails regarding this new interest began appearing on the Teva network. *(Investigator's Note: No evidence was gleaned during the investigation that indicates Monroe Pharmacy does any business whatsoever with Teva. This determination is supported by the email review, by Ms. Zahavi's statement that she does not recognize this supplier as a Teva vendor and by an Oracle vendor review conducted by the OBI investigator.)*
- On March 13, 2015, Mr. Iqbal emailed his partners in Monroe Pharmacy (Mr. Hosain, Mr. Chowdhury and Leetu Zaman) a very long list of forty-five tasks and assignments relating to the opening of this new business, which was slated for August 2015. This email is followed by hundreds of emails among the partners, who discuss roles, responsibilities, concerns and investment obligations.
- On May 20, 2015, Mr. Hosain, to allay his business partners' concerns about unaddressed Monroe Pharmacy emails informed them, "I check Monroe Pharmacy emails everyday 10 times – no problem."
- On June 23, 2015, Mr. Hosain emailed ▓▓▓ REDACTED ▓▓▓ with the subject being "Monroe Pharmacy - Executed Pharmacy Provider Agreement." Attached to the email was a "Participating Pharmacy Information Form" listing Mr. Hosain as the Vice President and owner.
- Throughout 2015, to further his outside business, Mr. Iqbal received quotes from REDACTED; he then sent the quotes to Suffern Pharmacy for a PO; after he received a PO from Suffern Pharmacy, he then sent the Suffern Pharmacy PO to REDACTED. This type of transaction occurred numerous times, generating hundreds of emails related to their outside business.

*The OBI investigator notes that in the exchanges with REDACTED it is very clear to REDACTED employees that Mr. Iqbal is representing Suffern Pharmacy and not Teva, although Mr. Iqbal's email address clearly contains tevapharm.com.*

The investigation determined that Mr. Iqbal uses his Teva resources to run several business endeavors in which he has a majority interest (64%); namely, Acoustic Clean Corporation and Aloft LLC. Acoustic Clean Corporation operates eight dry cleaning companies in and around Arlington, Texas. Aloft LLC is a real estate partnership. Records indicate that as of July 2014, Acoustic Clean Corporation operated the following businesses: DCSC, Star Cleaners, T-Cleaners, Crystal Cleaners, Circle S, DCSC Hurst, Royal and Comet Cleaners.

*The OBI investigator notes that the email review uncovered records that indicate Mr. Iqbal receives a salary plus profit sharing proceeds from the above entities. It's not evident to the OBI investigator what, if any, income Messrs. Iqbal and Hosain receive from Suffern and Monroe Pharmacies.*

**Note:** *After the interviews of the Implicated Parties on February 23, 2016, the OBI reviewed email data one more time and found evidence that both gentlemen were paid in cash for working shifts at Suffern Pharmacy throughout 2014 – 2015.*

As with his dealings with REDACTED and others, Mr. Iqbal's emails contain a variety of titles and affiliations. For example, he is "Mohammed Iqbal, President & CEO, Acoustic Clean," "Management, Acoustic Clean Corp," "CEO and President of Monroe Pharmacy" and "Dry Clean Super Center," to list a few. Mr. Hosain sometimes places the name and address of Suffern Pharmacy in his emails.

In addition to voluminous emails generated among the partners to run these businesses, a sample of Messrs. Iqbal and Hosian's email includes multiple correspondence with the following recipients:

12

**Office of Business Integrity**
**CONFIDENTIAL**



- Chase Bank – bank statements and correspondence
- Internal Revenue Service
- Accounting and CPA firms - Acoustic payroll records, U.S. federal income tax returns
- Insurance companies
- Mortgage and loan companies
- Better Business Bureau of Fort Worth, Texas
- Various New York State (NYS) tax and business registration agencies (e.g., NYS Board of Pharmacy and NYS Secretary of State)
- Legal Zoom
- Advertising agencies and pharmacy suppliers
- Texas Commission on Environmental Quality (TCEQ)

During contact with many of the above entities, both gentlemen, but especially Mr. Iqbal, spent quite a lot of time re-negotiating many financial issues stemming from these businesses. For instance, with the TCEQ, Mr. Iqbal had continually sought an acceptable payment plan for fines incurred by the dry cleaning businesses. He also was in a constant state of re-negotiating better terms for debts, business loans and mortgages.

Review of Legal Documents Between Teva and Suffern Pharmacy

As noted in Overview section of this report, the investigation determined that no contract was executed between Teva and Suffern Pharmacy; instead, only a Reciprocal Confidentiality Agreement, which Suffern Pharmacy employee, Mr. Frenkel, signed on February 11, 2015, is the only legal document between Teva and Suffern Pharmacy.

Review of Teva's Code of Conduct, US Policy -- 405 Conflicts of Interest, Outside Employment Policy and US Electronic Communications Policy

A review of the above policies was conducted with relevant extracts of each policy as they relate to this investigation noted below:

In regard to conflicts of interest, Teva's Code of Conduct states, "Employees are responsible for avoiding situations that present – or create the appearance of – a conflict between their interests and those of Teva." The US Policy -- 405 Conflicts of Interest states that, "Teva expects that each of its employees will act, at all times in the course of his or her duties, in the best interests of Teva. Each employee must be free from any actual or potential conflict of interest and must avoid even the appearance of such a conflict in dealing with other businesses or individuals on behalf of Teva." It continues, "Employees must disclose, in writing and in advance, any potential or actual conflict of interest for resolution."

The Code of Conduct and the US Electronic Communications Policy further advise employees that, "Teva's electronic communications system should be used primarily for Company business and incidental or occasional personal use should not further the business activity of any entity other than Teva."

The Outside Employment Policy states, "Outside employment or interests will present a conflict of interest if they have, or present the opportunity to have, an adverse impact on Teva. Teva expects its employees to regard their employment with Teva as their primary employment. No outside activity may interfere with an employee's ability to properly perform job duties. If Teva determines that outside work or activity is interfering with Teva performance, the employee may be asked to terminate or modify the outside work/activity if he/she wishes to remain with Teva."

13

Office of Business Integrity
CONFIDENTIAL



In reference to market collusion and price fixing, the Code of Conduct's Antitrust and Unfair Competition Clauses state, "Antitrust and competition laws focus on ways to ensure that businesses compete on the basis of quality, price and service and that these laws seek to protect competition by prohibiting, among other things, agreements to fix prices or obtain a monopoly through something other than competition on the merits."

## V.  CONCLUSION AND RECOMMENDED ACTION

Regarding the lack of disclosure relating to the conflict of interest, as noted above on page four of this report, on March 27, Ms. Zebleckes of Procurement contacted Mr. Tong inquiring about the approval of Suffern Pharmacy as an official Teva vendor.  Although Mr. Tong said Mr. Iqbal verbally disclosed his interest in Suffern Pharmacy to him, this disclosure was not done in accordance with the written requirements of Teva's Code of Code or US Policy -- 405 Conflicts of Interest, the result of which conduct is a violation of both policies.

Furthermore, the investigation determined conclusively that Messrs. Iqbal and Hosain have been operating their own personal businesses, and, in doing so during Teva working hours while utilizing Teva resources, have created a conflict of interest.  By engaging in this conduct, they have violated Teva's Code of Conduct's prohibition of excessive personal use of Teva's IT as well as Teva's restrictions on outside employment as the investigation has clearly found that their outside interests have been a distraction and have interfered with their Teva work responsibilities.  Additionally, to conduct these outside activities, Messrs. Iqbal and Hosain regularly communicated as Suffern Pharmacy officers with numerous outside parties, including negotiating with representatives from drug companies such as REDACTED and REDACTED.

Moreover, the investigation established that Messrs. Iqbal and Hosian have compounded the conflict of interest by colluding with other pharmacies and by creating an unfair advantage for themselves in the transactions involving REDACTED, in violation of the Code of Conduct's Antitrust and Unfair Competition Clauses.  Also, Mr. Iqbal made several false statements to his Teva colleagues regarding the desire for pre-payments, when, in fact, the advance payments were needed to ameliorate Suffern Pharmacy's cash flow problems.  On May 18, 2015, Mr. Hosain, while he exchanged emails with his Suffern Pharmacy partners with the subject being cash flow concerns, captured the essence of Mr. Iqbal's intentions when he wrote, "I see Iqbal (original) is pushing the T-guys about the p-payment."

Another concern identified during the investigation relates to the conduct of Ms. Morris in her interactions with Mr. Iqbal and whether she compromised her objectivity in selecting suppliers.  As illustrated on pages nine and ten of this report, the OBI has called Ms. Morris's behavior into question when she asked Mr. Iqbal, "Can you beat that?" and when she said she had "spiffed up" his email, presumably to increase Mr. Iqbal's odds of receiving a pre-payment.  The OBI would like to explore her intent and the possible bid rigging concern presented in these situations and whether these interactions resulted in a violation of the Code of Conduct's Antitrust and Unfair Competition Clauses as well as an adverse impact on Teva's business operations.

In conclusion, the above-described conduct resulted in a windfall for Messrs. Iqbal and Hosain as their company, Suffern Pharmacy, of which they own 25% each, earned nearly $50,000.00 in five months from their transactions with Teva, thus enriching them and clearly putting their interests above Teva's.

Given the above conclusions, the OBI recommends that Messrs. Iqbal and Hosain be interviewed and given the opportunity to provide a response to the allegations.  Management is also requested to

14

examine the extent to which their chains of command were aware of the conflict of interest. It is also recommended that Ms. Morris be interviewed to explain her intent and decisions as these transactions were being negotiated. The OBI can provide further investigative assistance if warranted. Finally, Management must consider corrective actions where warranted, specifically in relation to the conflict of interest, the misuse of Teva time and resources, the outside employment activities and the evidence of market collusion.

## VI. LESSONS LEARNED

## VII. APPENDICES

**Post-Preliminary Investigative Report Steps:**

- On February 24, 2016, a conference call was conducted to discuss the below interview results and corrective actions. Personnel on the call were Tony Tong, Elaine Lakis, Thomas McDonough, Associate General Counsel; Inna Ben Anat, Director, R&D; Kathleen Veit, Director, OBI; and James Mikalic.

- Additional interviews conducted after the Preliminary Investigative Report was issued on February 9, 2016 included the Implicated Parties, Messrs. Iqbal and Hosain, and Ms. Morris. Ms. Lakis was present during the following three interviews.

- Interviewed Mr. Iqbal on February 23, 2016 in Pomona, New York. The OBI captured the following salient points:

    - Mr. Iqbal was asked to discuss Suffern Pharmacy. He admitted reluctantly that he is a 25% owner in this business.
    - Mr. Iqbal was asked who executed the CDA (also referred to as a Reciprocal Confidentiality Agreement) on behalf of Suffern Pharmacy and replied he did not recall.
    - When informed the person was Supervising Pharmacist Eugene Frankel who signed CDA and the Teva Procurement form, he replied this is a common practice.
    - He went on to say it's a legal requirement for the Supervising Pharmacist to sign these types of legal documents. He further explained the State of NY Pharmacy Board that controls and governs pharmacists insists that the Supervising Pharmacist sign the CDA and Procurement form.
    - When shown that emails indicated that he deliberately tried to conceal the ownership of Suffern Pharmacy during the application process (January – February 2015), he said that it was not true.
    - He was shown a 3/31/2015 email to Mr.Tong and asserted that was the time of his disclosure. When he was reminded that the CDA and Procurement documents were signed in the beginning of February, he didn't acknowledge the inconsistency.
    - When asked, Mr. Iqbal thought the amount of money Suffern Pharmacy earned from Teva was $20,000.00 - 30,000.00. When informed that the net income was closer to $50,000.00, he said the OBI Investigator's figures and conclusions were subject to interpretation. He was informed that his Suffern Pharmacy partner prepared an Excel spreadsheet with profit figures on it which was found in his Teva emails. He was told the OBI Investigator examined it and relied on that internal document which clearly

showed the higher profit margin.  Mr. Iqbal did not acknowledge this fact other than to reiterate the numbers were subject to interpretation.

o   Mr. Iqbal was asked about outside employment.  He initially did not admit to any outside employment other than Suffern Pharmacy.  The OBI investigator brought to his attention that he also has ownership interests in Monroe Pharmacy and dry cleaning businesses in Texas.  He admitted having an ownership interest in Monroe Pharmacy.  He said he is the President and CEO of Acoustic Clean as a favor to his family there.

o   When informed that the OBI Investigator has seen evidence that he owns eight dry cleaning locations, he said that may have been true at one point but that presently he owns two locations.

o   When asked about salaries, he said his wife receives a small salary from Acoustic Clean.  He was informed the OBI Investigator knew he also receives a salary from the dry cleaning business because the OBI Investigator found many emails between him and his payroll company.  He admitted he receives a salary but added it's very small.

o   Mr. Iqbal does not consider Suffern and Monroe Pharmacies to be outside business interests because he doesn't draw a salary from either entity.  He also does not think these businesses are distractions to his work at Teva.

o   Mr. Iqbal was asked why he uses the Teva email infrastructure as much as he does.  He replied that most of his contacts use his old Barr Labs email address which rolls into his tevapharm.com account.

o   When it was brought to his attention that this answer made no sense whatsoever and that many of his outside business interests were developed many years after the Barr system became obsolete, he did not reply.

o   He said he is phasing out relying on the Teva system.  When asked when he made this decision to no longer use the Teva IT system for personal business, he could not answer.  He simply said "enough is enough."

o   Mr. Iqbal was asked to review his numerous email exchanges with REDACTED employees.  He did not acknowledge how REDACTED employees could potentially view these emails, meaning it could occur to them to ask the question: how is it that a Teva employee is conducting negotiations for Suffern Pharmacy?  He added that he didn't think representing to being the CEO and President of Suffern Pharmacy on his tevapharm.com email account and negotiating with REDACTED and others could adversely affect Teva's reputation.  He refused to see this as an issue.

o   Regarding the REDACTED and REDACTED orders, Mr. Iqbal asserted he had to pre-pay his suppliers.  When challenged that the timing and tone of his and others' emails suggested otherwise, Mr. Iqbal did not reply.  He insisted on saying he paid these suppliers in advance.

o   When asked about the exchange between him and Ms. Morris where she asked, "Can you beat that?", Mr. Iqbal did not specifically answer the question.  He said generally he does not see how his employment at Teva and Suffern Pharmacy is unethical or how transactions between Teva and Suffern Pharmacy could create an unfair advantage for him and Suffern Pharmacy.

o   He further stated he does not see a conflict of interest by being a Teva employee and a Suffern Pharmacy owner, who happened to be a Teva supplier.  He added any perception of a conflict of interest is subject to interpretation.

o   *In sum, it is the OBI investigator's opinion that Mr. Iqbal viewed his alleged violations of the Code of Conduct (conflict of interest, outside business activity, abuse of Teva's time and resources, bid rigging and collusion) as being all matters that were subject to interpretation.  He accepted no responsibility for his conduct and was less than forthright when responding to questions.*

Office of Business Integrity
CONFIDENTIAL



- o   *Statements and topics where he lacked candor included the CDA process and the application of Suffern Pharmacy to become a Teva vendor; the disclosure of his ownership interest in Suffern Pharmacy; the need to have Mr. Frenkel be the responsible party as per State of NY Pharmacy Board requirements; the range of his outside businesses and salary; the overall use of Teva IT for non-Teva business and his communications with* REDACTED *the market collusion with other friendly pharmacies; the purported need for advance payments; and the unfair advantage he would have over other suppliers as he would know the pipeline. He admitted that he engaged in certain conduct (i.e., having outside businesses and being paid a salary), only when shown irrefutable evidence and when absolutely necessary. When he did admit a transgression, he minimized his behavior. For instance, he said he would stop using the Teva IT system but never accepted responsibility for his conduct and blamed others for using his old Barr Labs email address. Other times when his statements conflicted with factual evidence the OBI presented, he would simply say nothing.*

- Interviewed Mr. Hosain on February 23, 2016 in Pomona, New York. The OBI captured the following salient points:

    - o   Mr. Hosain said he is a 25% owner of Suffern Pharmacy
    - o   His Suffern Pharmacy partner, Mr. Iqbal, did the filing with Teva Procurement. He had no involvement in registering Suffern Pharmacy as a vendor/supplier for Teva.
    - o   Mr. Iqbal told him that Teva Management was aware of their ownership interest in Suffern Pharmacy and he thought Mr. Iqbal went through the required due diligence.
    - o   He did not think becoming an approver supplier would be granted because of the potential conflict of interest and because the Code of Conduct prohibits these types of arrangements.
    - o   When Mr. Iqbal told Mr. Hosain he had a CDA signed by Teva Management, Mr. Hosain said he was surprised as he did not expect this outcome.
    - o   Regarding his outside business interest in Suffern Pharmacy, he said his managers – both former and present (Michael Frank, Chris Main and Ms. Anat, respectively) were aware of this outside activity. He said it was common knowledge and no one had an issue with it.
    - o   However, when asked, Mr. Hosain advised that his managers did not know Suffern Pharmacy became a Teva supplier.
    - o   When asked if he had other outside business, Mr. Hosain replied he has a 33% ownership interest in Monroe Pharmacy.
    - o   He said that, although he works every other Saturday at Suffern Pharmacy, he does not receive salaries from these businesses as he and his partners are still trying to build up the businesses.
    - o   Regarding the use of Teva's IT resources for personal business, Mr. Hosain accepted responsibility; he admitted it was a mistake; and said he will refrain from using it in the future.
    - o   In May or June 2015 Teva Procurement decided that there was a conflict of interest between Teva and Suffern Pharmacy and that they could no longer do business. Mr. Hosain said he was relieved and not disappointed by the decision
    - o   He said he was always concerned about a conflict of interest but he thought Mr. Iqbal had taken care of everything
    - o   When asked questions regarding which individual should sign the CDA and Procurement registration forms, Mr. Hosain said it is almost always the President or

17

**Office of Business Integrity**
**CONFIDENTIAL**



CEO who executes these forms. He added that it's not a New York State legal
requirement for the Supervising Pharmacist to sign documents.

o   Mr. Hosain is not aware of who signed the CDA for Suffern Pharmacy. When
    informed it was Mr. Frenkel, he was surprised.

o   Mr. Hosain thought the amount of money Suffern Pharmacy earned from Teva was
    $20,000.00 - 30,000.00. When informed that the net income was closer to
    $50,000.00, he said that "it's possible."

o   Regarding the $300,000.00 REDACTED transaction, he said he was happy to help Teva
    but also volunteered and recognized that Suffern Pharmacy had made money on the
    deal.

o   Mr. Hosain does not believe he and Mr. Iqbal colluded with other pharmacies to corner
    the REDACTED market. He also felt the advance payments - $300,000.00, $72,000.00
    and $57,000.00 – that Suffern Pharmacy received from Teva were used appropriately.

o   He said he recognized the conflict of interest from the very beginning because he
    takes the Code of Conduct training annually.

o   Mr. Hosain was asked about the email exchange between Mr. Iqbal and Ms. Morris
    where Ms. Morris asked, "Can you beat that?" Mr. Hosain thought that it's an
    unethical situation because Mr. Iqbal now knows the competitor's price.

o   *In sum, it is the OBI Investigator's opinion that Mr. Hosain accepted responsibility; he
    apologized for his transgressions; and he expressed remorse. He thought Mr. Iqbal
    had done all the proper due diligence to avoid a conflict of interest. He disclosed his
    outside business to his managers but did not disclose to his manager that Suffern
    Pharmacy had become a Teva vendor. He admitted that using Teva's IT system to
    conduct personal business was wrong. He does not believe he colluded with other
    pharmacies. Although he acknowledged Suffern Pharmacy made money on its
    transactions with Teva, he thought he was helping Teva secure certain lots at the best
    prices.*

o   *However, it is also the OBI Investigator's opinion that Mr. Hosain was not truthful when
    he said he did not receive a salary for his services at Suffern Pharmacy. After the
    interview of Mr. Hosain, the OBI reviewed the email data one more time. In email
    records the OBI found evidence to support the assessment that Mr. Hosain was
    regularly paid in cash ($20-40 per hour) for working Saturdays and other days as
    needed throughout 2014 and 2015. Based on the available records found in the
    forensic review, the sum of these cash wages totaled several thousand dollars over
    this period.*

•   Interviewed Ms. Morris on February 23, 2016 in Pomona, New York. The OBI captured the
    following salient points:

o   Sometime in 2014, Mr. Hosain told her in a casual conversation that Suffern
    Pharmacy had opened up and that Mr. Hosain worked there.

o   In February 2015, Anwar Hossain, a former Teva employee, contacted her to see
    about registering Suffern Pharmacy as an approver vendor. Mr. Hossain told her that
    Suffern Pharmacy would be cheaper than its competitors.

o   Mr. Hossain was the first to contact her about Suffern Pharmacy becoming an
    approved supplier for Teva.

o   On or around February 2015 she learned that Suffern Pharmacy was owned by
    Messrs. Iqbal and Hosain. She does not recall how she found out.

o   She said the Code of Conduct instructs employees to report to management any
    potential conflict of interest and she felt at the outset that this relationship was a
    conflict of interest.

18

Office of Business Integrity
CONFIDENTIAL



- o She reported this issue to her manager, Sohobed Saha and to Mr. Tong as well. She said she explained to Messrs. Saha and Tong that she had a problem with the fact that Suffern Pharmacy was owned by two employees.
- o She thought this was a conflict of interest that should have never been approved. She also knew that Mr. Iqbal would know the pipeline and requested lots because he was present in many meetings where these topics were discussed.
- o She learned that Mr. Tong had signed the CDA so she thought it was okay to use Suffern Pharmacy.
- o She did not like being forced to use Suffern Pharmacy but she ended up using them because she was trying to please her partners in R&D and was always trying to get the best price for Teva.
- o When shown the CDA and Procurement registration form, Ms. Morris said Mr. Iqbal, as CEO and President of Suffern Pharmacy, should have signed these documents not Mr. Frenkel.
- o Ms. Morris was asked about the email between her and Mr. Iqbal where she asked, "Can you beat that?"
- o Ms. Morris said she viewed Suffern Pharmacy as a supplier and that's the way she negotiates with suppliers. She does not think she ever gave Suffern Pharmacy any preferential treatment. She always tries to get the best prices for Teva.
- o When asked why she selected Suffern Pharmacy over another pharmacy that was quoting a lower price, she said the other pharmacy probably couldn't fulfill the entire lot and order.
- o When Procurement determined that R&D could no longer use Suffern Pharmacy as a supplier she felt relieved and explained she did not like being in this position.

- • Subsequent to the interview, on February 25, 2016, Ms. Morris emailed the OBI Investigator supporting documents to refute the allegation that bid rigging existed between her and Mr. Iqbal. Ms. Morris said the quote of $216.00 for REDACTED she received was from Mark Snyder of REDACTED and that the likely reason she did not buy from him was because he could not guarantee an order lot of 230 tubes of REDACTED.

19

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MOHAMMED ZAFAR IQBAL,                    )
                                          )
            Plaintiff,                    )      Case No.: 7:16-cv-03464
                                          )
v.                                        )
                                          )
TEVA PHARMACEUTICALS USA, INC.,           )
                                          )
            Defendant.                    )
                                          )

### AFFIDAVIT OF LARRY J. RAPPOPORT

                          )
                          ) ss.
                          )

1. I am counsel for Teva Pharmaceuticals USA, Inc. ("Teva") in this action. I am providing this affidavit testimony based upon my firsthand knowledge.

2. In August of 2016, Teva discovered that Iqbal had not been paid for 64 hours of unused vacation time when his employment was terminated.

3. Accordingly, on August 24, 2016, I forwarded a check from Teva to Iqbal's counsel in the amount of $5,067.72, thereby resolving Iqbal's claim for vacation pay.

4. A true and correct copy of the letter I sent on August 24, 2016 is attached hereto as Exhibit 1.

                                    Larry J. Rappoport

FURTHER AFFIANT SAYETH NAUGHT.

_____

COUNTY OF *Philadelphia*          : ss.
Sworn to before me and subscribed in my presence this *3rd* day of May, 2017.
*Patricia A. McCloskey*
NOTARY PUBLIC

SL1 1462918v1 030421.00653

# STEVENS & LEE
## LAWYERS & CONSULTANTS

620 Freedom Business Center, Suite 200
King of Prussia, PA 19406
(610) 205-6000 Fax (610) 337-4374
www.stevenslee.com

| | |
|---|---|
| Direct Dial: | (610) 205-6039 |
| Email: | ljr@stevenslee.com |
| Direct Fax: | (610) 371-7977 |

August 24, 2016

BY FEDERAL EXPRESS

Adam M. Peska, Esq.
PESKA & ASSOCIATES, P.C.
235 Main Street, Ste. 450
White Plains, NY 10601

Re: Iqbal v. Teva Pharmaceuticals USA, Inc.
S.D.N.Y. No. 7:16-cv-03464

Dear Adam:

It was Teva's understanding that Mr. Iqbal had been paid for all unused vacation time he had accrued upon the termination of his employment. As you know, during Mr. Iqbal's deposition he raised for the first time an issue regarding carry-over vacation time from previous years. As a result of that testimony, Teva immediately checked and confirmed that Mr. Iqbal did, in fact, have unused vacation time that had carried over from previous years. Accordingly, Teva is issuing the enclosed check for $5,067.72, which represents 64 hours of unused vacation pay, minus applicable payroll taxes.

We anticipate that this will resolve Mr. Iqbal's claim against Teva for unpaid vacation time.

Very truly yours,

STEVENS & LEE

/s/ Larry J. Rappoport

LARRY J. RAPPOPORT

BMK:
Enclosure

Philadelphia • Reading • Valley Forge • Allentown • Harrisburg • Lancaster • Scranton
Wilkes-Barre • Princeton • Charleston • New York • Wilmington
A PROFESSIONAL CORPORATION

08/24/2016 SL1 1429245v1 030421.00653

A.148

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MOHAMMED ZAFAR IQBAL,                     )
                                          )
            Plaintiff,                    )         Case No.: 7:16-cv-03464
                                          )
v.                                        )
                                          )
TEVA PHARMACEUTICALS USA, INC.,           )
                                          )
            Defendant.                    )
                                          )

<u>AFFIDAVIT OF COURTNEY MAZZOLA</u>

                          )
                          ) ss.
                          )

1. I am a Human Resources Manager for Teva Pharmaceuticals USA, Inc. ("Teva

USA"). I am providing this affidavit testimony based upon my firsthand knowledge.

2. I have worked in Teva's Human Resources Department since 2006.

3. I am familiar with the documents governing compensation and benefits offered to

Teva employees in the United States, including the Plaintiff in this lawsuit, Mohammed Zafar

Iqbal.

4. Attached hereto as Exhibit A is a true and correct copy of the Employee Incentive

Compensation Policy governing the Bonus Program for eligible Teva employees in the United

States, including Mr. Iqbal.

5. Attached hereto as Exhibit B is a true and correct copy of the 2010 Long-Term

Equity-Based Incentive Plan governing stock options awarded to Teva employees, including Mr.

Iqbal.

6. I am familiar with Teva's regular practice with regard to pay increases given to

employees in the United States. Pay increases typically take effect in or around March of every

year.  I am not aware of any Teva employee who has been paid a check in March representing a

retroactive pay increase from the period of January 1 until the date when a pay increase is

implemented.  Nor to my knowledge has any employee been promised such a payment.

Courtney Mazzola

FURTHER AFFIANT SAYETH NAUGHT.

COUNTY OF BERGEN                    : ss.

Sworn to before me and subscribed in my presence this 3ʳᵈ day of May, 2017.

NOTARY PUBLIC

Antonina Nasca
Notary Public
Bergen County, New Jersey
My Commission Expires August 8, 2018

2

 | Human Resources Management Guidelines

Guideline Title:    Employee Incentive Compensation Policy
Coverage:           All Non-Union Employees
Location:           All Locations
Date:               July 1, 2012
Supersedes:         NA

## Policy

In addition to base salary compensation, Teva awards bonuses to employees to recognize contributions to the success of the business, to encourage appropriate behavior that will sustain the long-term success of the company, and to retain outstanding performers. As part of the Total Rewards philosophy, bonuses help motivate strong individual, team, and company performance to meet and exceed business objectives.

Incentive plans may be adjusted due to changes in business conditions. The Company reserves the right to modify or terminate these plans at any time at its discretion. To be eligible to receive an annual bonus award an employee must be an active employee in good standing on the date that bonuses are paid, with limited exceptions. An employee is in good standing when there are no known performance shortfalls or compliance violations over a period of time (i.e. 12 months). Eligibility to participate in the plan does not guarantee an bonus award.

## Annual Bonuses – Non Sales Employees

The annual bonus paid to employees is part of a broad reward program tied to the achievement of pre-determined corporate goals and objectives. The plan is designed to ensure a link between the company's success and the individual and team effort required to achieve enterprise excellence. Strategic business targets are established and approved by senior management on an annual basis and bonus payments are typically awarded annually based on the measured achievement of these established goals. The individual bonus amounts will increase or decrease in proportion to the level of the corporate goals attained and the individual's performance.

## Field Sales Bonuses

The incentive program for field sales and field sales management is intended to reward results achieved using sales practices that encourage appropriate and compliant behavior in order to achieve those results. Sales targets are set by each business unit or product franchise and approved by senior management. The terms and conditions of the sales incentive plan are provided to all eligible individuals in writing. This information is considered confidential and proprietary and should be treated as such. Further details regarding eligibility, including performance requirements, are detailed in the specific business unit or franchise plan description.

The design and/or any changes to the design of the plans are approved by senior members of U.S. Brands: President of U.S. Brands, Business Unit General Manager, and Head of Finance for U.S. Brands, Head of US Compliance, Head of US Compensation & Benefits, and Head of Human Resources for U.S. Brands. In addition, any special contests tied to sales must be approved by this same group prior to implementation and announcement of the plan to the field. The plan should be presented in written form to the approving team by the proponent of the plan.

Implementation of these Field Sales Bonus plans and review / approval of individual bonus calculations are the responsibility of the Business Unit General Manager, Head of Sales, Finance Director, and Human Resources Business Partner for each business unit or franchise, with additional review by the US Compliance Group.

Approved By: _Laura R. _____                              Page:   1

## TEVA PHARMACEUTICAL INDUSTRIES LIMITED
## 2010 LONG-TERM EQUITY-BASED INCENTIVE PLAN

1.      Purpose.

The purpose of the Plan is to assist the Company (a) in attracting, retaining, motivating, and rewarding certain key employees, officers and directors of and consultants to the Company and its Affiliates, and (b) promoting the creation of long-term value for shareholders of the Company by closely aligning the interests of such individuals with those of such shareholders. The Plan authorizes the award of Share-based incentives to Eligible Persons to encourage such persons to expend their maximum efforts in the creation of shareholder value. The Plan shall serve as the primary plan under which equity-based incentives are awarded on a worldwide basis to Eligible Persons.

2.      Definitions.

For purposes of the Plan, the following terms shall be defined as set forth below:

(a)      "2005 Plan" means the Teva Pharmaceutical Industries Limited 2005 Omnibus Long-Term Share Incentive Plan.

(b)      "ADS" means an American Depositary Share, which represents one Ordinary Share.

(c)      "Affiliate" means, with respect to any entity, any other entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such entity and any other entity determined by the Committee to be an "Affiliate" for purposes of this Plan.

(d)      "Award" means an Option, a Restricted Share, a Restricted Share Unit, a Share Appreciation Right, or any other Share-based award granted under the Plan.

(e)      "Award Agreement" means a written agreement (which may be in electronic form) between the Company and a Participant evidencing the terms and conditions of such Participant's Award.

(f)      "Board" means the Board of Directors of the Company.

(g)      "Cause" means, in the absence of an effective employment agreement between a Participant and the Employer otherwise defining Cause, (i) a Participant's conviction of or indictment for any criminal act (whether or not involving the Company or its Affiliates) (A) constituting a felony, (B) evidencing moral turpitude, or (C) that has, or could reasonably be expected to result in, an adverse impact on the performance of the Participant's duties to the Employer, or otherwise has, or could reasonably be expected to result in, an adverse impact to the business or reputation of the Company or its Affiliates; (ii) conduct of the Participant, in connection with his or her employment, that has, or could reasonably be expected to result in, material injury to the business or reputation of the Company or its Affiliates; (iii) any material violation of the policies of the Company or its Affiliates, including, but not limited to those

1

relating to sexual harassment, corruption, the disclosure or misuse of confidential information, or those set forth in the manuals or statements of policy of the Company or its Affiliates; or (v) willful neglect in the performance of the Participant's duties for the Employer or willful or repeated failure or refusal to perform such duties; *provided, however,* that if, subsequent to the Participant's voluntary Termination for any reason or involuntary Termination by the Company or an Affiliate without Cause, it is discovered that the Participant's employment could have been terminated for Cause, such Participant's employment shall be deemed to have been terminated for Cause. In the event there is an effective employment agreement between a Participant and the Employer defining Cause, "Cause" shall have the meaning provided in such agreement, and a Termination by the Employer for Cause hereunder shall not be deemed to have occurred unless all applicable notice and cure periods in such employment agreement are complied with.

(h)   "Change in Control" means:

(i)   a change in ownership or control of the Company effected through a transaction or series of transactions (other than an offering of Shares to the general public through a registration statement filed with the Securities and Exchange Commission) whereby any "person" (as defined in Section 3(a)(9) of the Exchange Act) or any two or more persons deemed to be one "person" (as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act), other than the Company or any of its Affiliates, or an employee benefit plan maintained by the Company or any of its Affiliates, directly or indirectly acquire "beneficial ownership" (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company possessing more than fifty percent (50%) of the total combined voting power of the Company's securities outstanding immediately after such acquisition;

(ii)   the date upon which individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board"), cease for any reason to constitute at least a majority of the Board; *provided, however,* that any individual becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least two-thirds (2/3) of the directors then constituting the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a person other than the Board; or

(iii)   the sale or disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company to any "person" (as defined in Section 3(a)(9) of the Exchange Act) or to any two or more persons deemed to be one "person" (as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act) other than the Company's Affiliates.

(i)   "Code" means the United States Internal Revenue Code of 1986, as amended from time to time, including regulations thereunder and successor provisions and regulations thereto.

(j)   "Committee" means a committee of the Board consisting of two or more members of the Board, each of whom shall be an "independent director" as defined under the

2

Teva-135

rules and regulations of The Nasdaq Stock Market, Inc. ("NASDAQ"), and at least one of whom shall be a "statutory independent director" (as defined under the Companies Act); *provided*, that to the extent necessary to comply with applicable law, the Board shall be deemed to be the Committee for purposes of this Plan. Unless otherwise determined by the Board, the HR and Compensation Committee of the Board shall act as the Committee hereunder.

(k)    "Companies Act" means the Israeli Companies Law.

(l)    "Company" means Teva Pharmaceutical Industries Limited, an Israeli corporation.

(m)    "Consultant" means each person who provides substantial services to the Company and/or its Affiliates and is designated as eligible by the Committee. For purposes of the Plan, in the case of a Consultant, references to employment shall be deemed to refer to such Consultant's service in such capacity.

(n)    "Disability" means, in the absence of an effective employment agreement between a Participant and the Employer otherwise defining Disability, the permanent and total disability of such Participant as defined by applicable law or in the applicable Subplan. In the event there is an effective employment agreement between a Participant and the Employer defining Disability, "Disability" shall have the meaning provided in such agreement.

(o)    "Effective Date" means the date on which this Plan is approved by the shareholders of the Company at the 2010 annual meeting of shareholders.

(p)    "Eligible Person" means (i) each employee of the Company or of any of its Affiliates, including each such person who may also be a director of the Company and/or its Affiliates; (ii) each non-employee director of the Company and/or its Affiliates, (iii) each Consultant; and (iv) any person who has accepted an offer of employment from or entered into a agreement to provide consulting services with the Company or its Affiliates; *provided, however*, that any such person may not receive any payment or exercise any right relating to an Award until such person has commenced employment or service with the Company or its Affiliates. An employee on an approved leave of absence (including maternity leave) shall be considered as still in the employment of the Company or its Affiliates for purposes of eligibility for participation in the Plan.

(q)    "Employer" means either the Company or an Affiliate of the Company by which the Participant is principally employed or to which the Participant provides services (including services as a non-employee director), as applicable (in each case determined without regard to any transfer of an Award).

(r)    "Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time, including rules thereunder and successor provisions and rules thereto.

(s)    "Expiration Date" means the date upon which the term of an Option expires, as determined under Section 5(b) hereof.

3

Teva-136

(t)     "Fair Market Value" means, as of any date when the Shares are listed on one or more United States securities exchanges, the closing price reported on the principal United States national securities exchange on which such Shares are listed and traded on such date, or, if not quoted on such date, then on the last preceding date on which the Shares were quoted. If the Shares are not listed on a United States exchange, or representative quotes are not otherwise available, the Fair Market Value shall mean the amount determined by the Board in good faith, and in a manner consistent with Section 409A of the Code, to be the fair market value per Share.

(u)     "Full Value Award" shall have the meaning set forth in Section 4(b)(i) hereof.

(v)     "Incentives" shall have the meaning ascribed to such term in the 2005 Plan.

(w)     "Incumbent Board" shall have the meaning set forth in Section 2(g)(ii) hereof.

(x)     "Option" means a conditional right, granted to a Participant under Section 5 hereof, to purchase one Share at a specified price during a specified period. No Option granted pursuant to this Plan shall be considered an "incentive stock option" (within the meaning ascribed to such term in Section 422 of the Code).

(y)     "Ordinary Shares" means the Company's ordinary shares, par value NIS 0.1 per share.

(z)     "Participant" means an Eligible Person who has been granted an Award under the Plan, or if applicable, such other person or entity who holds an Award.

(aa)    "Performance Objectives" means performance objectives based on one or more of the following criteria that are related to the performance of an individual Participant or the Employer, division, department, or function within the Company or the Participant's Employer and may be measured on an absolute or relative basis: return on equity; diluted earnings per share; net earnings; total earnings; earnings growth; return on capital; working capital turnover; return on assets; earnings before interest and taxes; earnings before interest, taxes, depreciation, and amortization; sales; sales growth; gross margin; return on investment; increase in the fair market value per share; share price (including but not limited to, growth measures and total shareholder return); operating profit; cash flow (including, but not limited to, operating cash flow and free cash flow); cash flow return on investment (which equals net cash flow divided by total capital); inventory turns; financial return ratios; total return to shareholders; market share; earnings measures/ratios; economic value added; balance sheet measurements including (but not limited to receivable turnover); internal rate of return; and expense targets.

(bb)    "Plan" means this Teva Pharmaceutical Industries Limited 2010 Long-Term Equity-Based Incentive Plan. The Plan shall be deemed to include any Subplans, supplements to or amendments, restatements or alternative versions of this Plan or any Subplan approved by the Board which, in the aggregate, shall constitute one Plan governed by the terms set forth herein.

4

(cc)   "Qualified Member" means a member of the Committee who is a "Non-Employee Director" within the meaning of Rule 16b-3 of the Exchange Act and an "outside director" within the meaning of Treasury Regulation § 1.162-27(e) under Code Section 162(m).

(dd)   "Qualifying Retirement" means the Termination by a Participant (i) who has attained the statutory retirement age in the country in which such Participant is then a resident or primarily employed, or if there is no statutory retirement age in the applicable country, the age set forth in the applicable Subplan, or (ii) whose Termination meets guidelines for Qualifying Retirements under the Plan approved by the Board or the Committee.

(ee)   "Qualifying Committee" shall have the meaning set forth in Section 3(b) hereof.

(ff)   "Restricted Share" means a Share granted to a Participant under Section 6 hereof that is subject to certain restrictions and to a risk of forfeiture.

(gg)   "Restricted Share Unit" means a notional unit representing the right to receive one Share (or the cash value of one Share, if so determined by the Committee) on a specified settlement date.

(hh)   "Securities Act" means the United States Securities Act of 1933, as amended from time to time, including rules thereunder and successor provisions and rules thereto.

(ii)   "Share" means an Ordinary Share and/or an ADS, as the context may require, and such other securities as may be substituted for such Share pursuant to Section 9 hereof.

(jj)   "Share Appreciation Right" means a conditional right to receive an amount equal to the increase in the Fair Market Value of one Share over a specified period. Share Appreciation Rights shall be settled in Shares, or, if set forth in the applicable Award Agreement or in accordance with Section 9 hereof, in cash.

(kk)   "Subplan" shall have the meaning set forth in Section 3(a) hereof.

(ll)   "Termination" means the termination of a Participant's employment or service, as applicable, with the Employer; provided, however, that (i) the transfer of employment or service, as applicable, to another Employer, (ii) the change of a Participant's status in relation to the Employer from an employee to a Consultant or vice versa and (iii) such other change of a Participant's status in relation to the Employer if so determined by the Committee at the time of such change in status, will not be deemed to be a Termination hereunder. Unless otherwise determined by the Committee, in the event that any Employer ceases to be an Affiliate of the Company (by reason of sale, divesture, spin-off or other similar transaction), unless a Participant's employment or service with such Employer is transferred to another entity that would constitute an Employer immediately following such transaction, such Participant shall be deemed to have suffered a Termination hereunder as of the date of the consummation of such transaction.

5

Teva-138

J

3.    Administration.

    (a)    Authority of the Board. The Board has the exclusive authority to approve one or more subplans that will be established, within the parameters and according to the overall terms and provisions of the Plan, to facilitate local administration of the Plan in any jurisdiction in which the Company or its Affiliates operate and to conform the Plan to the legal requirements of any such jurisdiction or to allow for favorable tax treatment under any applicable provision of tax law (each a "Subplan").

    (b)    Authority of the Committee. Except as otherwise provided herein or required under applicable law, the Plan shall be administered by the Committee. The Committee shall have full and final authority, in each case subject to and consistent with the provisions of the Plan, to (i) allocate from within the aggregate number of Shares covered by the Plan, a portion thereof to be specifically utilized in connection with each of the Subplans, and determine the types of Awards available for grant under each Subplan; (ii) establish, as permitted by law, policies, guidelines or parameters applicable to Awards granted under the Subplans; (iii) select Eligible Persons to become Participants; (iv) grant Awards (other than Awards to members of the Board, which must be approved in accordance with the Companies Act); (v) determine the type, number of Shares subject to, and other terms and conditions of, and all other matters relating to, Awards; (vi) prescribe Award Agreements (which need not be identical for each Participant) and rules and regulations for the administration of the Plan and each of the Subplans; (vii) construe and interpret the Plan, any Subplan and any Award Agreement and correct defects, supply omissions, or reconcile inconsistencies therein; (viii) suspend the right to exercise Awards during any period that the Committee deems appropriate to comply with applicable securities laws, and thereafter extend the exercise period of an Award by an equivalent period of time; and (ix) make all other decisions and determinations as the Committee may deem necessary or advisable for the administration of the Plan and each Subplan. Any action of the Committee shall be final, conclusive, and binding on all persons, including, without limitation, the Company, its Affiliates, Eligible Persons, Participants, and beneficiaries of Participants.

    (c)    Manner of Exercise of Committee Authority. At any time that a member of the Committee is not a Qualified Member, (i) any action of the Committee relating to an Award intended by the Committee to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code may be taken by a subcommittee, designated by the Committee or the Board, composed solely of two or more Qualified Members (a "Qualifying Committee"); and (ii) any action relating to an Award granted or to be granted to a Participant who is then subject to Section 16 of the Exchange Act in respect of the Company may be taken either by such a Qualifying Committee, or by the Committee but with each such member who is not a Qualified Member abstaining or recusing himself from such action; provided, that upon such abstention or recusal, the Committee remains composed of two or more Qualified Members. Any action authorized by such a Qualifying Committee or by the Committee upon the abstention or recusal of such non-Qualified Member(s) shall be deemed to be the action of the Committee for purposes of the Plan. The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee.

6

(d)      Delegation. To the extent permitted by applicable law, the Committee may delegate to officers or employees of the Company or any of its Affiliates, or committees thereof, the authority, subject to such terms as the Committee shall determine, to perform such functions, including but not limited to administrative functions, as the Committee may determine appropriate. The Committee may appoint agents to assist it in administering the Plan. Notwithstanding the foregoing or any other provision of the Plan to the contrary, any Award granted under the Plan to any person or entity who is not an employee of the Company or any of its Affiliates (including any non-employee director of the Company or any Affiliate) or to any person who is subject to Section 16 of the Exchange Act shall be expressly approved by the Committee or Qualifying Committee in accordance with subsection (b) above.

4.      Shares Available under the Plan.

(a)      Number of Shares Available for Delivery. Subject to adjustment as provided in Section 9 hereof, the total number of Shares reserved and available for delivery in connection with Awards under the Plan shall be seventy million (70,000,000). No incentives will be granted under the 2005 Plan on or after the Effective Date. In no event shall an Award be granted under this Plan if, as a result of such grant, the average number of Shares underlying Awards granted during each of the three 12-month periods ending on the date such Award is granted exceeds 2.0% of the Company's then outstanding Shares. Shares delivered under the Plan shall consist of authorized and unissued Shares or previously issued Shares reacquired by the Company or its Affiliates on the open market or by private purchase. In no event shall fractional shares be issued under the Plan. No more than 50% of the Awards granted under this Plan may involve Full Value Awards.

(b)      Share Counting Rules. The Committee may adopt reasonable counting procedures to ensure appropriate counting, avoid double counting (as, for example, in the case of tandem or substitute Awards) and make adjustments if the number of Shares actually delivered differs from the number of shares previously counted in connection with an Award.

(i)      The total number of available Shares will be reduced by one Share for every Option or Share Appreciation Right that is awarded, and any Award other than an Option or Share Appreciation Right (each, a "Full-Value Award") shall reduce the pool by the ratio of the fair value of a Full-Value Award to the fair value of an Option or Share Appreciation Right, as applicable, determined on or about the date on which the Full-Value Award is granted, based on valuation methods reasonably determined by the Committee (for example, in the event such ratio is 1:3, a Full-Value Award representing one Share will reduce the pool by three Shares).

(ii)      To the extent that an Award expires or is canceled, forfeited, settled in cash, or otherwise terminated without a delivery to the Participant of the full number of Shares to which the Award related, the number of Shares that were reduced from the total number of available Shares pursuant to Section 4(b)(i) above on account of such undelivered shares will again be available for grant. Conversely, the number of Shares that were reduced from the total number of available Shares pursuant to Section 4(b)(i) above on account of (x) Shares withheld in payment of the exercise price or taxes relating to an Award, or (y) Shares surrendered in payment of any exercise price or taxes relating to an Award, shall constitute

7

shares delivered to the Participant and shall not be deemed to again be available for Awards under the Plan.

(iii)      Notwithstanding anything herein to the contrary, equity-based awards assumed or substituted by the Company or its Affiliates as part of a corporate transaction (including, without limitation, from an entity merged into or with the Company or any of its Affiliates, acquired by the Company or any of its Affiliates, or otherwise involved in a similar corporate transaction) shall not count against the number of shares reserved and available for issuance pursuant to this Plan.

(c)      162(m) Limitation. Notwithstanding anything to the contrary herein, during any time that the Company is subject to Section 162(m) of the Code, the maximum number of Shares with respect to which Options and Share Appreciation Rights that may be granted to any individual pursuant to this Plan in any one year shall not exceed the maximum number of Shares available for issue hereunder, as such number may change from time to time.

5.      Options.

(a)      General. Options may be granted to Eligible Persons in such form and having such terms and conditions as the Committee shall deem appropriate. The provisions of each Option grant shall be set forth in an Award Agreement.

(b)      Term. The term of each Option shall be set by the Committee at the time of grant; provided, however, that no Option granted hereunder shall be exercisable after the tenth (10th) anniversary of the date it was granted (or, if such anniversary is not a business day in the United States, the next succeeding United States business day).

(c)      Exercise Price. The exercise price per Share for each Option shall be set by the Committee and shall not be less than the Fair Market Value of the underlying Shares on the date of grant.

(d)      Payment for Shares. Payment for Shares acquired pursuant to Options granted hereunder shall be made in full, upon exercise of the Options, (I) in immediately available funds, or by certified or bank cashier's check or (ii) by any other means approved by the Committee.

(e)      Vesting. Options shall vest and become exercisable in such manner, on such date or dates, or upon the achievement of any Performance Objectives, in each case, as may be determined by the Committee and set forth in the Award Agreement; provided, that, subject to Section 9 hereof, no Option shall vest prior to the second (2nd) anniversary of the date of grant. Except as otherwise specifically determined by the Committee or provided in the Plan, the vesting of an Option shall occur only while the Participant is employed or rendering services to the Employer, and all vesting shall cease upon a Participant's Termination with the Employer for any reason. To the extent permitted by applicable law and determined by the Committee, vesting may be suspended during the period of any unpaid leave by a Participant and shall resume upon such Participant's return to employment; provided, however, that in the case of a Participant who takes unpaid maternity leave, vesting shall not be suspended and shall continue for the longer of (x) one year or (y) the maximum maternity leave period that a Participant may take without

8

adversely affecting such Participant's ability to retain the position held at the time of commencement of such leave under the laws, regulations or customs of the country in which such Participant is then a resident or primarily employed.

(f)  Termination of Employment or Service. Except as may otherwise be provided by the Committee in a Subplan or an applicable Award Agreement:

(i)  In the event of a Participant's Termination with the Employer prior to the Expiration Date for any reason other than (A) the Participant's death or Disability, (B) a Qualifying Retirement, or (C) by the Employer for Cause, (1) all vesting with respect to such Participant's Options shall cease, (2) all of such Participant's unvested Options shall expire as of the date of such Termination, and (3) all of such Participant's vested Options shall remain exercisable until the earlier of the Expiration Date and the date that is ninety (90) days after the date of such Termination.

(ii)  In the event of a Participant's Termination with the Employer prior to the Expiration Date by reason of such Participant's death, Disability or Qualifying Retirement, (A) all of such Participant's Options shall continue to vest in accordance with their original vesting schedule as if no such termination had occurred, and (B) such Options shall remain exercisable until the Expiration Date. In the event of a Participant's death, such Participant's Options shall be exercisable by the person or persons to whom a Participant's rights under the Options pass by will or the applicable laws of descent and distribution until the Expiration Date.

(iii)  In the event of a Participant's Termination with the Employer prior to the Expiration Date by the Employer for Cause, all of such Participant's Options (whether or not vested) shall immediately expire as of the date of such Termination.

6.  Restricted Shares.

(a)  General. Restricted Shares granted hereunder to Eligible Persons shall be in such form and shall contain such terms and conditions as the Committee shall deem appropriate. The terms and conditions of each Restricted Shares grant shall be evidenced by an Award Agreement. Subject to the restrictions set forth in Section 6(b), except as otherwise set forth in the applicable Award Agreement, the Participant shall generally have the rights and privileges of a shareholder as to such Restricted Shares, including the right to vote such Restricted Shares. Unless otherwise set forth in a Subplan or a Participant's Award Agreement, cash dividends and share dividends, if any, with respect to the Restricted Shares shall be withheld by the Company for the Participant's account, and shall be subject to vesting and forfeiture to the same degree as the Restricted Shares to which such dividends relate. Except as otherwise determined by the Committee, no interest will accrue or be paid on the amount of any cash dividends withheld.

(b)  Restrictions on Transfer/Vesting. In addition to any other restrictions set forth in a Participant's Award Agreement, until such time that the Restricted Shares have vested pursuant to the terms of the Award Agreement, the Participant shall not be permitted to sell, transfer, pledge, or otherwise encumber the Restricted Shares. Restricted Shares shall vest in such manner, on such date or dates, or upon the achievement of any Performance Objectives, in

9

each case, as may be determined by the Committee and set forth in the Award Agreement; *provided*, that, subject to Section 9 hereof, no Restricted Share shall vest prior to the second (2nd) anniversary of the date of grant. Except as otherwise specifically determined by the Committee or provided in the Plan, the vesting of a Restricted Share shall occur only while the Participant is employed or rendering services to the Employer, and all vesting shall cease upon a Participant's Termination with the Employer for any reason. To the extent permitted by applicable law and determined by the Committee, vesting may be suspended during the period of any unpaid leave by a Participant and shall resume upon such Participant's return to employment; *provided, however*, that in the case of a Participant who takes unpaid maternity leave, vesting shall not be suspended and shall continue for the longer of (x) one year, or (y) the maximum maternity leave period that a Participant may take without adversely affecting such Participant's ability to retain the position held at the time of commencement of such leave under the laws, regulations or customs of the country in which such Participant is then a resident or primarily employed.

(c)    Termination of Employment or Service. Except as may otherwise be provided by the Committee in a Subplan or an applicable Award Agreement:

(i)    In the event of a Participant's Termination with the Employer prior to a vesting date for any reason other than (A) the Participant's death or Disability, (B) a Qualifying Retirement, or (C) by the Employer for Cause, (1) all vesting with respect to such Participant's Restricted Shares shall cease, and (2) as soon as practicable following such Termination, such unvested Restricted Shares shall be forfeited by the Participant to the Company as of the date of such Termination.

(ii)    In the event of a Participant's Termination with the Employer prior to a vesting date by reason of such Participant's death, Disability or Qualifying Retirement, all of such Participant's Restricted Shares shall continue to vest in accordance with their original vesting schedule as if no such termination had occurred.

(iii)    In the event of a Participant's Termination with the Employer for Cause prior to a vesting date, all of such Participant's unvested Restricted Shares shall immediately be forfeited for no consideration as of the date of such Termination.

7.    Restricted Share Units.

(a)    General. The terms and conditions of each Restricted Share Unit grant shall be evidenced by an Award Agreement. Such Award Agreement may, at the discretion of the Committee, include payment for dividend equivalents.

(b)    Vesting. Restricted Share Units shall vest in such manner, on such date or dates, or upon the achievement of any Performance Objectives, in each case, as may be determined by the Committee and set forth in the Award Agreement; *provided*, that, subject to Section 9 hereof, no Restricted Share Unit shall vest prior to the second (2nd) anniversary of the date of grant. Except as otherwise specifically determined by the Committee or provided in the Plan, the vesting of a Restricted Share Unit shall occur only while the Participant is employed or rendering services to the Employer, and all vesting shall cease upon a Participant's Termination with the Employer for any reason. To the extent permitted by applicable law and determined by

10

Teva-143

the Committee, vesting may be suspended during the period of any unpaid leave by a Participant and shall resume upon such Participant's return to employment; *provided, however*, that in the case of a Participant who takes unpaid maternity leave, vesting shall not be suspended and shall continue for the longer of (x) one year, or (y) the maximum maternity leave period that a Participant may take without adversely affecting such Participant's ability to retain the position held at the time of commencement of such leave under the laws, regulations or customs of the country in which such Participant is then a resident or primarily employed.

(c) Settlement of Restricted Share Units. Upon such date or dates designated in the applicable Award Agreement, unless earlier forfeited, the Company shall settle each Restricted Share Unit by delivering one Share (or the cash value of one Share, if so determined by the Committee).

(d) Termination of Employment or Service. Except as may otherwise be provided by the Committee in a Subplan or an applicable Award Agreement:

(i) In the event of a Participant's Termination with the Employer prior to a vesting date for any reason other than (A) the Participant's death or Disability, (B) a Qualifying Retirement, or (C) by the Employer for Cause, all vesting with respect to such Participant's Restricted Share Units shall cease and any vested Restricted Share Units shall be settled in accordance with the settlement schedule set forth in the applicable Award Agreement.

(ii) In the event of a Participant's Termination with the Employer prior to a vesting date by reason of such Participant's death, Disability or Qualifying Retirement, all of such Participant's Restricted Share Units shall continue to vest and settle as if no such termination had occurred.

(iii) In the event of a Participant's Termination with the Employer for Cause prior to settlement, all of such Participant's Restricted Share Units shall immediately be forfeited as of the date of such Termination.

8. Other Share-Based Awards.

The Committee is authorized, subject to limitations under applicable law, to grant to Participants such other Awards that may be denominated or payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Shares, as deemed by the Committee to be consistent with the purposes of the Plan, including, without limitation, Share Appreciation Rights. The Committee may also grant Shares as a bonus, or may grant other Awards in lieu of obligations of the Company or an Affiliate to pay cash or deliver other property under this Plan or under other plans or compensatory arrangements, subject to such terms as shall be determined by the Committee. The terms and conditions applicable to each such Award shall be determined by the Committee and evidenced by an Award Agreement.

9. Adjustment for Recapitalization, Merger, etc.

(a) Capitalization Adjustments. The aggregate number of Shares that may be granted or purchased pursuant to Awards (as set forth in Section 4 hereof), the number of Shares

11

Teva-144

covered by each outstanding Award, and the price per share thereof in each such Award shall be equitably and proportionally adjusted or substituted, as determined by the Committee in its sole discretion, as to the number, price, or kind of a Share or other consideration subject to such Awards (I) in the event of changes in the outstanding Shares or in the capital structure of the Company by reason of share dividends, share splits, reverse share splits, recapitalizations, reorganizations, mergers, consolidations, combinations, exchanges, or other relevant changes in capitalization occurring after the approval by the Committee of any such Award (including any Corporate Event, as defined below); (ii) in connection with any extraordinary dividend declared and paid in respect of Shares, whether payable in the form of cash, shares, or any other form of consideration; or (iii) in the event of any change in applicable laws or any other change in circumstances that results in or could result in any substantial dilution or enlargement of the rights granted to, or available for, Participants under the Plan.

(b)    Corporate Events. Notwithstanding the foregoing, except as may otherwise be provided in an Award Agreement, in connection with (I) a merger or consolidation involving the Company in which the Company is not the surviving corporation; (ii) a merger or consolidation involving the Company in which the Company is the surviving corporation but the holders of Shares receive securities of another corporation and/or other property, including cash; (iii) a Change in Control; (iv) a sale, divesture, spin-off or other similar transaction in which any Affiliate of the Company ceases to be an Affiliate of the Company, with respect to outstanding Awards held by Participant's that experience a Termination on account of such event only, or (v) the reorganization or liquidation of the Company (each, a "Corporate Event"), the Committee may, in its discretion, provide for any one or more of the following:

(1)    that such Awards be assumed or substituted in connection with such Corporate Event, in which case, the Awards shall be subject to the adjustment set forth in subsection (a) above;

(2)    that the vesting of any Awards shall be accelerated, subject to the consummation of such Corporate Event;

(3)    that any or all vested and/or unvested Awards be cancelled as of the consummation of such Corporate Event, and that Participants holding Awards so cancelled will receive a payment in respect of cancellation of their Awards based on the amount of the per-share consideration being paid for the Shares in connection with such Corporate Event, less, in the case of Options, Share Appreciation Rights, and other Awards subject to exercise, the applicable exercise price; provided, however, that holders of Options, Share Appreciation Rights, and other Awards subject to exercise shall only be entitled to consideration in respect of cancellation of such Awards if the per-share consideration less the applicable exercise price is greater than zero (and to the extent the per-share consideration is less than or equal to the applicable exercise price, such Awards shall be cancelled for no consideration); and

(4)    to the extent permissible under applicable law, that Awards be replaced with a cash incentive program that preserves the value of the Awards so replaced (determined as of the consummation of the Corporate Event), with subsequent payment of cash incentives subject to the same vesting conditions as applicable to the Awards so replaced, and payment to be made within thirty (30) days of the applicable vesting date.

12

Tova-145

Payments to holders pursuant to clause (3) above shall be made in cash or, in the sole discretion of the Committee, in the form of such other consideration necessary for a Participant to receive property, cash, or securities (or combination thereof) as such Participant would have been entitled to receive upon the occurrence of the transaction if the Participant had been, immediately prior to such transaction, the holder of the number of Shares covered by the Award at such time (less any applicable exercise price). In addition, in connection with any Corporate Event, prior to any payment or adjustment contemplated under this subsection (b), the Committee may require a Participant to (i) represent and warrant as to the unencumbered title to his Awards, (ii) bear such Participant's pro rata share of any post-closing indemnity obligations, and be subject to the same post-closing purchase price adjustments, escrow terms, offset rights, holdback terms, and similar conditions as the other holders of Shares; and (iii) deliver customary transfer documentation as reasonably determined by the Committee.

(c)     Fractional Shares. Any adjustment provided under this Section 9 may provide for the elimination of any fractional share that might otherwise become subject to an Award.

10.     Use of Proceeds.

The proceeds received from the sale of Shares pursuant to the Plan shall be used for general corporate purposes.

11.     Rights and Privileges as a Shareholder.

Except as otherwise specifically provided in the Plan, no person shall be entitled to the rights and privileges of share ownership in respect of Shares that are subject to Awards hereunder until such shares have been issued to that person.

12.     No Other Entitlements.

(a)     No individual shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for a grant of any other Award.

(b)     Neither the Plan nor any action taken hereunder shall be construed as giving any individual any right to be retained in the employ or service of the Company or an Affiliate of the Company.

(c)     Except as may be otherwise specifically stated in any other employee benefit plan, policy or program, neither any Award under this Plan nor any amount realized from any such Award shall be treated as compensation for the purpose of calculating an employee's benefit under any benefit plan, policy or program.

13.     Compliance with Laws.

The obligation of the Company to deliver Shares upon vesting and/or exercise of any Award shall be subject to all applicable laws, rules and regulations, and to such approvals by governmental agencies as may be required. The Company shall be under no obligation to register

13

Teva-146

A.164

for sale or resale under any applicable laws, rules and regulations any of the Shares to be offered or sold under the Plan or any Shares issued upon exercise or settlement of Awards. If the Shares offered for sale or sold under the Plan are offered or sold pursuant to an exemption from registration under the Securities Act, the Company may restrict the transfer of such shares and may legend the Share certificates representing such shares in such manner as it deems advisable to ensure the availability of any such exemption.

14.   Withholding Obligations.

As a condition to the vesting and/or exercise of any Award, the Committee may require that a Participant satisfy, through deduction or withholding from any payment of any kind otherwise due to the Participant, or through such other arrangements as are satisfactory to the Committee, the amount of all federal, state, and local income and other taxes or other mandatory payments of any kind required or permitted to be withheld in connection with such vesting and/or exercise, as well as amounts payable to any third party for escrow services and escrow fees, bank fees, exercise fees, account fees and other related fees and expenses. The Committee, in its discretion, may permit Shares to be used to satisfy such withholding requirements and fee payments, and such shares shall be valued at their Fair Market Value as of the date they are so used; *provided, however,* that the aggregate Fair Market Value of the number of Shares that may be used to satisfy tax withholding requirements may not exceed the minimum statutorily required withholding amount with respect to such Award.

15.   Transferability.

Each Award granted under the Plan will not be transferable or assignable by the recipient, and may not be made subject to execution, attachment or similar procedures, other than by will or the laws of descent and distribution or as determined by the Committee pursuant to the terms of any Award Agreement in accordance with any other applicable law, rule or regulation.

16.   Amendment of the Plan or Awards.

(a)   Amendment of Plan. The Board at any time, and from time to time, may amend the Plan; *provided, however,* that the Board shall not, without shareholder approval, make any amendment to the Plan that requires shareholder approval pursuant to applicable law or the applicable rules of the national securities exchange on which the Shares are principally listed.

(b)   Amendment of Awards. The Board or the Committee, at any time, and from time to time, may amend the terms of any one or more Awards; *provided, however,* that the rights under any Award shall not be impaired by any such amendment unless the Participant consents in writing (it being understood that no action taken by the Board or the Committee that is expressly permitted under the Plan, including, without limitation, any actions described in Section 9 hereof, shall constitute an amendment of an Award for such purpose). Notwithstanding the foregoing, subject to the limitations of applicable law, if any, and without an affected Participant's consent, the Board or the Committee may amend the terms of any one or more Awards if necessary to bring the Award into compliance with any applicable tax legislation, rule, regulation or guidance (even if issued or amended after the Effective Date), including without

14

Teva-147

limitation Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder.

      (c)   <u>No Repricing of Awards without Shareholder Approval</u>. Notwithstanding subsection (a) or (b) above, or any other provision of the Plan, repricing of Awards shall not be permitted without shareholder approval. For this purpose, a "*repricing*" means any of the following (or any other action that has the same effect as any of the following): (i) changing the terms of an Award to lower its exercise price (other than on account of capital adjustments resulting from share splits, etc., as described in Section 9(a)); (ii) any other action that is treated as "*repricing*" under generally accepted accounting principals; and (iii) repurchasing for cash or canceling an Award in exchange for another Award at a time when its exercise price is greater than the Fair Market Value of the underlying Shares, unless the cancellation and exchange occurs in connection with an event set forth in Section 9(b).

    17.   Termination or Suspension of the Plan.

      The Board may suspend or terminate the Plan at any time. Unless sooner terminated, the Plan shall terminate on the day before the fifth (5th) anniversary of the Effective Date. No Awards may be granted under the Plan while the Plan is suspended or after it is terminated.

    18.   Effective Date of the Plan.

      The Plan is effective as of the Effective Date.

    19.   Miscellaneous.

      (a)   <u>Certificates</u>. Shares acquired pursuant to Awards granted under the Plan may be evidenced in such a manner as the Committee shall determine. If certificates representing Shares are registered in the name of the Participant, the Committee may require that such certificates bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Shares, that the Company retain physical possession of the certificates, and that the Participant deliver a stock power to the Company, endorsed in blank, relating to the Shares. Notwithstanding the foregoing, the Committee may determine, in its sole discretion, that the Shares shall be held in book entry form rather than delivered to the Participant pending the release of any applicable restrictions.

      (b)   <u>Delay in Delivery</u>.

         (i)   The Company is relieved from any liability for the nonissuance or nontransfer, or for any delay in the issuance or transfer of any Shares subject to Awards, resulting from the inability of the Company to obtain, or from any delay in obtaining, from any regulatory body having jurisdiction or authority, any requisite approval to issue or transfer any such Shares, if counsel for the Company deems such approval necessary for the lawful issuance or transfer thereof.

        (ii)   Without limiting the generality of the foregoing, the Company shall not have any obligation or liability as a result of any delay in issuing any certificate

<div align="center">15</div>

evidencing Shares or in the delivery thereof to Participants, or any act or omission of any Company-designated brokerage firm in relation to Shares.

(c)     Escrow Agreement. The Committee may require a Participant who receives an Award to enter into an escrow or trustee agreement providing that such Award, or Shares distributed in connection with the vesting, settlement or exercise thereof, will remain in the physical custody of an escrow holder or trustee, as necessary to satisfy applicable local law or otherwise determined to be in the best interests of the Company by the Committee in its discretion.

(d)     Clawback/Recoupment Policy. Notwithstanding anything contained herein to the contrary, all Awards granted under the Plan shall be and remain subject to any incentive compensation clawback or recoupment policy currently in effect or as may be adopted by the Board, and in each case, as may be amended from time to time. Any such policy adoption or amendment shall in no event require the prior consent of any Participant.

(e)     Provision for Foreign Participants. Awards may be granted to Participants who are foreign nationals or employed outside Israel, or both, on such terms and conditions different from those applicable to Awards to Participants employed in Israel as may be necessary or desirable, in the discretion of the Committee, in order to recognize differences in local law or tax policy. The Committee may also impose conditions on the exercise or vesting of Awards in order to minimize the Company's obligation with respect to tax equalization for Participants on assignments outside their home countries.

(f)     Payments Following Accidents or Illness. If the Committee shall find that any person to whom any amount is payable under the Plan is unable to care for his affairs because of illness or accident, or is a minor, or has died, then any payment due to such person or his estate (unless a prior claim therefor has been made by a duly appointed legal representative) may, if the Committee so directs the Company, be paid to his spouse, child, relative, an institution maintaining or having custody of such person, or any other person deemed by the Committee to be a proper recipient on behalf of such person otherwise entitled to payment. Any such payment shall be a complete discharge of the liability of the Committee and the Company therefor.

(g)     Governing Law. The Plan shall be governed by and construed in accordance with the internal laws of the State of Israel without reference to the principles of conflicts of laws thereof.

(h)     Funding. No provision of the Plan shall require the Company, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall the Company maintain separate bank accounts, books, records, or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes.

(i)     Restrictions. The Committee shall have the power to impose such other restrictions on Awards as it may deem necessary or appropriate to ensure that such Awards

16

Teva-149

satisfy all requirements for favorable tax treatment under Section 162(m)(4)(C) of the Code, Section 102 of the Israeli Tax Ordinance or any other applicable tax law provision.

(j)    No Limitation on Compensation. Nothing in the Plan shall be construed to limit the right of the Company to establish other plans or to pay compensation to its employees, officers or directors in cash or property, in a manner that is not expressly authorized under the Plan.

(k)    No Constraint on Corporate Action. Nothing in the Plan shall be construed (i) to limit, impair or otherwise affect the Company's right or power to make adjustments, reclassifications, reorganizations or changes of its capital or business structure, or to merge or consolidate, or dissolve, liquidate, sell or transfer all or any part of its business or assets, or (ii) except as provided in Section 15 or 17, to limit the right or power of the Company or any subsidiary or affiliate to take any action that such entity deems to be necessary or appropriate.

(l)    Reliance on Reports. Each member of the Committee and each member of the Board shall be fully justified in relying, acting or failing to act, and shall not be liable for having so relied, acted, or failed to act in good faith, upon any report made by the independent public accountant of the Company and its Affiliates and upon any other information furnished in connection with the Plan by any person or persons other than such member.

(m)    Titles and Headings. The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

*     *     *

17

Teva-150

A.168

APPENDIX FOR EMPLOYEES OF TEVA USA

## APPENDIX A

Awards granted pursuant to the Award Agreement pursuant to which this Appendix A is attached (the "Agreement") shall be subject to the following terms and conditions, which shall be in addition to, and not in lieu of, the terms and conditions set forth in the Agreement and the Plan. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Agreement.

1.    Form of Equity Deliverable. All references to the term "Shares" in the Agreement shall be construed to refer to American Depositary Shares ("ADSs") of the Company.

2.    Options.

(a)    Non-Qualified Options. The Options granted pursuant to the Agreement are non-qualified options and are not intended to qualify as incentive stock options under Section 422 of the Code.

(b)    Method of Exercising Options; Payment of Exercise Price. To exercise vested Options granted pursuant to the Agreement, the Participant (or his or her authorized representative) will give notice to Merrill Lynch or such other Award administration system manager, as Participant will be notified by the Participant's Employer from time to time, in accordance with the procedure set forth under the Merrill Lynch Award administration system or such other system as the Participant will be advised by the Employer. Such notice shall state the election to exercise Options and the number of ADSs in respect of which Options are being exercised, and shall be signed by the person or persons so exercising the Options. Such notice shall be accompanied by payment in full for ADSs acquired pursuant to Options, to be made in accordance with Section 5(d) of the Plan, which Section 5(d) is incorporated herein by reference and made a part hereof. The Participant agrees to the terms and conditions, including concerning fees, applicable to Participants under the Merrill Lynch Award administration system used by the Company or the Employer, and further agrees to the terms of any substitute or alternative system that may be elected by the Company or the Employer, which may also include terms similar to the following:

(i)    the information contained or presented to the Participant on or through use of the system does not constitute an offer to buy or sell securities and does not constitute tax or investment advice;

(ii)    the manager of the system does not guarantee the accuracy, completeness or timeliness of, or otherwise endorse views, opinions or recommendations published on or through the system or made by third parties; and

(iii)    each Participant is responsible for all statements made and acts or omissions that occur while the Participant's system user-ID and password are being used. Each Participant is responsible for protecting and securing its CEFS user-ID and password from unauthorized use and disclosure.

A-1

3.    Restricted Share Units.

(a)    Settlement. Notwithstanding anything in the Plan or the Agreement to the contrary, the settlement of any Restricted Share Units granted pursuant to the Agreement shall not be accelerated in the event that such acceleration will cause such Restricted Share Units to violate Section 409A of the Code. Settlement of Restricted Share Units shall take place on the date of such Unit's vesting, by issuance of one Share per Unit vested to Participant's account under the Award administration system then being used by the Company or the Employer.

(b)    Dividend Equivalent Rights. For the avoidance of doubt, the Participant shall not have rights to dividends or any dividend equivalents declared on the ADSs subject to the Restricted Share Units provided in the Agreement.

4.    Other Provisions.

(a)    Disability. For purposes of Awards granted under the Agreement, the term "Disability" shall mean, in the absence of an effective employment agreement between the Participant and the Employer otherwise defining Disability, the permanent and total disability of the Participant within the meaning of Section 22(e)(3) of the Code or any successor provision thereto. Notwithstanding the foregoing, in the event there is an effective employment agreement between the Participant and the Employer defining Disability, "Disability" shall have the meaning provided in such agreement.

(b)    Suspension of Vesting. Notwithstanding anything in Sections 1(b) or 2(b) of the Agreement, the Company shall not suspend the vesting of any Awards granted under the Agreement during any family or medical leave taken in accordance with the Family and Medical Leave Act of 1993, as amended. Additionally, the Company shall not suspend the vesting of any Awards granted under the Agreement during any period in which the Participant is considered an "active employee" under the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended.

(c)    Qualifying Retirement. For purposes of Awards granted under the Agreement, the term "Qualifying Retirement" as used in Section 5(f) and 7(d) of the Plan shall mean (i) a Termination by the Participant that (x) occurs on or following the date on which the Participant's age plus years of service with the Company and its Affiliates equals or exceeds seventy (70), and (y) is determined by the Employer's head of Human Resources (or equivalent position) to qualify as a Qualifying Retirement, or (ii) a Termination by the Participant that is determined by the Company's Human Resources and Compensation Committee to qualify as a Qualifying Retirement.

(e)    Governing Law. The Agreement (and this Appendix A) shall be construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to the principles of conflicts of laws thereof.

*        *        *

A-2