```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MOHAMMED ZAFAR IQBAL,                   :
                        Plaintiff,      :
                                        :     OPINION AND ORDER
v.                                      :
                                        :     16 CV 3464 (VB)
TEVA PHARMACEUTICALS USA, INC.,         :
                        Defendant.      :
--------------------------------------------------------------x
```

Briccetti, J.:

Plaintiff Mohammed Zafar Iqbal brings this action under New York Labor Law ("NYLL") Section 198(1-a), and for breach of contract, alleging that when defendant Teva Pharmaceuticals USA, Inc. ("Teva"), fired Iqbal, Teva failed to pay Iqbal earned compensation in the form of an increased salary payment, a bonus, stock options, unused vacation time, and severance.

Before the Court is defendant's motion for summary judgment (Doc. #54), and plaintiff's cross-motion for partial summary judgment. (Doc. #59).

For the reasons set forth below, defendant's motion is GRANTED, and plaintiff's cross-motion is DENIED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1332.

## BACKGROUND

The parties have submitted briefs, statements of fact pursuant to Local Civil Rule 56.1, declarations and affidavits, and supporting exhibits, which reflect the following factual background.

Iqbal was hired by Teva's predecessor company, Barr Laboratories, Inc. ("Barr"), in 1997. Barr became a wholly-owned subsidiary of Teva in 2010, at which time Iqbal became an employee of Teva.

1

On December 20, 2012, Iqbal was promoted to Associate Director, Process Engineering, memorialized in an offer letter, which Iqbal signed on January 2, 2013[1] (the "offer letter").

Iqbal had an ownership interest in Suffern Pharmacy ("Suffern"), a retail pharmacy and wholesale supplier of branded drugs, which Iqbal and others formed in February 2014. Iqbal never disclosed this ownership interest in Suffern to Teva in writing. Iqbal also had an ownership interest in at least two other businesses, Mydesh, Inc. (d/b/a Monroe Pharmacy), and Aloft, LLC (d/b/a Dry Clean Center).[2]

Teva's Research and Development Department obtains branded drugs after the applicable patents on those drugs expire or when they are about to expire and, through clinical testing, creates generic versions of those drugs.

Between February and May 2015, Teva purchased approximately $470,000 in branded drugs from Suffern, Iqbal's company. Suffern made approximately $50,000 in profit from these transactions. In July 2015, Teva terminated its business relationship with Suffern.

On March 12, 2015, pursuant to an award letter, Teva awarded Iqbal 1,304 stock options.

In late 2015, as part of a routine audit, an agent of Teva identified Suffern as a supplier in need of further review. As a result of the audit, and because two Teva employees (including Iqbal) had ownership interests in Suffern, the review of Suffern was transferred to Teva's Office of Business Integrity ("OBI").

---

[1]   It appears Iqbal misdated the signature as January 2, 2012. (See Def.'s App. at A.025).

[2]   Teva contends Iqbal owns no fewer than ten businesses. Aloft, LLC, a company in which Iqbal has an undisputed interest, may have, at some point, operated multiple locations with different names, resulting in this discrepancy. In any event, there is no dispute Iqbal held an ownership interest in no fewer than three businesses.

The OBI investigator assigned to the matter was James Mikalic, a former FBI agent and former Assistant Director of Intelligence for the New York State Office of Homeland Security. Mr. Mikalic's initial investigation lasted from December 8, 2015, to February 9, 2016. Mr. Mikalic documented the results of his investigation in a report, originally dated February 9, 2016, and updated on March 8, 2016. (Def.'s App. at A.128-146; the "Mikalic report").[3]

As part of his investigation, Mr. Mikalic reviewed purchase orders, invoices, registration documents, and other records of Teva's relationship with Suffern as well as Iqbal's Teva-owned email and computer files. Mr. Mikalic interviewed Iqbal, Daud Hosain, another Teva employee and co-owner of the Suffern and Monroe pharmacies, and Miriam Morris, a Clinical Supply Coordinator at Teva.

The investigation determined, and Iqbal does not dispute, that Iqbal used his Teva email to correspond on behalf of his outside business interests during regular Teva business hours.

Teva terminated Iqbal on February 26, 2016. Teva did not provide Iqbal with written notice of his termination or a general release form.

Teva paid Iqbal his salary during January and February 2016 at the same rate he was paid in 2015. Iqbal was not employed at Teva when bonuses for 2015 were paid later in 2016. Teva

---

[3] Iqbal objects to the Mikalic report for several reasons including that it is hearsay, there is no adequate foundation to establish its authenticity, and it is prejudicial. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party may object to evidence that would not be admissible at trial. The Court finds that the Mikalic report is a business record under Federal Rule of Evidence 803(6) and thus is not inadmissible hearsay. Iqbal has not, as part of his objection to the report, made an adequate showing that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). Similarly, there is no evidence in the record that the Mikalic report is not authentic. Mr. Mikalic testified about the report at his deposition and Iqbal submits no excerpts from that deposition to suggest the document was not the report prepared by Mr. Mikalic as a result of his investigation. The Court also does not find the report to be unfairly prejudicial. To the extent that there is internal hearsay within the report, the Court considers each use of the report to determine admissibility.

did not pay Iqbal any severance. After Iqbal was fired, his stock options expired. Iqbal was paid for unused vacation time after this action was commenced.

## DISCUSSION

I.   Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."
Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial.  Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

A court may grant summary judgment on a contract claim when the contractual language is "'plain and unambiguous.'"  Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 164 (2d Cir. 2005) (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148–49 (2d Cir. 1993)). "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (alteration in original) (quoting Breed v. Insurance Company of North America, 46 N.Y.2d 351, 355 (1978)).

II.       Teva's Motion for Summary Judgment

Teva is entitled to summary judgment because there is no genuine dispute that (i) Iqbal was terminated for cause for violating Teva policies, and (ii) Iqbal is not entitled to the compensation he seeks under the terms of the applicable Teva benefits policies.[4]

A.       Termination for Cause

Teva asserts Iqbal was terminated for cause because he violated the Conflicts of Interest Policy, the Outside Employment Policy, and the Electronic Communications Policy.

The Court agrees.

Behavior that constitutes cause for termination is defined by contract, including company policies and procedures, even if the employee is at will. See Benoit v. Commercial Capital Corp., 2008 WL 3911007, *6 (S.D.N.Y. Aug. 25, 2008).

Whether an employee was terminated for cause is generally a question of fact unsuitable for disposition on summary judgment when the employee denies the underlying conduct. Benoit v. Commercial Capital Corp., 2008 WL 3911007, *6 (collecting cases).

Here, however, Iqbal's underlying conduct is undisputed. Because of that undisputed conduct, Iqbal was in violation of several Teva policies at the time he was fired.

Specifically, the Teva Code of Conduct states: "[E]mployees who violate the Code will be held accountable and sanctioned appropriately. This may include termination of employment. . . . Misconduct that may result in discipline includes . . . violation of the Code." (Def.'s App. at A.069).

---

[4]      The parties vigorously dispute whether the signed January 2, 2013 offer letter between Teva and Iqbal is an employment contract. The Court need not resolve this issue because it is undisputed Iqbal was an "at will" employee (see Pl.'s Br. at 4), and the nature of the offer letter is not dispositive of the motion.

6

> The Code of Conduct also incorporates by reference other Teva policies:
>
> In certain cases, this Code of Conduct is supplemented by additional policies that cover specific topics in more detail . . . . [The Code] is not as comprehensive as these supplemental policies and therefore does not supersede them or act as a substitute for reviewing each policy that applies to [an employee's] specific job.

(Def.'s App. at A.035).

First, Iqbal violated the Conflicts of Interest Policy by failing to disclose to Teva, in writing, his interest in Suffern. The policy, as detailed in a Teva memorandum dated July 1, 2012, states:

> Each employee must be free from any actual or potential conflict of interest and must avoid even the appearance of such a conflict in dealing with other businesses or individuals on behalf of Teva. A conflict of interest may arise in any situation in which an employee's judgments and loyalties are divided between any business or outside interest that, to any degree, is incompatible with the best interest of Teva. . . . Types of activities and relationships that could potentially affect an employee's independent judgment may include outside employment relationships . . . [or] personal investments . . . . For this reason, <u>employees must disclose, in writing and in advance, any potential or actual conflict of interest for resolution</u>. . . . Employees should avoid outside business or consulting activities that would divert their time, interest or talents from Teva business. <u>The employee's manager must approve, in writing, any outside or consulting activity</u> for a vendor, a supplier of goods or services, . . . or a business that provides services to or related to the healthcare industry.

(Def.'s App. at A.079–A.080) (emphasis added).

Although Iqbal argues others at Teva knew of his ownership interest in Suffern, the Conflicts of Interest Policy requires Iqbal to provide notice to Teva in writing. Iqbal offers no evidence that he provided notice to Teva in writing.

Iqbal also contends his manager, Tony Tong, provided written approval, as required by Teva policy, when Mr. Tong signed the February 12, 2015, confidentiality agreement between Suffern and Barr Laboratories. (Pl.'s Br. Ex. G). That agreement, however, is a document to protect proprietary information exchanged in the course of business transactions; it does not

7

disclose or otherwise document approval of Iqbal's ownership interest in Suffern. Mr. Tong recognized this distinction. Specifically, when asked if there was any "HR approval for [the Suffern] engagement," Mr. Tong replied, "I don't think so." (Pl.'s Br. Ex. F).

Second, Iqbal violated the Outside Employment Policy and Electronic Communications Policy by using Teva work time and Teva-owned technology to further Suffern's interest.

The Outside Employment Policy states: "It is the policy of Teva that no outside employment or interests interfere with the ability of employees to satisfactorily perform their job duties and meet scheduling demands and other work requirements of Teva." (Def.'s App. at A.072). The policy continues: "Teva may opt to terminate the employee's employment if Teva, at its sole discretion, determines that the circumstances of the employee's violation of this policy renders continued employment inappropriate." (Id.).

Similarly, under the Electronic Communications Policy, dated April 15, 2014, "[a]ll electronic communication systems and hardware must be used primarily for business purposes. Personal use must remain limited, incidental and in no way affect productivity." (Def.'s App. at A.073). The consequences of a violation include termination of employment.

It is undisputed that Iqbal used his Teva computer and email to conduct business for Suffern and his other businesses. (Def.'s App. at A.139–A.140).[5] These emails were voluminous; for example, one Suffern transaction generated 115 emails in one month. (Id. at A.136).

---

[5] The Mikalic report summarizes communications between Iqbal and entities for the purpose of furthering Iqbal's businesses. The content of the communications themselves are not offered for their truth, but to show Iqbal sent such emails. Therefore, these portions of the report are not hearsay. See Fed. R. Evid. 801(c)(2).

Although Teva did not provide Iqbal with written notice of his termination, the record is clear Iqbal knew the underlying reasons for and circumstances of his termination. When Elaine Lakis, a Teva Associate Director of Human Resources, called Iqbal to tell him he was fired, she told him, "[s]omething to the effect of, as a result of our investigation, it was decided to terminate your employment." (Def.'s App at A.089). Iqbal, in his affidavit, stated that when Mr. Mikalic interviewed him, he accused Iqbal of, in part, "failing to disclose [Iqbal's] ownership in Suffern Pharmacy, and using company resources for personal matters on company time." (Pl.'s Br. Ex. C at 4). Therefore, at the time Iqbal was fired, after his interview with Mr. Mikalic, he was aware that Mr. Mikalic's investigation centered on the breach of the Teva policies discussed above.

Because Iqbal's underlying conduct is undisputed, and such conduct violated Teva policies, there is no genuine issue of material fact that Teva fired Iqbal for cause.

B.   Eligibility for Compensation

Having determined Teva fired Iqbal for cause, the Court addresses how that determination, as well as the plain language of Teva's policies, affect each form of compensation to which Iqbal claims he is entitled.

1.   Retroactive Payment of Higher Salary

Teva argues Iqbal is not entitled to a retroactive pay increase for January and February 2016 because Iqbal offers no evidence of a Teva policy awarding retroactive salary increases, and there is no contract term guaranteeing such payment.

The Court agrees.

Iqbal states in his own affidavit that, to his knowledge, "salary increases are effectuated in March of the next year, however, the Teva employee will receive an additional smaller check

9

in March to cover the January-March salary increase." (Pl.'s Br. Ex. C at 4). In response, Teva's human resources manager, Courtney Mazzola, testified she is familiar with Teva policy regarding pay increases, but is "not aware of any Teva employee who has been paid a check in March representing a retroactive pay increase from the period of January 1 until the date when a pay increase is implemented." (Def.'s App. at A.149).

Iqbal also relies on a screenshot from Teva's internal budget system, "GTOP" (Pl.'s Br. Ex. B), which shows Teva budgeted for his wage increase. The category headings in the GTOP system include "New Eligible Salary" and "Budget Allocation." (Id.). The "eligible salary" language does not, by its own terms, constitute an agreement to pay the full amount allocated, or any amount at all. Similarly, the act of budgeting salary costs does not create an obligation to pay those salaries as stated on GTOP, retroactively or otherwise.

There is arguably an issue of fact whether Teva retroactively paid employees increased wages. However, even if true, that fact is immaterial to the breach of contract claim because Iqbal does not offer any contract provision or policy memorializing this retroactive payment.

Accordingly, Iqbal's claim for payment of a two-month salary increase is dismissed.

  2. <u>Bonus</u>

Teva argues it had no obligation to pay Iqbal a bonus for 2015 both because it had discretion to award bonuses and because it had a policy of paying bonuses only to current employees.

The Court agrees.

In general, entitlement to a bonus exists only when the terms of the relevant contract require it. See <u>Ireton–Hewitt v. Champion Home Builders Co.</u>, 501 F.Supp.2d 341, 353 (N.D.N.Y. 2007). "However, this rule is limited by the 'long standing policy against the

forfeiture of earned wages.'" Id. (quoting Weiner v. Diebold Group, Inc., 563 N.Y.S.2d 959, 961 (1st Dep't 1991)).  Consistent with this rule (and its limitation), when an employee has already earned compensation under the terms of his employment contract, his termination does not affect his rights to that compensation.  Weiner v. Diebold Group, Inc., 563 N.Y.S.2d at 961.  However, when the employer retains discretion to award a bonus (or other compensation), no forfeiture of earned wages occurs if a bonus is not paid.  Id.

Under Teva's Employee Incentive Compensation Policy dated July 1, 2012 (the "Bonus Policy"), Teva retains discretion to award bonuses.  The policy states:

> The Company reserves the right to modify or terminate these [incentive] plans at any time at its discretion.  To be eligible to receive an annual award an employee must be an active employee in good standing on the date that bonuses are paid, with limited exceptions.  An employee is in good standing when there are no known performance shortfalls or compliance violations over a period of time (i.e. 12 months).  Eligibility to participate in the plan does not guarantee an [sic] bonus award.

(Def.'s App. at A.151).

It is undisputed that Iqbal was not employed by Teva when bonuses were distributed in 2016 for work performed in 2015.  Therefore, under the plain language of the Bonus Policy, Iqbal was not an active employee in good standing.

Moreover, the Bonus Policy's reference to "limited exceptions" does not, as Iqbal argues, mandate Teva pay him.  Rather, the "limited exceptions" language underscores Teva's discretion to award bonuses to employees who were not active or in good standing as Teva deemed appropriate.  An interpretation to the contrary defies logic.

Finally, nothing in Iqbal's February 8, 2016, performance review can be construed as an agreement to pay Iqbal a bonus.  The review contains no language about a bonus nor does it provide any correlation between a bonus payment and an employee's overall evaluation

11

(assessed as one of five designations: "below," "mostly meets," "meets," "exceeds," or "exceptional"). Although Iqbal claims that by receiving a "meets" evaluation in his review,[6] he is guaranteed a bonus, he provides no evidence that such a guarantee exists. Moreover, the Court has found no evidence in the record suggesting this is the case.

Therefore, when Teva failed to pay Iqbal a bonus in 2016, after he had been terminated, that was within both the plain language of the Bonus Policy and within Teva's discretion.[7]

Accordingly, the bonus claim is dismissed.

### 3. Stock Options

Teva argues Iqbal's vested stock options[8] expired upon his termination for cause, pursuant to Teva policy.

The Court agrees.

---

[6] In his brief, Iqbal asserts he "'exceeded' in 10 of 14 categories, all which resulted in . . . the 20 percent bonus award." (Pl.'s Br. at 9). Iqbal inadvertently attached and cited his 2015 performance review as an exhibit to his brief. (Pl.'s Br. Ex. L). In that evaluation, he received an "exceeds" overall evaluation. (Pl.'s Br. Ex. L at 20). In Iqbal's 2016 review, he received a "meets" overall evaluation. (Def.'s Opp. Ex. A at 2).

[7] Iqbal also argues the January 2, 2013, offer letter guaranteed Teva would pay his bonus. However, the offer letter gives Iqbal "[c]ontinued eligibility to participate in the Teva 2013 Bonus Program with an incentive opportunity equal to 20% of [his] Annual Base Salary, subject to the terms and conditions of the 2013 Bonus Program. . . . Teva reserves the right to change, end, or alter plans and eligibility dates at any time." (Def.'s App. at A.025). Eligibility is not a guarantee of payment, nor does the opportunity to earn an additional 20 percent guarantee that any bonus will be for 20 percent of base salary. Thus, the terms of the letter do not guarantee any payment of a bonus, let alone a specific calculation.

[8] Iqbal seeks damages "with respect to the Teva stock previously allocated to the Plaintiff's account that the Plaintiff reasonably believed had vested." (Compl. ¶ 24). The complaint also calculates damages of "$110,000 representing Teva stock value." (Compl. ¶ 30). In his moving papers, Iqbal clarifies: "At issue is [sic] the Plaintiff's stock options that had fully vested." (Pl.'s Br. at 23).

The policy, titled "Teva Pharmaceutical Industries Limited 2010 Long-Term Equity-Based Incentive Plan" (the "Stock Option Policy"), governs Teva's grant of options to Iqbal.

Regarding the expiration of options, Subsection 5(f)(iii) of the Stock Option Policy states: "In the event of a Participant's Termination with the Employer prior to the Expiration Date by the Employer for Cause, all of such Participant's Options (whether or not vested) shall immediately expire as of the date of such Termination."  (Def.'s App. at A.160).

Subsection 2(g) of the Stock Option Policy defines termination "for cause" in substantially the same way as the Court defined it above (see supra at II.A):

> "Cause" means, in the absence of an effective employment agreement between a Participant and the Employer otherwise defining cause . . . (iii) any material violation of the policies of the Company or its Affiliates, including, but not limited to . . . those set forth in the manuals or statements of policy of the Company or its Affiliates.

(Def.'s App. at A.152–A.153).

Here, it is undisputed that Iqbal never exercised or sold his Teva options before his termination.  Because Iqbal was indisputably fired for cause, pursuant to the language of the Stock Option Policy, his unexercised options expired upon termination.  Thus, it is undisputed that Teva is not obligated to compensate Iqbal for his expired stock options.

Accordingly Iqbal's vested stock options claim is dismissed.

        4.     Unused Vacation Time

Teva asserts it paid Iqbal for his unused vacation time, rendering Iqbal's claim in this regard moot.

The Court agrees.

A court must dismiss claims that are rendered moot while litigation is pending.  Preiser v. Newkirk, 422 U.S. 395, 401 (1975).

Here, it is undisputed that on August 24, 2016, Teva paid Iqbal $5,067.72 for unused vacation time. Iqbal argues that, although Teva paid him, the issue of unpaid vacation time shows Teva's pattern of willful misconduct.

Because the Court dismisses all of Iqbal's contract claims, this additional argument is of no consequence.

        5.    <u>Severance Pay</u>

Finally, Teva argues Iqbal was not entitled to severance pay because Iqbal was fired for cause.

The Court agrees.

Teva's Severance Policy states:

> While Teva reserves the right to determine, on a case-by-case basis, whether an individual employee is eligible for severance pay, the following circumstances will make an individual ineligible to receive severance benefits from Teva: . . . Termination for misconduct, or violation of company policies, procedures, practices or Ethics and Code of Conduct.

(Def.'s App. at A.084).

As previously established, Iqbal was terminated because he was indisputably in violation of several Teva policies. Therefore, under the terms of the Severance Policy, no severance pay was due.

Accordingly, the severance pay claim is dismissed.

    C.    <u>Labor Law Section 198(1-a)</u>

Teva argues Iqbal cannot prevail on a NYLL Section 198(1-a) claim for liquidated damages and attorney's fees because that statute does not apply to common-law breach of contract claims.

The Court agrees.

14

"It is settled that section 198 does not 'permit recovery . . . on a common-law contractual remuneration claim' as the recovery of attorney's fees and liquidated damages is 'limited to actions for wage claims founded on the substantive provisions of Labor Law article 6.'" Gold v. Am. Medical Alert Corp., 2015 WL 4887525, *2 (S.D.N.Y. August 17, 2015) (citing Gottlieb v. Kenneth D. Laub & Co., 82 N.Y.2d 457, 464 (1993)).

Here, Iqbal asserts a Section 198(1-a) claim, the costs and remedies provision of NYLL Article 6, but has not alleged any violation of its substantive provisions.

Accordingly, Iqbal's claim for liquidated damages and attorney's fees under Section 198(1-a) is dismissed.

III.   Plaintiff's Cross-Motion for Partial Summary Judgment

Plaintiff cross-moves for partial summary judgment asserting he is entitled as a matter of law to his bonus for 2015 work and to a retroactive pay increase, for a total amount of $32,616.

Having resolved these issues in Teva's favor on its motion for summary judgment, the Court denies plaintiff's cross-motion for summary judgment.

**CONCLUSION**

Defendant's motion for summary judgment is GRANTED.

Plaintiff's cross-motion for partial summary judgment is DENIED.

The Clerk is instructed to terminate the pending motions (Docs. ##54, 59) and close this case.

Dated: December 27, 2017
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge